OAKWOOD AT MADISON, INC., A CORPORATION OF THE STATE OF NEW JERSEY, BEREN CORPORATION, A CORPORATION OF THE STATE OF NEW JERSEY, DOROTHY MAE SHEPARD, LOUVENIA ALSTON, WILLIAM BAYLIS, BRENDA SMITH, LIZZIE WALKER AND GERALDINE YORK, PLAINTIFFS-RESPONDENTS-CROSS-APPELLANTS, v. THE TOWNSHIP OF MADISON, DEFENDANT-APPELLANT-CROSS-RESPONDENT, AND THE STATE OF NEW JERSEY, DEFENDANT.

Argued—March 5, 1973—Reargued January 8, 1974—April 14, 1975 —November 18, 1975—Decided—January 26, 1977.

482

486

488

*Mr. Richard F. Plechner* argued the cause for appellant.

*Mr. Frederick C. Mezey* and *Ms. Lois D. Thompson,* a member of the New York Bar, argued the cause for respondents-cross-appellants (*Messrs. Mezey & Mezey,* attorneys; *Mr. Mezey, Ms. Thompson,* and *Mr. Ray Dennison,* of counsel; *Mr. Mezey, Ms. Thompson, Mr. Dennison* and *Mr. Richard F. Bellman,* on the briefs).

*Mr. Melville D. Miller, Jr.* argued the cause for *amicus curiae* State Office of Legal Services (*Mr. Warren E. Smith,* attorney; *Mr. Miller* and *Mr. Steven P. McCabe,* of counsel and on the brief).

*Mr. Carl S. Bisgaier* argued the cause for *amicus curiae* Department of the Public Advocate (*Mr. Stanley C. Van Ness,* Public Advocate, attorney; *Mr. Bisgaier, Mr. Kenneth E. Meiser* and *Mr. Peter A. Buchsbaum,* of counsel and on the briefs).

*Mr. Joseph M. Clayton, Jr.,* Deputy Attorney General, argued the cause for defendant State of New Jersey on March 5, 1973 (*Mr. George F. Kugler, Jr.,* Attorney General of New Jersey, attorney; *Mr. Stephen Skillman,* Assistant Attorney General, and *Mrs. Virginia Long Annich* and *Mr. Jonathan Weiner,* Deputy Attorneys General, of counsel and on the brief).

*Mr. Gerard Moran* and *Mr. Norman Williams,* a member of the New York Bar, argued the cause for *amici curiae* Sierra Club and Public Interest Research Group of New Jersey on March 5, 1973 (*Mr. Moran,* attorney; *Mr. Moran* and *Mr. Williams* on the brief).

*Messrs, Pitney, Hardin & Kipp,* attorneys, appeared for *amicus curiae* Township of Mahwah (*Messrs. Breslin* and *Breslin,* attorneys; *Mr. E. Carter Corriston* of counsel; *Mr. Clyde A. Szuch, Mr. William C. Slattery, Ms. Bethany T. Kadish, Mr. Armen Shahinian* and *Ms. Sondra V. Lasky* on the briefs).

## OUTLINE OF OPINION

| | | |
|------:|-----------------------------------------------------------------|-----:|
| I | Outline of Major Issues | 497 |
| II | "Fair Share" and "Region" — Preliminary Considerations | 498 |
| III | Madison — Its Growth and Development | 500 |
| IV | The Zoning Ordinances | 503 |
| V | "Least Cost" versus "Law and Moderate Income" Housing, etc. | 510 |
| VI | Incapacity of 1973 Ordinance to Effect Lower Income Housing | 514 |
| VII | The "Fair Share" Approach of the Defendant | 524 |
| VIII | "Fair Share" and "Region" — General Considerations | 531 |
| IX | Environmental Considerations | 544 |
| X | "Affirmative Action" for Lower Income Housing | 546 |
| XI | The Validity of the Zoning Statute | 547 |
| XII | Relief for Corporate Plaintiffs | 548 |
| XIII | Remedy and Remand | 552 |

The opinion of the court was delivered by

CONFORD, P. J. A. D., Temporarily Assigned. We today review the decision of Judge Furman invalidating the 1973 amendatory zoning ordinance of defendant Township of Madison.[1] 128 *N. J. Super.* 438 (Law Div. 1974). That determination culminated an action instituted by plaintiffs in November 1970 challenging the validity of a zoning ordinance adopted by the township in September 1970 to replace a previous one in effect since 1964.[2] Judge Furman had invalidated the 1970 ordinance in *Oakwood at Madison, Inc. v. Tp. of Madison,* 117 *N. J. Super.* 11, 21 (Law Div. 1971), but at the same time rejected an attack by plaintiffs on the constitutionality of the enabling zoning statute, *N. J. S. A.* 40:55–30 *et seq. Id.* at 16.

Defendant obtained a stay of judgment pending its appeal to the Appellate Division, and plaintiffs filed a cross-appeal as to that part of the judgment sustaining the validity of the statute. On plaintiffs' motion, and because of the importance of the case, we certified the appeals pending unheard in the Appellate Division pursuant to *R.* 2:12–2. 62 *N. J.* 185 (1972).

Oral argument was originally heard by the court on March 5, 1973, and additional argument was requested for January 8, 1974. However, on October 1, 1973 Madison Township adopted a major amendment to the 1970 ordinance. Conse-

---

[1]Since the last oral argument the name of the municipality was changed to Old Bridge. For convenience and conformity with the record we use the former name, Madison, in this opinion.

[2]In 1969, prior to adoption of the 1970 ordinance, the township declared a moratorium on all residential construction other than owner-occupied single family dwellings pending the adoption of a new master plan and zoning ordinance. As a result of litigation challenging the moratorium, the Superior Court in Middlesex County, in *Verterre Corp. v. Township Comm. of Twp. of Madison* (Docket No. L–13820–68 P. W., 7/30/69), ordered the submission to the Township of a new master plan by January 1, 1970 and adoption of a new zoning ordinance by July 1, 1970.

quently, on January 8, 1974, while retaining jurisdiction, we remanded the action to the trial court for a trial and ruling on the ordinance as amended, with the result stated above.

Oral argument on the present phase of the appeal has been had twice, emphasis being placed on the effect on the issues herein of our intervening decision in *So. Burl. Cty. N.A.A. C.P. v. Tp. of Mt. Laurel*, 67 *N. J.* 151, app. dism. and *cert.* den. 423 *U. S.* 808, 96 *S. Ct.* 18, 46 L. Ed. 2d 2028 (1975) (*"Mount Laurel"* hereinafter). We have received and considered supplemental briefs and materials.

Plaintiffs herein comprise two groups. Oakwood at Madison, Inc. and Beren Corporation (hereinafter "corporate plaintiffs"), both New Jersey corporations, were developers owning a tract of vacant developable land of some 400 acres, the disputed Oakwood-Beren tract. Six individuals were low income persons acknowledged by the trial judge as "representing as a class those who reside outside the township and have sought housing there unsuccessfully." *Oakwood at Madison, Inc. v. Tp. of Madison, supra* (117 *N. J. Super.* at 14). Plaintiffs alleged, *inter alia,* (a) that the exclusionary nature of the ordinance rendered it unconstitutional; (b) that the enabling legislation was unconstitutional in its failure to provide adequate standards for municipal exercise of the zoning power; and (c) that the restrictive effect of the ordinance as applied to corporate plaintiffs' property rendered it confiscatory.

The trial court invalidated the 1970 ordinance, primarily on the grounds that in zoning massive areas of vacant developable land for one-and two-acre single family residences, beyond the reach of 90% of the population, and in allocating only "miniscule" acreage for multi-family dwelling units, it ignored the housing needs of the township and the region, and failed "to promote reasonably a balanced community in accordance with the general welfare." 117 *N. J. Super.* at 20–21. The court upheld the constitutionality of the enabling legislation; it did not reach the issue of confiscation, appar-

ently regarding the invalidation of the entire ordinance as rendering that matter moot.

While the 1973 amendatory ordinance transferred substantial areas from large lot to smaller lot zoning, made more land available for multi-family development and provided for planned unit development (PUD) and "cluster" zones, the evidence in the case convinced the court that the municipality still was not satisfying its obligation to "provide its fair share of the housing needs of its region", particularly in relation to the low-income and moderate-income population. 128 *N. J. Super.* at 447. The amended ordinance was therefore again struck down in its entirety. *Ibid.*

The main lines of the Law Division opinion striking down the 1973 ordinance may be summarized as follows. A crisis in housing needs continues, most serious for those of low and moderate income. The region, whose housing needs must reasonably be provided for by such municipalities as Madison, is not necessarily coextensive with Middlesex County. "Rather, it is the area from which, in view of available employment and transportation, the population of the township would be drawn, absent invalidly exclusionary zoning". 128 *N. J. Super.* at 441. Almost all of Madison's employed residents work outside the township, 50% in the county, 15% in New York City, 10% in Essex County, and the remainder in nearby counties, including 7% in Monmouth County. After an analysis of the testimony concerning the number of housing units which could be expected, under the amended ordinance, to be produced and to be affordable by low and moderate income households, the court said:

Of the total 20,000 to 30,000 housing units which may be built in Madison Township under the 1970 zoning ordinance as amended, about 3500 [12% to 17%] at most would be within the reach of households with incomes of $10,000 a year, the upper limit of moderate incomes, and virtually none within the reach of households with incomes of $9,000 a year or less. This contrasts with the present township population, approximately 12% low income and 19% moderate income. *Id.* at 446.

The court assessed Madison Township's obligation to provide its fair share of regional housing needs as follows:

> Without the rigidity of a mathematical formula this court holds that Madison Township's obligation to provide its fair share of the housing needs of its region is not met unless its zoning ordinance approximates in additional housing unit capacity the same proportion of low-income housing as its present low-income population, about 12%, and the same proportion of moderate-income housing as its present moderate-income population, about 19%. The amended zoning ordinance under review falls palpably short and must be struck down in its entirety. *Id.* at 447.

The court did not specify any absolute numerical quota of low and moderate income units the ordinance would be expected to render possible, but found that annual needs "into the 1980's were 750 to 1000 units, 500 to 600 of those low and moderate income." *Id.* at 442.

The court dealt with the defendants' argument that ecological and environmental factors justified the RP, R–80 (2 acre lot minimum) and R–40 (1 acre lot minimum) zones by pointing out that such problems had "no bearing" except in specified limited areas and that "ample land outside these areas is available" with which the township could meet its obligation to provide its fair share of needed housing. 128 *N. J. Super.* at 447.

It should be stated at the outset that the basic rationale embraced by Judge Furman in both of his opinions in the case is substantially that adopted by this court in *Mount Laurel,* with the qualification that our determination there rested on the state constitutional ground that due process and equal protection are denied if "substantial segments of the population" are improperly precluded from residing within the municipality because of local zoning regulations. 67 *N. J.* at 175. The "substantial" segments thus identified were those low and moderate income people of the region economically unable to afford suitable housing in developing municipalities of the region because of their highly cost-generating zoning restrictions.

General guidelines toward eliminating undue cost-generating restrictions were stated in *Mount Laurel* (67 *N. J.* at 187) :

> By way of summary, what we have said comes down to this. As a developing municipality, Mount Laurel must, by its land use regulations, make realistically possible the opportunity for an appropriate variety and choice of housing for all categories of people who may desire to live there, of course including those of low and moderate income. It must permit multi-family housing, without bedroom or similar restrictions, as well as small dwellings on very small lots, low cost housing of other types and, in general, high density zoning, without artificial and unjustifiable minimum requirements as to lot size, building size and the like, to meet the full panoply of these needs.

█ In the absence of legislation providing for regional zoning authorities, while municipalities are empowered to zone individually, they must nevertheless (if of the "developing" category described in *Mount Laurel*, 67 *N. J.* at 160), by their zoning regulations serve and not impede the general welfare represented by satisfaction of the housing needs of lower income people throughout the region. 67 *N. J.* at 188–190 ;[3] *id.* at 194 (Pashman, J., concurring).

---

[3]Since *Mount Laurel* is based on State constitutional grounds, its requirements are not affected by the less restrictive federal concept of equal protection in this area. See *Arlington Heights v. Metropolitan Housing Development Corp.*, —— *U. S.* ——, 97 *S. Ct.* 555, 50 L. Ed. 2d 450 (1977).

*Mount Laurel* has been the subject of extensive discussion in the literature. See Ackerman, "The *Mount Laurel* Decision: Expanding the Boundaries of Zoning Reform", 1976 *U. of Ill. Law Forum* 1; Payne, "Delegation Doctrine in the Reform of Local Government Law: The Case of Exclusionary Zoning", 29 *Rutgers L. Rev.* 803, 805–819, 859–866 (1976) ; Williams, *American Land Planning Law* (1975) Addendum Ch. 66; Rose, "The *Mount Laurel* Decision: Is It Based on Wishful Thinking?", 4 *Real Estate L. J.* 61 (1975) ;. Mytelka and Mytelka, "Exclusionary Zoning: A Consideration of Remedies," 7 *Seton Hall L. Rev.* 1, 3–4 (1975) ; Kushner, "Land Use Litigation and Low Income Housing: Mandating Regional Fair Share Plans", 9 *Clearinghouse Rev.* 10 (1975) (terming *Mount Laurel* the "Magna Carta of suburban low and moderate income housing") ; Rohan, "Property Planning and the Search for a Comprehensive

After the last argument in this matter the Legislature revised the zoning statutes of this State by enactment of the "Municipal Land Use Law", L. 1975, c. 291, which by its terms became operative August 1, 1976. We invited and have received from counsel supplemental comment as to any effect of the new law on the issues herein, particularly as to the continued viability of *Mount Laurel*. We find nothing in the statute inconsistent with the doctrine there laid down. (The decision would control, in any event, in view of its constitutional underpinning.) Without here indulging in any comprehensive evaluation of the new law, certain of the purposes stated in Section 2 seem particularly pertinent.

d. To ensure that the development of individual municipalities does not conflict with the development and general welfare of neighboring municipalities, the county and the State as a whole;

e. To promote the establishment of appropriate population densities and concentrations that will contribute to the well-being of persons, neighborhoods, communities and regions and preservation of the environment;

g. To provide sufficient space in appropriate locations for a variety of agricultural, residential, recreational, commercial and industrial uses and open spaces, both public and private, according to their respective environmental requirements in order to meet the needs of all New Jersey citizens.

Housing Policy — The View from *Mount Laurel*", 49 *St. Johns L. Rev.* 653 (1975) ; Williams and Doughty, "Studies on Legal Realism: *Mount Laurel, Belle Terre* and *Berman*", 29 *Rutgers L. Rev.* 73 (1975) (calling *Mount Laurel* a "major turnaround on a major current problem") ; Mallach, "Do Law Suits Build Housing? The Implications of Exclusionary Zoning Litigation", 6 *Rutgers-Camden L. J.* 653 (1975) ; Rose, "Exclusionary Zoning and Managed Growth: Some Unresolved Issues", 6 *Rutgers-Camden L. J.* 689 (1975) ; 6 Powell, *Real Property*, § 872.1[2][g] (1975) ; Rose and Levin, "What is a 'Developing Municipality' Within the Meaning of the *Mount Laurel* Decision?", 4 *Real Estate L. J.* 359 (1976). See also Berger, *Land Ownership and Use* 790–799 (2d ed. 1975). For a journalistic appraisal, see "U. S. Journal: Mount Laurel, N. J. — Some Thoughts on Where Lines are Drawn", *New Yorker*, 69 (Feb. 2, 1976). See also Note, "The Inadequacy of Judicial Remedies in Cases of Exclusionary Zoning", 74 *Mich. L. Rev.* 760 (1976).

At the same time, the new law reminds us, as we emphasized in *Mount Laurel,* that out of a proper concern for adequate housing there should not and need not be overintensive and too sudden development, future suburban sprawl and slums, or sacrifice of open space and local beauty. 67 *N. J.* at 191. Thus, the newly articulated purposes of Section 2 of the statute include:

c. To provide adequate light, air and open space.

j. To promote the conservation of open space and valuable natural resources and to prevent urban sprawl and degradation of the environment through improper use of land.

## I

### *Outline of Major Issues*

The judgment of the trial court, the intervention of our decision in *Mount Laurel* and the nature of the record and briefs before us combine to cast the issues for determination as follows:

1. Is the Madison 1973 zoning ordinance exclusionary, *i. e.,* whether or not so intended, does it operate in fact to preclude the opportunity to supply any substantial amounts of new housing for low and moderate income households now and prospectively .needed in the municipality and in the appropriate region of which it forms a part?

2. If, as we have concluded, the affirmative response to the foregoing question by the trial court should be sustained, is it incumbent upon the courts, pursuant to *Mount Laurel,* to demarcate a pertinent region and to fix a specific number of lower-cost housing units as the "fair share" of the regional need therefor to be made possible by the Madison ordinance?

3. If, as we have concluded, the foregoing question should be answered in the negative, what kind of an order should be made to assure Madison's compliance, as a developing municipality, with *Mount Laurel's* mandate that its zoning ordinance "afford the opportunity" for at least "the mu-

nicipality's fair share of the present and prospective regional need" for "decent and adequate low and moderate income housing"? 67 *N. J.* at 188.

## II
### *"Fair Share" and "Region"—*
### *Preliminary Considerations*

As noted above, the prime question before us, in *Mount Laurel* terms, is whether the trial court has correctly found that Madison's zoning ordinance does not provide the opportunity to meet a fair share of the regional burden for low and moderate income housing needs. We have seen that the trial court did not specify the precise boundaries of the applicable region nor fix an absolute number of appropriate housing units to be provided. It merely described the pertinent region as the area from which the population of the township would be drawn, absent exclusionary zoning.

A substantial body of evidence was adduced by the defendant below purporting to specify Madison's fair share of Middlesex County's unmet need for low and moderate income housing as of 1975. Moreover, the record before us, the briefs and the literature in the field supply abundant data concerning methods and techniques for estimating a municipality's fair share of a regional housing need. We propose to comment on these matters hereinafter, for three purposes: (a) to explain our conclusion that the evidence concerning fair share adduced by defendant does not refute the trial court determination that the Madison ordinance is deficient in the respects noted; (b) to elucidate the considerations relating to the appropriate "region" whose housing needs are relevant to this action; and (c) to furnish guidance to courts, counsel and expert witnesses in this area in applying the principles of *Mount Laurel* to litigated controversies generally.

■■ However, we deem it well to establish at the outset that we do not regard it as mandatory for developing municipalities whose ordinances are challenged as exclusionary to devise specific formulae for estimating their precise fair share of the lower income [4] housing needs of a specifi-

---

[4] "Lower income" is intended as a generic reference to low and moderate income, collectively.

cally demarcated region. Nor do we conceive it as necessary for a trial court to make findings of that nature in a contested case. Firstly, numerical housing goals are not realistically translatable into specific substantive changes in a zoning ordinance by any technique revealed to us by our study of the data before us. There are too many imponderables between a zone change and the actual production of housing on sites as zoned, not to mention the production of a specific number of lower cost units in a given period of time. Municipalities do not themselves have the duty to build or subsidize housing. Secondly, the breadth of approach by the experts to the factor of the appropriate region and to the criteria for allocation of regional housing goals to municipal "subregions" is so great and the pertinent economic and sociological considerations so diverse as to preclude judicial dictation or acceptance of any one solution as authoritative. For the same reasons, we would not mandate the formula approach as obligatory on any municipality seeking to correct a fair share deficiency.

We are convinced from the record and data before us that attention by those concerned, whether courts or local governing bodies, to the *substance* of a zoning ordinance under challenge and to *bona fide* efforts toward the elimination or minimization of undue cost-generating requirements in respect of reasonable areas of a developing municipality represents the best promise for adequate productiveness without resort to formulaic estimates of specific unit "fair shares" of lower cost housing by any of the complex and controversial allocation "models" now coming into vogue.[5]

It is desirable that administrative agencies acting under legislative authorization assume the regulation of the housing distribution problem. Until then, in the current post-*Mount Laurel* period judicial emphasis on approaches such as those just outlined, and exemplified in the remedial sec-

[5] See notes 39, 40, *infra.* We of course do not deprecate regional "fair share" studies by official or quasi-official governmental agencies or commissions such as those discussed hereinafter. Indeed, as will be emphasized, the basic underlying social problem is far better addressed by administrative action than litigation. In any case, the setting of numerical housing goals is only an incidental phase of the solution.

tion of this opinion, will, it is hoped, suffice to move the State toward the objective of "available housing in the developing municipalities for a goodly number of the various categories of people of low and moderate income who desire to live therein and now cannot." *Mount Laurel*, 67 *N. J.*, at 188, n. 21.

## III

### *Madison — Its Growth and Development*

Madison Township consists of approximately 42 square miles, or 25,000 acres, in the southeast corner of Middlesex County, of which almost 40% is vacant developable land. Its location within the gap between the metropolitan centers of New York and Philadelphia is a strategic one: this "Atlantic urban region" gap is expected to be bridged within the next 25 years, with a concomitant population increase of 75%. The Tri-State Regional Planning Association (covering counties in New York, New Jersey and Connecticut and including Middlesex) predicts that Middlesex will be one of four counties to experience the greatest rates of growth in the tri-state area from 1970 to 2000.

Parts of the township lie within 20 miles of the highly urbanized areas of Elizabeth and Newark. Easy access to and from the municipality is provided by several major highways which traverse it. The Garden State Parkway and State Highways 34 and 35 cut across the eastern portion of the township, connecting Madison to both the south Jersey shore area and the Newark-New York metropolitan area. State Highway 18 and U. S. Route 9 run through the center of the township, and there are three major county roads, 527, 516 and 520. The New York-Long Branch Railroad runs through the eastern portion of the municipality, and although there are no commuter stations in the township itself there are in nearby communities. The accessibility of the township is readily illustrated by the status of the com-

The effective substantive revision of restrictive ordinances and governmental desire to implement such goals affirmatively are the essential prerequisites for housing relief.

We recognize, moreover, that fair share studies by expert witnesses may be of substantial evidential value to a trial court confronted with a litigated issue like the present one.

munity as a commutershed. Only 1% of Madison's employed residents work within the township. As found by the trial court, 50% of the work force are employed in Middlesex County, 15% in New York City, 10% in Essex County, 9–12% in Union County and 7% in Monmouth County.

Madison is an archetypal "developing" municipality within the contemplation of the *Mount Laurel* specifications. 67 *N. J.* at 173, 187. During the past 25 years, it has experienced explosive growth. Its population increased over two decades by 561%, from 7,366 in 1950 to 48,715 in 1970. This boom has continued, with the population climbing to 50,000 by the time of the first trial and 55,000 by the second in 1974. With the growth and concomitant municipal problems came a steady rise in tax rates.

Even in light of this period of great expansion, Madison still has large potential for further growth.[6] Among the twenty-five municipalities in Middlesex County, Madison in 1970 ranked 20th lowest both in population density and housing density. Vacant acreage is plentiful; of the township's 25,000 acres, between 8,143 and 11,000 are vacant and developable. The township is a sprawling municipality marked by little continuity and spotty development. The area is laced by a network of streams and rivers eventually feeding into South River to the north. Cheesequake State Park occupies a sizeable portion of land in the eastern part of the town.

The older residential development is concentrated to some extent in the Old Bridge and Browntown areas and on the Raritan Bay, which forms the eastern boundary of the municipality. Lawrence Harbor and Cliffwood Beach, the two major developments located on the Raritan Bay, consist mainly of bungalows on 50-foot lots originally built in the

[6]Our discussion of the facts is not to be taken as laudation of growth *per se*. The fact and extent of anticipated growth are circumstances material to the need for housing all segments of the population. The control of growth is attracting widespread attention as vital to the maintenance of an acceptable environment. See *Federal Environmental Law* (1974) at pp. 1420–1426. See also 3 Williams, *American Land Planning Law* (1975), Ch. 73, "Timing of Development", p. 345 *et seq.; Mount Laurel*, 67 *N. J.* at 191; *id.* at 213 (Pashman, J., concurring).

1920's as summer cottages and since converted into year-round residences. Newer single family developments and apartment complexes are peppered over the township, except for the southwestern third of the township which is largely undeveloped. Most single family homes are on lots less than an acre. It does not appear that prior to the first trial any one-or two-acre housing developments had been constructed except for some two-acre homes built in the 1920's. Commercial land uses are scattered, generally following some of the major highway routes. Industrial usage is slight.

Construction within the township fell off from 1970 to 1973. Comparing Madison with four nearby municipalities of generally similar characteristics (with large undeveloped areas) for the said three year period, Madison issued an average of only 53 dwelling unit building permits per year as against 368 in East Brunswick, 309 in Monroe, 89 in Sayreville and 212 in South Brunswick. Although Madison contains 20% of the county's vacant residentially zoned land, and from 1960 to 1970 issued 15% of all the building permits, from 1970 to 1972 its percentage of county building starts fell to 6%.

From 1950 to 1970 the housing growth in the township was characterized by construction of single family homes built on lots of 15,000 square feet or less and of a number of multi-family garden apartment developments. Virtually all the apartment units in the township, however, were constructed after 1963, and by April 1969 they comprised 3,700 or 27.4% of the total of 13,499 housing units in the township. In 1970, 56% of the single family dwellings in the township were valued at $25,000 or less. Figures from the 1970 census show that, in terms of statewide quintiles (20%) of income category, 12% of the township's households had incomes below $6,627, 19% between $6,627 and $9,936, 24% between $13,088 and $19,236, and 18% above $19,236. As of 1970, existing land uses were predominantly residential: 68% of all realty taxes were paid by single family homeowners, 16% by apartments and condominiums and the rest by commercial users, farms and industry.

Thus the overall pattern of land use confronting Madison Township planners and officials in 1970 was one of substantial

but scattered residential growth, with little industrial and commercial development. The 1970 ordinance was a hurried effort to slow population growth and the accompanying rise in the tax rate and largely to confine new population to designated areas. See 117 *N.J. Super.* at 14.

## IV

### *The Zoning Ordinances*

#### *A. The 1970 Ordinance*

■ For present purposes the salient provisions of the 1970 ordinance are adequately summarized in the first opinion of the trial court. 117 *N.J. Super.* 16–17. The patent intent and effect of the ordinance was to prevent construction of a substantial number of homes or apartments, particularly at low cost. Most of the land area was zoned for one- or two-acre single family homes — uses not only beyond the reach of 90% of the general population but also responsive to little if any existing market. *Ibid.* It goes without saying that the ordinance was clearly violative of the principles later enunciated in *Mount Laurel.* Judge Furman properly condemned it as pure "fiscal zoning", not taking into consideration "[h]ousing needs of the region" and failing to promote "reasonably a balanced and well ordered plan for the entire municipality." 117 *N.J. Super.* at 18.

#### *B. The 1973 Ordinance*

The 1973 ordinance extensively revised the land use restrictions of the prior ordinance. The amount of land zoned nonresidential (commercial, office and industrial) was decreased by 760 acres from 19.80% to 16.70% of the total. A new "open space" zone — RP or Recreation-Preservation — was created. This encompassed the areas deemed environmentally sensitive by the township: Cheesequake State Park, the Old Bridge sands area, Burnt Fly Bog, the meadowlands adjacent to Deep Run (the latter three containing underground water resources areas), and the Raritan beachfront. The RP and the RR zone (also an open space area devoted to substantial preservation in a natural condition) were permitted to be developed as R–80 on two-acre lots until acquired by the municipality.

Although the fact was not stressed at trial, Madison has placed more than 4,000 acres in zones restricted to industrial and office uses despite the fact that only some 600 acres have ever been devoted to that use. By comparison, we criticized Mount Laurel for zoning 4,100 acres industrial although only 100 acres had ever been so used. 67 *N. J.* at 162–163, 184.

The 1973 ordinance considerably increased the facial housing potential of the prior ordinance. It enlarged the total acreage available therefor by 800 acres and the potential housing capacity, inclusive of existing housing, by 16,000 units or 46,000 persons. These figures, supplied by the Madison Township Housing Study, may be misleading, as they assume all acreage zoned residential is or will be developed to its maximum permissible density whereas some of it is already developed, either non-residential or below permissible density, or is undevelopable.

Under the 1973 ordinance, there are five single-family zones, accounting for 72% of the total vacant residential area.[7] The most restrictive zone, the R–80, with a minimum lot size of two acres, was reduced from 9,134 to 3,040 acres. The R–40 zone (one acre minimum lot size) was increased from 5,557 to 7,511 acres. Together, however, these two zones account for 42% of the total acreage within the township, 58% of its vacant developable acreage, 70% of the total acreage zoned single-family, and 80% of vacant developable single family acreage.[8] The R–20 zone, 1,977 total

---

[7]Trial figures on the amount of acreage in each zone, both total and vacant developable, were often in conflict. However, unless otherwise stated, the statistics cited herein for total acreage, total units and total population are those submitted by the township's planning firm. The vacant developable acreage figures are those of defendant's expert witness Dennis Lanning, and, with the exception of the AF zone, were stipulated by the parties.

[8]The minimum floor space limitations in the R–40 and R–80 zones were eliminated, and minimum floor space limitations per room were established in all residential zones. With respect to the R–40 and R–80 zones, however, these changes have no effect on provision of low cost housing.

or 1,285 vacant developable acres, requires a 20,000 square foot minimum lot size.

These three zones (R–20, R–40 and R–80) may be compared with the zones considered exclusionary in *Mount Laurel*. There more than half the township was zoned R–3, requiring single family homes on half acre lots; in the instant case, over 50% of the township is zoned for half acre lots or larger, and 42% for one-or two-acre lots. Considering only vacant developable acreage, the total for the three zones is over 65%, 58% comprising R–40 and R–80.[9]

The R–15 zone [10] and R–10 zones, requiring 15,000 and 10,000 square foot lots respectively, account for another 5% of the land. Both are more restrictive than the R–1 zone (9,375 square foot, 75' wide lots) involved in *Mount Laurel*. Calling for some "very small lot" zoning in a developing municipality, 67 *N. J.* at 170, n. 8, 187, Justice Hall noted that minimum size lots of 9,375 to 20,000 square feet "cannot be called small lots and amounts to low density zoning." 67 *N. J.* at 183. Yet almost 70% of Madison Township is zoned at such or lower densities (including the RP and RR zones).

Only the R–7 zone allows residential single family development on lots smaller than those found in *Mount Laurel* to constitute low density zoning. It allows 7,500 square foot lots and two-family dwellings. However it accounts for only 5.8% of the total acreage and 2% of the vacant developable acreage in the township.

[9] We have no intent to impugn large lot zoning *per se*. If a developing municipality adequately provides by zoning for lower income housing it may zone otherwise for large lots to the extent that the owners of property so zoned have no other legitimate grievance therewith. *Cf.* Berger, *Land Ownership and Use*, 735, 756 (2d ed. 1975).

[10] The R–15 is a new zone on the outskirts of existing high density development and contains a little over 500 acres. The 1964 ordinance had a major residential area similar to the R–15 in which there were more than 3,000 vacant and developable acres compared to 168 acres under the 1973 ordinance. Thus although the R–15 has been restored, it is reduced to a small fraction of its original size.

The AF or multi-family apartment zone was enlarged by 150 acres. The prescribed bedroom ratio of the prior ordinance (80% one bedroom, 20% two bedroom) was deleted and replaced by a floor area ratio (FAR) limiting construction to a maximum of 10,000 square feet per acre. Although the ordinance presumably allows any size units in any combination, up to the maximum FAR, the impact of the building area ratio combined with the profit incentive which motivates developers is such that, according to the proofs, only small units (efficiencies and one bedrooms) will be constructed.[11]

Of the 676 acres zoned AF (2.7% of the total township acreage) at most only 193 acres are vacant and developable (2.3% of township total). The true figure, however, as indicated by Judge Furman, is more likely to approximate 120 acres (or 1.5% of township total).[12] The AF zone is limited to the development of parcels of six or more acres. The parties agreed that the AF zone could hold at least 800 housing units, but defendant maintains the maximum capacity

[11]Taken in entirety, the record herein justifies the following conclusions. Using the allowable 10,000 square foot figure, it would be possible to build 16 efficiencies per acre, which, at an average rental of $180 per month, would yield a total rental income per acre of $2880 per month. An acre can alternatively accommodate twelve one- and two-bedroom apartments on an 80–20 ratio, which, at rentals of $200 and $240 per month respectively, yields a monthly rental income per acre of $2496. If three-bedroom units were built, only 7 to 8 units would be possible, which, at a monthly rent of $280 per month, gross only $1960 or $2,240 per acre per month. Obviously, given equal marketability of all units, it is more profitable to develop efficiencies. Consequently we find justified Judge Furman's acceptance of plaintiffs' witness' testimony that under the restricted FAR provision, and without a maximum density per acre, efficiencies and one bedroom apartments will predominate. 128 *N. J. Super.* at 443.

All income, sale or rental figures set forth in this opinion, unless otherwise indicated, reflect economic conditions as of 1974 when the case was tried.

[12]The township tax assessor gave two figures for the vacant developable acreage in the AF—112 and 125 acres. Plaintiffs contend the figure is closer to 67 acres.

is 1,700. However, as against township planner Abeles's estimate of 15,600 to 20,700 total additional units of all kinds possible under the ordinance, the potential AF units constitute only 5.1% to 8.2% thereof.[13]

Madison Township relies heavily on provisions in the 1973 ordinance for PUDs (planned unit developments) and clustering to satisfy its obligation with respect to low and moderate income housing. On the evidence, that reliance is illusory.

The PUD, an overlay zone, is a modern planning modality, introduced by the 1973 ordinance pursuant to *N. J. S. A.* 40:55–54 *et seq.* See *Mount Laurel,* 67 *N. J.* at 166; *L.* 1975, *c.* 291, Secs. 2k, 29.1b. Three areas are zoned for PUD — two of which are on remote sites unserviced by water and sewer utilities. PUD requirements vary, depending upon the amount of land in the developer's tract.[14] A Class I PUD, between 150 and 300 acres, has a maximum density of 3.5 units per acre. Of all the units constructed in a Class I PUD, a minimum of 30% must be detached single-family units,[15] and the remainder may be medium density multi-family.[16] A Class II PUD, between 300 and 500 acres, has a maximum density of 4.25 units per acre; a minimum of 17.5% of the units must be single-family, a maximum of 12.5% may be

---

[13]Based on other figures adduced at trial which were more favorable to the township, Judge Furman found a total additional capacity under the ordinance of 20,000 to 30,000 units. 128 *N. J. Super.* at 446. Using this capacity range, the percentage range is 4% to 5.7%.

[14]PUD tracts may be enlarged by up to 15% from neighboring (non-PUD) tracts if approval is obtained. On the other hand, if the site is inadequately serviced by water, sewage or traffic facilities, the maximum allowable density may be reduced.

[15]With an average lot size of 15,000 square feet.

[16]Medium density (garden apartments, townhouses, attached single family) means maximum of two stories, 8 dwelling units per building, and 10,000 gross square feet of development per acre.

high density,[17] and the remainder medium density. Class III PUDs (over 500 acres) are the most favored, with an allowable density of 5.0, 12.5% minimum single-family detached and maximum 17.5% high density. The densities allowed in the PUD zones are 20% lower than those originally proposed by the municipal planners. Moreover, it is unlikely that the highest density (5.0) will ever be utilized as there are within the PUD zones no 500-acre parcels owned by a single entity, and accumulation of the necessary number of acres is, according to the credible evidence, neither "possible nor probable."[18]

For every PUD project the developer is required to maintain at least 12.5% of the gross project area as undeveloped open space and 7.5% as developed open space; at least 5% of a Class I and 10% of a Class II or III tract must be non-residential development; at least 3% in all the classes must be commercial and 2% of Class II special development. There is the additional requirement that the developer build a school large enough to accommodate .5 children per dwelling unit and dedicate the land to the township. Streets and utility hookups must also be provided by the developer. There is a lengthy three-stage approval process, which, according to the estimate of the township planner, may take as long as a year but plaintiffs' expert pegs at 18 months to two years.

The proofs render it patent that the PUD requirements have the potential for greatly increasing the costs of housing units in that zone. The school requirement alone adds a cost of $2.2 million (or 66% of all the central improvement costs involved in a PUD project) to the project budget of a Class II PUD.

---

[17]High density means a maximum height of 7 stories or 75 feet and 35,000 gross square feet per acre.

[18]In its density regulations, the PUD in the instant case is more restrictive than the PUD involved in *Mount Laurel* where allowable densities were as high as 6 and 7 units per acre.

The cluster provisions (a PUD variation, not including commercial uses) apply to any lands in the R-40 or R-80 zones not alternatively designated PUD. Under the cluster provisions, a developer is allowed to build at increased densities if he preserves a proportion of his land as open space, public purpose space or donated public purpose space. If 20% of the gross project area is devoted to open space, the allowable densities are increased from normal R-40 and R-80 densities of 1 unit and ½ unit per acre to 1-1/3 and 5/6 units per acre, respectively. If an additional 20% of the land is devoted to public purpose space, a further increase in density to 1-2/3 unit and 1.0 units per acre is allowed. Furthermore, if the public purpose land (in an R-40 zone) is dedicated to the township, the developer may build 20% of all his units in attached buildings of four units each. A cluster development must be a minimum of 25 and maximum of 150 acres.

The credible proofs indicate that the clustering provisions are unlikely to have a significant impact on the cost of housing as the low densities and limits on numbers of attached units make significant economies of scale unlikely, and therefore, according to plaintiffs' experts, cluster development may not occur at all. Yet even under the cluster provisions costs would be prohibitive to most lower income families. According to the township planner, an R-40 townhouse would cost a minimum of $29,000; plaintiffs' expert places the average townhouse figure at $52,000. Moreover, the single family detached units which constitute 80% of an R-40 cluster would according to plaintiffs' expert cost $64,000. The allowable densities are still too low to create significant cost savings. By comparison, *Mount Laurel* had a similar cluster provision allowing a density of 2.25 units per acre upon dedication of 15% of the total acreage to the municipality and reservation of 25% for public use.

The distribution of vacant and developable acreage (and total acreage) among the various zones under the ordinance shows that low density, middle and high income residential

uses are strongly favored. Only a maximum of 2.37% of the town's vacant developable residential acreage is zoned for multi-family apartments (AF), and the correct figure may be as low as 1.02% or 0.84%. An additional 2% is zoned R-7 for small lot attached double houses. Though 9.9% is zoned for PUD development, the location of two of the three PUD tracts makes their development highly unlikely. Using the township planner's estimates of the potential future building capacity under the 1973 ordinance, the R-7 and AF zones account for a maximum of 16% of all housing units. By contrast, the R-80, R-40 and open space zones account for over 71% of the vacant developable residential acreage and over 41% of the housing units. If the R-15 and R-20 zones are counted, the large-lot single-family acreage figure increases to 82% and the unit figure to almost 50%.

V

*"Least Cost" versus "Low and*
*Moderate Income" Housing*

A key consideration in this particular case as well as a factor integral to the entire problem, generally, is the well-known fact, amply corroborated by this record, that private enterprise will not in the current and prospective economy without subsidization or external incentive of some kind construct new housing affordable by the low income population and by a large proportion of those of moderate income.[19] We recognized this fact in *Mount Laurel. 67 N. J.*

---

[19]Kleven, "Inclusionary Ordinances — Policy and Legal Issues in Requiring Private Developers to Build Low Cost Housing", 21 *U. C. L. A. L. Rev.* 1432, 1434, 1451, 1456, 1466 (1974) ; Rose, "The *Mount Laurel* Decision: Is It Based on Wishful Thinking?", 4 *Real Estate L. J.* 61, 68 (1975) ; Mallach, "Exclusionary Zoning and Managed Growth: Some Unresolved Issues", 6 *Rutgers-Camden L. J.* 653, 660 (1975). See generally, HUD, *Housing in the Seventies* (1974), for a detailed discussion of housing costs, housing consumption by income groups, and the impact of subsidy programs.

at 170, n. 8; 188, n. 21. The amount and kind of governmental subsidies available for housing has always been fragmentary, and federal sources have recently been restricted.[20] What can legally be required of municipalities by way of initiation of public housing programs and provision of zoning incentives for production of lower income housing will be discussed *infra*. But it will be apparent that sources extraneous to the unaided private building industry cannot be depended upon to produce any substantial proportion of

---

[20]In January 1973, President Nixon announced the imposition of a moratorium on spending under the principal subsidized housing programs pending a reassessment of all federal efforts in the housing area and development of new housing policies. Among those programs suspended were the Section 235 homeownership assistance program established in 1968, the Section 236 cooperative housing program, the rent supplement program (Sections 221(d)(3), 236 and 231), the low rent public housing program originating in 1937, and the Farmers Home Administration Sections 502 and 504 Programs. See HUD, *Housing in the Seventies: A Report of the National Housing Policy Review* (1974) for a discussion and evaluation of these past programs.

However, there is hope that these programs will be extensively revitalized. When President Ford signed the Housing and Community Development Act of 1974, a number of the suspended programs were replaced. The § 235 homeownership subsidy program was reinstated, 12 *U. S. C.* § 1715z, and will provide monies to moderate income families for the purchase of dwelling units. A Section 8 Housing Assistance Payment Program, 42 *U. S. C.* § 1437f, provides housing assistance rent payments on behalf of lower income families occupying newly constructed, substantially rehabilitated or existing housing. A multi-family housing program for the elderly, Section 202 (42 *U. S. C.* § 1437 a note), was also instituted. A specific plan for the subsidization of 25,000 units in New Jersey under the Section 8 program was recently announced by HUD officials in New Jersey. *Newark Star Ledger*, April 25, 1976.

Limited State sources also exist for the financing of low and moderate income housing. During the year 1976, approximately $126 million were raised from the sale of bonds for loans to moderate income developers under the Housing Finance Agency Law of 1967. *N. J. S. A.* 55:14j–1 *et seq.* Additional monies are available under the Department of Community Affairs Demonstration Grant Act, *N. J. S. A.* 52:27D–59 *et seq.* and the Mortgage Finance Agency Law. *N. J. S. A.* 17:1B–4 *et seq.*

the housing needed and affordable by most of the lower income population.

In view of the foregoing, defendant implies that the mandate of *Mount Laurel* is impracticable in the current economy and that litigation to enforce it is futile. Thus defendant flatly asserts in a supplemental brief: "We do not believe that substantial low and moderate income housing can be created by zoning." However, it goes on to make an observation which appears to us to provide the clue to the only acceptable alternative recourse if in fact private enterprise cannot economically construct the housing needed for lower income families. It states:

> Planned Unit Development can help by providing large amounts of additional housing some of which is in the moderate income range. The effect of new construction is also to create filtering whereby families in the moderate income group move into new housing created in the PUD zone making available existing housing for lower income families who cannot afford the new. Without subsidization, this is undoubtedly the most reasonable and certain method of creating housing opportunities for low income families.

To the extent that the builders of housing in a developing municipality like Madison cannot through publicly assisted means or appropriately legislated incentives (as to which, see *infra*) provide the municipality's fair share of the regional need for lower income housing, it is incumbent on the governing body to adjust its zoning regulations so as to render possible and feasible the "least cost" housing, consistent with minimum standards of health and safety, which private industry will undertake, and in amounts sufficient to satisfy the deficit in the hypothesized fair share. As the matter was put in a supplemental *amicus* brief of The Public Advocate:

> * * * for now, and in the foreseeable future, it is absolutely essential to build a substantial amount of housing units at the lowest cost feasible and consistent with health and safety. Builders now must be given the opportunity to build as inexpensively as possible in order to accommodate the low, moderate-subsidized and, especially, moder-

ate-conventional population. ·Thus, in one sense, future disparities in the increases in housing cost and median income are not relevant; that is, we should be building at the lowest cost feasible now.

This sentiment has also been expressed by a leading commentator who responded thus to the argument that the inability of lower income persons to afford unsubsidized housing rendered minimal the impact of exclusionary ordinances:

As a factual matter, the situation may often be otherwise; particularly where the ordinance is enacted by an undeveloped suburb attempting to stem an urban tide, the availability of low cost housing a decade hence may be very much a function of zoning requirements today.

Sager, "Tight Little Islands: Exclusionary Zoning, Equal Protection and the Indigent", 21 *Stanford L. J.* 767, 792 (1969).

Nothing less than zoning for least cost housing[21] will, in the indicated circumstances, satisfy the mandate of *Mount Laurel*. While compliance with that direction may not provide *newly constructed* housing for all in the lower income categories mentioned, it will nevertheless through the "filtering down" process referred to by defendant tend to augment the total supply of available housing in such manner

---

[21]The concept of least cost housing is not to be understood as contemplating construction which could readily deteriorate into slums. We have emphasized the necessity for consistency of such housing with official health and safety requirements. The recently enacted State Uniform Construction Code Act, L. 1975, c. 217 (*N. J. S. A.* 52:27D–119 *et seq.*) states among its purposes "to encourage innovation and economy in construction * * *" and "to eliminate * * * construction regulations that tend to unnecessarily increase construction costs * * *", yet be "consistent with reasonable requirements for the health, safety, and welfare of occupants or users of buildings and structures". Sec. 2.

We envisage zoning provisions which will permit construction of housing, in reasonable amounts, at the least cost consistent with such standards. Observation in many areas of the State confirms that low cost housing can be maintained without becoming a slum. See also *Mount Laurel*, 67 *N. J.* at 191.

as will indirectly provide additional and better housing for the insufficiently and inadequately housed of the region's lower income population. See also *Mount Laurel,* 67 *N. J.* at 205 (Pashman, J., concurring).[22]

■ It will be apparent from our survey of the facts and the discussion hereinafter that the 1973 ordinance under review not only fails to provide directly for Madison's fair share of the region's low and moderate income housing needs but also is not geared to satisfy such a share in terms of "least cost" housing in the sense just described. The failure will be seen to be both quantitative and qualitative. Insufficient areas are zoned to permit such housing, and the zoning restrictions are such as to prevent production of units at least cost consistent with health and safety requirements.

## VI

### *Incapacity of the 1973 Ordinance to Effect Adequate Lower Income Housing*

As we shall indicate hereinafter, Madison's planners have, for purposes of this litigation, formulated a study purporting

---

[22]See Lansing, Clifton and Morgan, *New Homes and Poor People*: *A Study of Chains of Moves* (1969) (a study of the construction of over 1,000 new units in 17 metropolitan areas and its effects, especially on lowest income groups) ; Grigsby, *Housing Markets and Public Policy* 84–130 (1963) ; Fisher & Winnick, "A Reformulation of the Filtering Concept," 1951 *Journal of Social Issues* 47–58; Mallach, "Do Lawsuits Build Housing? The Implications of Exclusionary Zoning Litigation", 6 *Rutgers-Camden L. J.* 653, 666 (1975) (emphasizing filtering process may take a lifetime to occur).

The "filtering down" or "trickling down" theory has also been advocated in support of subsidies for middle income housing. See HUD, *Housing in the Seventies* 172–173 (1974).

Added support for this "filtering down" theory was adduced at the trial by Peter Abeles, township planner, who acknowledged that the movement of upper moderate or middle income families to newly constructed housing would leave their former housing available for families lower in the income scale. This movement can comprise a chain of families "moving up". The shorter the chain, the sooner the needs of the lowest income families are met and presumably the

to demonstrate an unmet need in Madison for low and moderate income housing, as its share of a larger Middlesex County regional need therefor, of some 1800 housing units as of 1975.[23] Assuming, for present purposes, the legitimacy of that estimate — a matter for discussion in a later section of this opinion — the evidence is convincing that the 1973 zoning ordinance does not hold the promise of an opportunity to meet that need and at the same time satisfy the prospective continuing need in the foreseeable period following 1975. This, in effect, was the substance of Judge Furman's holding, quoted earlier herein. From his conclusions,[24] amply supported by the record, it appears that no new housing is feasible under the ordinance for persons in the bottom income third of the population (under $9,000); that at most 12% (3500/30,000) to 17% (3500/20,000) of all new housing units are attainable by persons earning $10,000[25] a year; so that 83% to 88% of the feasible future units would be zoned out of the reach of the lowest 40% of the population.

The anatomy of these failures is apparent.

In our analysis of the minimum lot single-family and multi-family zones in IVB, *supra,* the *prima facie* disproportion of land zoned for high cost residences *vis-a-vis* that

---

better the facilities made available to them. The shortness of the chain obviously depends on the inexpensiveness of the most recently constructed housing. *Lansing et al., supra,* at pp. 5, 65.

[23]This is without regard to a share of the prospective need for the foreseeable future thereafter.

[24]Judge Furman's finding that 80% of vacant developable residential land is zoned R–40 and R–80 and 4% is zoned R–7 and R–10 is based on acreage in the single family zones only. See *supra* (p. 505).

[25]This was the figure used at trial for the upper limit of moderate income families, based on the 1972 median income in New Jersey of $11,600. Low income was set at below $7,000. Based on 1974 statistics of the Newark area, a low income family of four earns below $8,150 and a moderate income family earns between $8,150 and $13,050.

zoned for lower cost residences and multi-family units was fully canvassed. According to the proofs here adduced, there is little or no present market for the R–80 and R–40 zoning as such. *Cf. Schere v. Township of Freehold,* 119 *N. J. Super.* 433 (App. Div.), certif. den. 62 *N. J.* 69, *cert.* den. 410 *U. S.* 931, 93 *S. Ct.* 1374, 35 *L. Ed.* 2d 593 (1972). While the R–7 zone may permit a marginal amount of moderate income housing, new home ownership in that zone is precluded for the low income population. While the latter condition may be economically unavoidable (see V, *supra*), Madison has provided for no home ownership at all on "very small lots", as mandated by *Mount Laurel.* 67 *N. J.* at 187. Clearly no effort was made to permit "least cost" single family homes — and certainly not in reasonable numbers.

We have further seen that the multi-family zoning regulations are not only substantially deficient in areas of developable vacant land made available therefor, but also defective in their susceptibility to entrepreneurial concentration in one-and two-bedroom configurations.

*Mount Laurel* requires that a municipality must allow for "an appropriate variety and choice of housing." 67 *N. J.* at 174. This obligation extends to all types of housing and includes moderate and large sized multi-family units. In *Mount Laurel,* bedroom limitations were considered "so clearly contrary to the general welfare as not to require further discussion." 67 *N. J.* at 183. Although the express bedroom restrictions of the 1970 Madison ordinance were excised in 1973, the maximum bulk and density regulations in the AF and PUD zones (the sole sites of multi-family units),[26] when combined with the economics of building, effectively dictate devolopment on an 80% one bedroom, 20% two bedroom mix, and such a combination was within the contemplation of the township planners. This is not an

---

[26]Except for the AR zone, a small zone restricted to senior citizens housing.

inevitable result of zoning and economics, for a municipality through the zoning power can and should affirmatively act to encourage a reasonable supply of multi-bedroom units affordable by at least some of the lower income population. Such action should include a combination of bulk and density restrictions, utilization of density bonuses,[27] minimum bedroom provisions and expansion of the FAR ratio in the AF zone to encourage and permit larger units.

 Although the validity of a zoning provision for density bonuses in the sense stated in note 27, *supra* (as distinguished from unit bonuses for rental concessions — *i. e.*, "rent skewing"), has not been argued in this case, we see no objection to it in principle. Comparable bonuses are expressly permitted by the statute in relation to PUDs and clustering. *N. J. S. A.* 40:55–57(b)(2) and (3). While there is no express statutory sanction for a density bonus provision outside the PUD context, this type of regulation is directly tied to the physical use of the property and is thus within the recognized ambit of the zoning power. There was unanimity of opinion among the experts at the trial herein that such a device is a vital weapon in the armament of affirmative zoning for adequate housing of families in all income categories. Recognizing that the objectives of *Mount Laurel* are essential to the effectuation of the general welfare, and are within the broad legislative delegation to municipalities of both the zoning and the general police power, see *Ward v. Scott*, 11 *N. J.* 117 (1953); 16 *N. J.* 16 (1954), and *Inganamort et al. v. Bor. of Fort Lee, et al.*, 62 *N. J.* 521 (1973), we hold that provision for density bonuses in the sense indicated is within the municipal zon-

---

[27] The density bonus indicated in this context is the bonus of, for example, an additional single-bedroom or efficiency (in addition to those densities generally permitted) for every three-or four-bedroom unit constructed. Compare this to density bonuses as incentives for construction of subsidized or lower income housing discussed *infra*, n. 28 and accompanying text.

ing power, and, in situations such as that here presented, is a necessary implement in the encouragement of builders to provide multi-family housing for those of lower income. *Cf. Mount Laurel,* 67 *N. J.* at 170, n. 8.

We are constrained to take a more reserved position as to the validity of zoning provisions for "rent skewing", or the allowance of greater density in either sale or rental accommodations in exchange for special concessions by the developer of rental or sale price of a limited number of units. Although this is also a widely recommended zoning technique for handling the problem of encouraging private construction of lower income housing,[28] we discern serious problems with the exercise of local zoning power in such a manner without express legislative authorization. See *Board of Supervisors v. De Groff Enterprises Inc.,* 214 *Va.* 235,

---

[28]"Rent skewing" is a generic term referring to the imposition of a greater proportion of land, construction or other costs on one group of units in a development in order to lower the eventual rental or sale price of another group of units therein. Rent skewing can be encouraged by a municipality in two ways: requiring that a mandatory percentage of moderately priced dwellings be constructed (this is often referred to as an MPMPD ordinance) or allowing a developer a density bonus enabling him to build, for example, one conventional unit for every two low or moderate income units constructed. See Kleven, "Inclusionary Ordinances — Policy and Legal Issues in Requiring Private Developers to Build Low Cost Housing", 21 *U. C. L. A. Rev.* 1432 (1974).

Various alternatives have been suggested for satisfying the low and moderate income requirement: constructing federally subsidized housing, renting to low income families under a rent subsidy program, constructing units selling or renting at or below maximums fixed in the ordinance, conveying land to the county or its designee, selling or leasing units to a redevelopment or housing authority or giving the authority first refusal to rent or buy. See Kleven, *supra,* at 139–147.

On density bonuses or MPMPD's generally, see Rose, "The Mandatory Percentage of Moderately Priced Dwelling Ordinance (MPMPD) Is the Latest Technique of Inclusionary Zoning", 3 *Real Estate L. J.* 176 (1974); Rose, "The *Mount Laurel* Decision: Is It Based on Wishful Thinking?", 4 *Real Estate L. J.* 61, 68–9 (1975); Brooks, *Lower Income Housing: The Planner's Response,* ASPO Report No. 282 (Am. Socy. of Planning Officials, July-August 1972).

198 *S. E.* 2d 600 (Sup. Ct. 1973); *Annot.* 62 *A. L. R.* 3d 880 (1975). We will not here resolve the issue in the absence of adequate argument on the matter. However, we are not to be understood as discouraging local initiative in this area; the question, moreover, deserves legislative study and attention.

It seems useful to point out, in connection with the revision of the ordinance which will be required by our judgment herein, that sound planning calls for providing for a reasonable cushion over the number of contemplated least cost units deemed necessary and believed theoretically possible under a particular revision. Plaintiff adduced testimony that a reasonable margin over any formulaic quota was necessary in order to produce any likelihood of achievement of the quota. The reasons are evident. Many owners of land zoned for least cost housing may not choose to use it for that purpose. And developers of least cost housing may not select all of the zoned land available therefor, or at least not within the anticipated period of need. Thus over-zoning for the category desired tends to solve the problem.[29]

The PUD provisions do not contribute to the desideratum of *Mount Laurel.* The provisions were analyzed

---

[29] Of further significance, there is the possibility that low cost units actually built will not be utilized by persons needing low cost housing, but will be inhabited instead by higher income persons wishing to economize. According to the township's housing study statistics, 31% of its households are low or moderate income, yet 62.4% of its housing stock can be categorized as low and moderate income housing. These figures seem to support the inference that since not all inexpensive dwellings will be inhabited by households economically requiring such accommodations, a municipality should overzone to meet the requirements of those who do. See Mallach, "Exclusionary Zoning and Managed Growth: Some Unresolved Issues," 6 *Rutgers-Camden L. J.* 660, 668 (1975).

Finally, in this connection, it is obvious that a zoning ordinance may be revised periodically if experience shows that the allocations for a particular type of housing are excessive or impracticable. Note that the new statutory zoning revision, see *supra* (p. 496) calls for a general reexamination at least every six years of a master plan and development regulations. *L.* 1975, *c.* 291, Sec. 76.

in IVB, *supra*. We assume, for present purposes, that PUD zoning is valid. It has not been attacked in this case, and the relevant legislation, *N. J. S. A.* 40:55–54 *et seq.; L.* 1975, *c.* 291, Secs. 2 k, 29.1 b, as in the case of all legislation, is presumptively valid. *Cf. Mount Laurel,* 67 *N. J.* at 166–167, n. 5. In any event, it is a corollary of *Mount Laurel* that when municipal exactions from developers reach such proportions as to exert an exclusionary influence, whether in a PUD or any other context, they offend the constitutional precept of *Mount Laurel* and must be remedied.

As pointed out by Heyman and Gilhool in their penetrating study of the rationale for upholding subdivision requirements: "But such exactions raise the spectre of exclusion: arguably they will add so to the cost of suburban housing as to exclude an even larger portion of lower income and nonwhite population than is presently relegated to life in the central cities by the higher suburban costs." "The Constitutionality of Imposing Community Costs of New Suburban Residents Through Subdivision Exactions", 73 *Yale L. J.* 1119, 1155 (1964). The authors conclude, however, that the exclusionary impact of such exactions "will be strikingly slight because legislative and judicial pressures will tend to require the establishment of reasonable ceilings." *Ibid. Cf. Berger, Land Ownership and Use* 786, 787 (2d ed. 1975).

Heyman and Gilhool found subdivision exactions ranging from $37.50 to $325 per lot to be reasonable. *Id.* at 1156. In contrast, a $2.2 million expenditure for schools in a Class II 300 acre PUD with a maximum capacity of 1,725 units yields a per unit exaction of $1275[30] which does

---

[30]Plaintiffs' expert witness allocated costs of $1380 and $4340 to Class II PUD units (depending upon type of unit, the lowest figure representing a mid-rise and the highest a single family unit) as the central improvement costs of the project. Of the total $3,383,200 cost of such improvements, $2,229,500 or 66% is directly attributable to the school requirement. This yields a per unit exaction for schools, alone, of between $911 and $2864.

not seem to be reasonable even at the high price levels of 1974.[31] This requirement must be omitted in the revision of the ordinance.

The requirement for the provision by the PUD developer of roads, water and sewage facilities presents a different situation. Such statutorily authorized municipal requirements for approval of subdivision plats have generally been held to be valid exercises of the police power. *Brazer v. Borough of Mountainside,* 55 *N. J.* 456 (1970). Nevertheless, as already noted, application of the police power through zoning cannot be had in a manner contrary to the general welfare. *Mount Laurel,* 67 *N. J.* at 175.

Other limitations on this statutory power have previously been recognized. *Cf. Divan Builders v. Planning Bd. Tp. of Wayne,* 66 *N. J.* 582 (1975). There this court considered a prerequisite to subdivision approval that the developer contribute toward the cost of an off-site drainage facility without allocating any part of the cost to other properties specially benefitted by the improvement, and found it invalid. Similarly, in *Longridge Builders, Inc. v. Planning Bd. of Princeton Tp.,* 52 *N. J.* 348 (1968), the court condemned a condition to subdivision approval that plaintiff pave an off-site right of way, resulting in the imposition of the entire cost upon plaintiff, when other lands would benefit from the improved road and there were inadequate standards and procedures for the allocation of costs.

In this light, the $300,000 and $600,000 costs involved in bringing roads and utilities to the removed PUD sites (a distance of up to two miles, compared to the 361-foot distance of the improvement involved in *Longridge,*

---

[31]The educational exaction demanded in the Mount Laurel PUDs was not as onerous as that here involved. A Mount Laurel developer was required to pay the costs of educating the additional school children in a PUD if the total number of school children in the PUD exceeded .3 per multi-family unit; in Madison, the developer must actually build all necessary schools and deed them to the township.

*supra*) bear examination. To the extent that these costs do not prohibit development, they nonetheless add sufficiently to final costs as to tend to have an exclusionary impact. Further considerations highlight the questionable validity of these requirements.

Only a limited area has been denoted PUD (9% of the township's vacant developable residential acreage), and 2/3 of it is in remote areas. This is not a case of a substantial category of land being reasonably zoned as a whole, with only a minor portion excessively burdened. Quite the opposite. The municipality could well have located these PUDS in more accessible areas of the town had it been motivated to render housing for lower income families more available. However, the record clearly shows that the sites were deliberately chosen in order to force the PUD developers and their customers to carry the burden of developing these remote areas. The township planner testified that the "decision was made that two PUDs would be the incentive to complete and bring around the water system * * * to provide a main system that would rationally serve 1/3 of the township." This kind of motivation is echoed in the minutes of the planning board and township council where it was noted that because of the locations chosen the developers would be required to build portions of the trans-Madison highway as well as to widen and improve Union Hill Road. Such expenditures by PUD developers would directly benefit the owners of other property advantaged by the added facilities and paved roads yet not required to contribute a proportionate amount of the cost.

The potential impact of the water and sewer line requirements is shown by the conclusion of the Middlesex County Planning Board, in reviewing the PUD ordinance, that the two remote PUD areas would probably not be developed at all within the next ten years. Under the totality of the stated circumstances, it must be concluded that a *prima facie* case of exclusion has been made out with respect to the road and facility requirements, and the burden shifts

to the municipality to justify those provisions of the ordinance. *Cf. Mount Laurel, supra,* 67 *N. J.* at 181. As the municipality has not met its burden, the municipality will be directed on remand to do one or more of the following in the course of revision of the ordinance (if it continues in its position that the PUD provisions partly meet its obligation to zone for least cost housing) : (1) eliminate these requirements or revise them to render them not exclusionary; (2) require proportionate donation by other property holders; or (3) relocate these or other PUD tracts nearer to utility hookups.

A third potentially cost-generating requirement in the PUD provisions is the approval process, which allegedly results in high carrying charges and has the potential for delay effectively barring the project. The approval process is a three-stage procedure, which, according to the township's witness, may be completed within a year, but which plaintiffs' experts testify would take eighteen months to two years.

Admittedly, a protracted approval process will add greatly to the cost of any project and hence may tend to render development prohibitive to lower income users. The evidence as to the cost impact of the Madison PUD provisions was contradictory. As noted, they were adopted pursuant to the PUD enabling legislation, *N. J. S. A.* 40:55-54 to 67. The statute undertakes to replace existing multifarious procedures with "an expeditious method of processing a plan for a planned unit development * * * to avoid the delay and uncertainty" inherent in the other procedures. *N. J. S. A.* 40:55-59. It then proceeds to lay out a two-stage approval process which the Madison ordinance follows with one exception. The ordinance adds a third "informal preliminary application" stage which must be completed prior to the filing of an application for tentative approval. This "informal" stage adds approximately 40 days. Without it,

the entire process on its face takes 150 days.[32] Consequently the township's testimony that the procedure may be completed within nine months is supportable on the record. Except for the "informal preliminary application" stage, the procedure is valid. The latter, being unduly cost-generating, and not contemplated by the statute, should be eliminated.

We need add no more to the discussion above in IV B of the inadequacy for fair share purposes of the cluster provisions of the ordinance.

In summation of this point, the 1973 Ordinance is shown not to provide the opportunity for a substantial amount of new housing which could be available to the lower income segments of the population. This failure arises from both (a) the inadequacy or non-existence of areas zoned for homes on very small lots or for multi-family housing; and (b) the undue cost-generating features inherent in the ordinance which raise the expense of purchasing or renting new housing units above the reach of the great majority of the lower income population.

## VII

### The "Fair Share" Approach of the Defendant

We made the preliminary observation in II, *supra*, that although we would neither make nor require a finding of

---

[32]The tentative approval stage requires a public hearing within 45 days of the filing of the application and a grant or denial of tentative approval within 60 days thereafter. Once an application for final approval is filed, unless the plan is substantially different from that receiving tentative approval, a final determination must be made within 45 days. It must be recognized, however, that preparation and planning required in the development of the application pursuant to the ordinance can add greatly to this 150 day period. However, we deem the evidence adduced at trial to be insufficient to permit us to hold the application requirements invalid as exclusionary as a matter of law.

fact as to a given number of lower income housing units to be made possible by the Madison Zoning Ordinance, we would, for the purposes there enunciated, nevertheless, discuss the evidence herein concerning Madison's fair share of a regional need for such housing. By way of further preliminary, we adhere to the broad principle of *Mount Laurel* that each developing municipality must by its zoning ordinance provide the opportunity for a fair share of the lower income housing needs of its region. We intend that our judgment herein shall subserve that principle notwithstanding that we do not propose to, nor require that the trial court shall demarcate specific boundaries for a pertinent region or fix a specific unit goal as defendants' fair share of such housing needs.

Defendant undertook at the trial to establish what would constitute a fair share of the regional need for low and moderate income housing for Madison's zoning ordinance to render possible. It relied upon two allocation studies, one made in 1972 on behalf of the Middlesex County Planning Board by a planner named Kim ("Kim study"); the other made on behalf of the Madison Township Planning Board in 1974, during the litigation below, by its planning adviser Abeles and his firm ("Abeles study"). The Abeles study, in turn, partly relied on an estimate of Madison's unmet lower income housing needs as of 1975, made in 1970, by the Middlesex County Planning Board ("County study"), updated by Abeles in 1974. Both the Kim and the Abeles studies took Middlesex County as the relevant region, making allocations of "fair shares" of lower income housing for each of the 25 municipalities in the county. The allocations of the two studies for Madison were relatively close, the Kim study arriving at about 1600 lower income units, and the Abeles study, about 1800 units, both as of 1975. Neither, however, ventured a prognostication as to Madison's continuing fair share of the region's needs on an annual or

other periodic basis for the foreseeable future beyond 1975.[33] In the latter regard, however, Abeles foretold that Madison's housing unit growth (total) until 1975 would be at the annual rate of 600-800 units and from 1975 to 1980 at 800-1000. This was not broken down between lower income and other categories.

By comparison with the foregoing, Davidoff, plaintiffs' planning expert, estimated an unmet need in Madison as of 1975 of 3,000 lower income units, and a continuing need thereafter into the 1980's of 1000-1200 units annually (total) of which 500-600 should be lower income.[34]

The county study indicated an unmet county need for lower income housing units as of 1975 of 23,600 units. Significantly, the study stated:

"To meet this deficit, increases in public and private resources will be required. For the county and its municipalities these resources would include *the freeing up of more land for residential development of a particular density* and location commensurate with socio-economic function of units required \* \* \*" (emphasis added).

The plan of the Kim study was to estimate what the demand (need) for low and moderate income housing in the county would be by 1975 and to compare it with the prospective supply of such units by that date. The pertinent lower income category used was those households with less than $12,000 annual income as of 1970. Kim estimated a 1975 county population of 766,946 (583,000 in 1970) and

---

[33]As seen above, the *Mount Laurel* description of a municipality's fair share is that "of the present *and prospective* regional need \* \* \*." 67 N. J. at 188 (emphasis added). The recent preliminary housing allocation plan of the State Division of State and Regional Planning (see note 37 *infra*) properly places considerable emphasis on prospective housing needs for the foreseeable future.

[34]Judge Furman's finding, as noted above, was that Madison's need into the 1980's would be for 750–1000 new units annually, 500–600 of those to be low or moderate income units. 128 *N. J. Super.* at 442.

the number of persons employed as 290,700 (241,000 in 1970). The estimates were based on expected movements of people and jobs from large urban centers to the suburbs. In general there would be an "expansion" from the New York metropolitian region to the outer boundaries of Middlesex County and to the south and west thereof.

Kim estimated a demand for lower income housing in 1975 of 126,374 households or units (111,301 in 1970) to which he added a factor of 6.5% for normal vacancy rate, or a total 1975 demand of 134,589.

The Kim approach to the estimate of anticipated housing deficiency was to balance prospective employment in the county with housing, following the approach of the Tri-State Regional Planning Commission. His study disclosed a 1975 housing supply of 115,791 lower income units, which, subtracted from demand, left a 1975 deficit of 18,798 lower income units.

The Kim allocation (fair share) of the deficit among the 25 municipalities of the county was based on a complex mathematical formula reflecting the following factors: (a) housing location in relation to work place; (b) housing location in relation to housing construction costs, *i. e.*, land costs per unit; (c) other "constraints", *e. g.*, the subregion's capacity to absorb more housing. The application of the formula to Madison was to allocate to it a "fair share" of 8.4%, or about 1600 units.

The Abeles study avowed as a goal "increasing the housing supply for all income groups." The new housing "should be provided in a mixture of housing types and costs at various locations in the township." The job dispersion outside Middlesex County of Madison's resident work force as compared with the work force resident in the county as a whole is indicated by the percentages of 50% for the township and 36% for the county. Correlatively, Madison has 8% of the population of the county but only 0.8% of the jobs.

:. The Abeles study averred that important to a fair share-regional plan is the consideration of the relevant "housing market area". This is defined as "the geographic area in which housing units are in competition for the people who are seeking housing". The study conceded that "Madison Township is a relatively small part of a market area which could encompass virtually all of Central New Jersey," but stated that its purposes would be met by assuming a housing market area confined to Middlesex County.[35]

The Abeles study projected a growth of 12,000 households in Middlesex County from 1970-1975 and another 15,000 between 1970 and 1980. This growth will take place primarily in municipalities with an ample supply of vacant land. The existing supply of housing in the county is very limited, as indicated by the abnormally low vacancy rates (1% in the county in 1970; 1.5% in Madison). Sixty minutes is a "commonly acceptable limit for commutation." The highway network allows for considerable mobility and creates substantial housing demand in Madison.

---

[35]To the extent that "housing market area" is identifiable with "region", in the *Mount Laurel* sense, the great predominance of the proofs in this record is that the area pertinent to Madison includes at least the seven northeastern counties of New Jersey, and is sometimes referred to as the New York Metropolitan Region, which is generally inclusive of those counties. (Note that 15% of Madison's resident work force is employed in New York City.) Indeed, another section of the Abeles study, in projecting Madison's future growth, said: "As part of the Middlesex County region, which is itself part of the larger New York metropolitan region, Madison Township is unalterably affected by regional population forecasts because of its relationship to housing and employment changes. Middlesex County estimates are influenced by the wider regional context in respect to land use, housing allocations, transport systems, employment locations and other factors."

The preliminary draft of "A Statewide Housing Allocation Plan for New Jersey" (Nov. 1976) by the State Division of State and Regional Planning places Middlesex County in an eight-county region of which the other counties are Bergen, Essex, Hudson, Morris, Passaic, Somerset and Union. pp. 10–11. See note 37, *infra.*

Unlike the Kim study, the Abeles study did not approach the concept of housing needs from a demand and supply relationship, but rather from that of the number of obsolete housing units in existence. Obsolescence was defined as (a) undesirable physical conditions; (b) overcrowding of occupants of unit; and (c) excessive share of income being paid as rent. The total thus determined was found to concur generally with a 1974 revision of the 1970 estimate by the county study of an unmet need as of 1975 for lower income housing in the county. The revision increased the original estimate of 23,600 to 29,251 units.

The county need was allocated as "fair shares" to municipalities in accordance with a formula generally resembling that devised by the Metropolitan Washington Council of Governments (COG). This involves housing need factors and housing supply factors. To those the Abeles study added certain modifiers. The need factors were generally those aforementioned related to obsolescence. The supply factors comprise vacant residential land as zoned and vacant housing units. The modifiers were (1) per capita financing resources; (2) the existing ratio of low and moderate income housing; (3) a multi-family housing index based on growth in multi-family units from 1960-1970; and (4) a housing density index, *i. e.,* the ratio of housing to total land area.

Application of the resulting formula to the 29,251 county units needed ascribed to Madison a "fair share" of 6.1%, or about 1800 lower income units. As already noted, the Abeles study made no prognostication as to a fair share of the continuing housing need subsequent to 1975.

The *post-litem* motivation of the Abeles study is apparent. It was approved by the township planning board April 23, 1974, two days before the end of the second trial and over 18 months after adoption of the 1973 ordinance. The analysis of "need" is largely weighted in favor of indigenous need, *i. e.,* of those persons already in the township, as compared with potential aspirants for housing from

outside the municipality. Of the 1784 units which the Abeles study attributes as Madison's fair share, 1394 units will represent the indigenous need and only 390 the need of the region (Middlesex).[36]

In several respects, over and above the apparent limitation of the region to the county, the formula presented by the Abeles study appears to be a self-serving one. First, the original COG formula contained an accessibility factor as one of the modifiers which Abeles omitted, ostensibly on the ground that a substantial proportion of all employment opportunity in Middlesex County lies within 45 minutes commuting time from any municipality therein. However, this unwarrantably favors Madison. As it is nearer to heavy employment centers such as Perth Amboy and Woodbridge than are places like Monroe and Cranbury, relatively more people would be likely to want to live in Madison, and correspondingly Madison's comparative fair share would be larger if accessibility were taken into account.

The inclusion of a multi-family index and a housing density index are two additional self-serving features of the Abeles study. These factors did not appear in the COG formula, and their use results in a substantial credit in Madison's favor. While the housing concentration factor defensibly affords some recognition to those subregions which "have already contributed to the supply of rental housing for low and moderate income families," Abeles nevertheless takes duplicative credits for both Madison's increase over the past ten years in multi-family units and for its existing housing density. As a result of the interplay of these factors, Madison, with 11,142 vacant and developable acres, ends up with a 6.1% allocation compared to towns of similar amounts of vacant residential acres, Monroe (12,067 acres), and

---

[36]See the criticism of the policy emphasis under the COG formula on housing replacement for substandard indigenous housing, to the subordination of regional need satisfaction, in NCDH, " 'Fair Share' Evolves" in *Trends in Housing*, Vol. 16, No. 3, pp. 1–2 (Fall 1972).

South Brunswick (10,778 acres), which, under the Abeles formula, receive fair share allocations of 16.1% and 12.6% respectively. Towns with closely corresponding fair share allocations, East Brunswick (7.5%), North Brunswick (6.0%), and Woodbridge (5.0%), have vacant residential acres of 4,722, 986, and 230 respectively.

## VIII

### "Fair Share" and "Region"

#### — *General Considerations*

The probative value of the Kim and Abeles fair share studies should be appraised against the background of the substantial body of experience that has been developed by governmental planning bodies in recent years in devising fair share plans for voluntary housing planning purposes as distinguished from litigation. All of them involve realistic housing market areas larger and functionally more appropriate, in *Mount Laurel* terms, than the small Middlesex County region. Before discussing those specific plans, some preliminary observations as to the concepts of "fair share" and "region" seem appropriate by way of background.

Of primary significance is the difference between the situation of an administrative planning agency functioning under authorizing legislation and that of a court dealing with an attack by litigation on the adequacy of the zoning ordinance of an isolated municipality. The former is dealing with a comprehensive, predetermined region and can render or delegate the making of allocations with relative fairness to all of the constituent municipalities or other subregions within its jurisdiction.[37] Moreover, it presumably has ex-

---

[37] A preliminary but comprehensive housing allocation plan for the entire State has just been published by the State Division of State and Regional Planning. "A Statewide Housing Allocation Plan for New Jersey", *op. cit. supra*, note 35. This undertaking, which is subject to public hearings and further review, was directed by Gov-

ernor Byrne's Executive Order No. 35, dated April 2, 1976. That order acknowledged the impetus of our decision in *Mount Laurel*, and it directed that the State Division of State and Regional Planning prepare State housing goals "to guide municipalities in adjusting their municipal land-use regulations in order to provide a reasonable opportunity for the development of an appropriate variety and choice of housing to meet the needs of the residents of New Jersey." County planning boards were permitted to be enlisted in the studies for regions, which could consist of counties or groups of counties. The order states the "law of the State of New Jersey" in language tracking the fair share-regional concept set forth in *Mount Laurel*.

In allocating regional goals the Division was directed to take into account: (1) the extent of housing need in the region; (2) the extent of employment growth or decline; (3) fiscal capacity to absorb the housing goal; (4) *availability of appropriate sites for the housing goal;* (5) "other factors as may be necessary and appropriate."

The resulting State Division study is presented in four sections: (1) present housing needs: 1970; (2) prospective housing needs: 1970–1990; (3) substate regions for housing allocation; and (4) housing allocation methodology. The study culminates in tables setting forth a "fair share" number of housing units for low and moderate income households to meet present and prospective housing needs allocated to every municipality in the State

Present housing needs are estimated by the criteria of (1) dilapidated units; (2) overcrowded units and (3) necessary vacant units, as of 1970. p. 13.

Prospective housing needs are based upon estimates of growth of housing units from 1970 to 1990. pp. 13–15.

The criteria for fixing regions were: (1) sharing housing needs; (2) socio-economic interdependence; (3) data availability; (4) the intent of Executive Order No. 35. pp. 7–8. There are 12 resulting regions: one from the eight northeastern counties (including Middlesex); one for Camden, Gloucester and Burlington; and one for each of the other ten counties of the State. pp. 10–11.

Allocation of fair shares to municipalities was developed separately for present housing needs and prospective housing needs. The method used for allocating present housing needs is to take the percentage of present housing needs of the region to the region's total housing stock and then apply that percentage to each municipality's housing stock. p. 13. The method used for allocating prospective housing needs was to apply an average of four indexes, being: (1) vacant developable land; (2) employment growth; (3) municipal fiscal capability (in terms of growth of non-residential ratables); and (4) personal income per capita. p. 14–15.

Each municipality's fair share is thus the sum of the two fair shares arrived at as aforesaid. p. 15.

By Executive Order No. 46, dated December 8, 1976, Governor Byrne has ordered postponement of hearings and final review of the preliminary study until after November 1977.

pertise suited to the task. The correlative disadvantages of a court adjudicating an individual dispute are obvious.[38]

The formulation of a plan for the fixing of the fair share of the regional need for lower income housing attributable to a particular developing municipality, although clearly envisaged in *Mount Laurel, 67 N. J.* at 162, 189–190, involves highly controversial economic, sociological and policy questions of innate difficulty and complexity. Where predictive responses are called for they are apt to be speculative or conjectural.[39] These observations are supported not only by the published literature[40] but by the proofs and comprehensive briefs supplied us by the parties and *amici.*

See also the nine-county housing allocation formula and projection published in 1973 by the Delaware Valley Regional Planning Commission (DVRPC). This agency monitors all federal funding for housing in its five Pennsylvania and four New Jersey counties (Mercer, Burlington, Camden and Gloucester). It also does regional planning for that area. The DVRPC determined total housing need in the region through the year 2000 and allocated the need by units among the nine counties. Each of the counties was then assigned the task of making municipal sub-allocations pursuant to DVRPC guidelines, and this has now been done in the four New Jersey counties named.

[38]We are not here confronted with litigation joining all the municipalities in a region or county. See *Mount Laurel, 67 N. J.* at 216–217 (Pashman, J., concurring); *cf. Urban League of Greater New Brunswick, et al. v. The Mayor and Council of the Borough of Carteret, et al.,* 142 *N. J. Super.* 11 (Ch. Div. 1976).

[39]One commentator has specifically warned that because of the conjectural nature of such calculations, utilization of the court as the forum for determining a municipality's fair share may result in "statistical warfare" between the litigants. Rose, "The *Mount Laurel* Decision: Is It Based on Wishful Thinking?", 4 *Real Estate L. J.* 61, 67 (1975).

[40]The recent literature on "fair share" methodologies is considerable. The leading theoretical analysis of fair share plans is found in Brooks, *Lower Income Housing: The Planner's Response,* ASPO Report No. 282 (Am. Socy. of Planning Officials, July-August 1972). In addition to Brooks, and the commentaries on *Mount Laurel* cited in note 3 *supra,* a representative sampling of fair share literature includes: Kelly, "Will the Housing Market Evaluation Model Be

Some of the problems catalogued above were touched upon in *Mount Laurel, e. g.,* "region", 67 *N. J.* at 162, 189–190; incidence of subsidized construction in contemplation, *id.* at 170, n. 8, 188, n. 21; sources of reliance for "fair share" guidance, *id.* at 190; quantity of needed housing reasonably expectable under proper zoning, *id.* at 188, n. 21. We take this occasion to make explicit what we adumbrated in *Mount Laurel* and have intimated above — that the governmental-sociological-economic enterprise of seeing to the provision and allocation throughout appropriate regions of adequate and suitable housing for all categories of the population is much more appropriately a legislative and administrative function rather than a judicial function to be exercised in the disposition of isolated cases.[41] *Cf.* 67 *N. J.* at 189, n. 22, 190.

---

The Solution to Exclusionary Zoning?" 3 *Real Estate L. J.* 373 (1975); Listokin, "Fair-Share Housing Distribution: Will It Open the Suburbs to Apartment Development?" 2 *Real Estate L. J.* 739 (1974); Listokin, "Fair Share Housing Distribution: An Idea Whose Time Has Come?" in *New Jersey Trends* 353 (T. Norman, ed., 1974); Lindbloom, "Defining 'Fair Share' of 'Regional Need': A Planner's Application of Mount Laurel", 98 *N. J. L. J.* 633 (1975); Moskowitz, "Regional Housing Allocation Plans: A Case History of the Delaware Valley Regional Plan," 7 *J. Urban Law* 292 (1975); National Committee Against Discrimination in Housing (NCDH), " 'Fair Share' Idea Begins to Spread", *Trends in Housing*, vol. 16, no. 2, pp. 2–3 (July 1972); NCD, " 'Fair Share Evolves' ", *Trends in Housing*, vol. 16, no. 3, pp. 1–2 (Fall 1972); Holmgren & Erber, "Fair Share Formulas", 4 *HUD Challenge* 22 (April 1973).

See also, Erber & Prior, *Housing Allocation Planning: An Annotated Bibliography*, Council of Planning Librarians Exchange Bibliography No. 547 (March 1974).

[41]Professor Charles M. Haar, in his pioneering work "Regionalism and Realism in Land Use Planning", 105 *U. Pa. L. Rev.* 515, 530–531 (1957), noted:

The limitations of the adversary process and the specialization of courts evoke serious doubts as to judicial competence in deciding the proper allocation of regional resources * * * Unless the courts are far more adept and skillful than claimed, or the adversary system lends itself to such analysis, or regionalism is not a job that requires scientific planning and engineering techniques, there is a patent need for further state legislation as to who should be the

Fortunately, the other branches of government are giving the matter their attention.[42] But unless and until other ap-

ultimate resolver of regional disputes. For the fact remains that no presently constituted agency can adequately meet this issue. The court lacks the staff, the time or the ability to prepare a rational plan. This kind of decision seems eminently suited for the administrative process. *If, however, the other governmental agencies default, certainty as well as the need to come to a final decision may be as important as the merits of the particular decision.* [Emphasis supplied].

Although Professor Haar was addressing himself to all types of regional planning, his remarks are particularly relevant to the problem of fair share allocations. Jerome Rose, in dealing specifically with this matter, prophetically observed that: ·

The courts seem to have undertaken the delicate and difficult task of maintaining community balance that the legislatures have been reluctant to accept. This is an unfortunate development because the nature of the problem is one that is best resolved by the kinds of political negotiation and compromise upon which a democratic legislative process is based. The legislative process has defaulted and as Governor Cahill predicted, if the legislature fails to meet its responsibility, there will be no alternative but for the courts to step in.

Rose, "The Courts and the Balanced Community: Recent Trends in New Jersey Zoning Law," 1973 *AIP Journal* 265, 274 (1973). See also Mytelka & Mytelka, "Exclusionary Zoning: A Consideration of Remedies", 7 *Seton Hall L. Rev.* 1, 5, 13 (1975) ; Note, "A Wrong Without a Remedy: Judicial Approaches to Exclusionary Zoning", 6 *Rutgers-Camden L. J.* 727, 741 (1975).

See Payne, "Delegation Doctrine in the Reform of Local Government Law: The Case of Exclusionary Zoning", 29 *Rutgers L. Rev.* 803 (1976), where not only is essentially the same point made as in the text, but a highly novel idea is proposed for solution of the problem without "judicialization" of it. See also Note, ·"The Inadequacy of Judicial Remedies in Cases of Exclusionary Zoning", 71 *Mich. L. Rev.* 760, 773–779 (1976).

42On March 24, 1975, State Senator Greenberg introduced a bill entitled, The Comprehensive Balanced Housing Plan, Senate Bill 3100, providing a new planning framework for the allocation of regional housing needs. Regrettably, this bill died in committee, thus following the path of past legislative efforts to remedy exclusionary zoning. For a discussion of these efforts, see Mallach, *supra* note 3, 6 *Rutgers-Camden L. J.* at 677–683.

However, a strong impetus to statewide allocation of goals for provision of low and moderate income housing was provided by Governor Byrne's Executive Order No. 35, dated April 2, 1976, men-

propriate governmental machinery is effectively brought to bear the courts have no choice, when an ordinance is challenged on *Mount Laurel* grounds, but to deal with this vital public welfare matter as effectively as is consistent with the limitations of the judicial process.

We address the question, implicated by defendant's evidential studies, of the appropriate concept of a "region" in the context of a litigation challenging the housing adequacy of a particular zoning ordinance. Defendant purports to justify its fair share allocation on the basis of a single county as a region. However, both the Kim and the Abeles studies, in estimating anticipatorily the need for and supply of housing as of 1975 in Middlesex County, apparently recognized the influence of growth of population and jobs emanating from the broader region of northeastern New Jersey and the New York metropolitan region. Thus, while it is questionable whether the functionally relevant regional housing need was adequately realized in the Kim and Abeles studies, it does appear that in effect they envisaged a need emanating beyond the county boundaries.

The technical details of the basis for fair-share allocations of regional goals among municipalities, pertaining as they do to an area of considerable complexity and theoretical diversity, are not as important to a reviewing court concerned with effectuating *Mount Laurel* objectives as the consideration that the gross regional goal shared by the constituent municipalities be large enough fairly to reflect the full needs of the housing market area of which the subject municipality forms a part.

---

tioned in note 37, *supra*, and the study which followed, there discussed.

The Department of Community Affairs had been well along in developing a housing allocation for the State when Executive Order No. 35 was announced.

As noted above, n. 37, separate fair share allocations have been promulgated in Mercer, Burlington, Camden and Gloucester Counties under the auspices of the DVRPC.

In broad principle, we believe Judge Furman was correct in conceiving the appropriate region for Madison Township as "the area from which, in view of available employment and transportation, the population of the township would be drawn, absent invalidly exclusionary zoning". 128 *N. J. Super.* at 441. This is essentially like the housing market area concept espoused in the Abeles report as sound in principle, although not directly employed in the Abeles fair share study.

The concept of a county *per se* as the appropriate region was thought not to be "realistic" by Justice Hall in writing *Mount Laurel.* He there said (67 *N. J.* at 189–190):

> The composition of the applicable "region" will necessarily vary from situation to situation and probably no hard and fast rule will serve to furnish the answer in every case. Confinement to or within a certain county appears not to be realistic, but restriction within the boundaries of the state seems practical and advisable. (This is not to say that a developing municipality can ignore a demand for housing within its boundaries on the part of people who commute to work in another state.)

Justice Hall defined the region applicable there as "the outer ring of the South Jersey metropolitan area, which area we define as those portions of Camden, Burlington and Gloucester Counties within a semicircle having a radius of 20 miles or so from the heart of Camden city." 67 *N. J.* at 162, 190. What was material to that determination was the proximity of Mount Laurel to the highly urbanized Camden area, its residential development due to the influx of new residents from nearby central cities, existing and projected employment patterns, the "highway network" linking Mount Laurel with all parts of the Camden area and the contrast of its vacant acreage (65%) with the land supply situation in those nearby central cities. See 67 *N. J.* at 161–162.

For purposes of our present problem, we distinguish the situation with which we would be confronted if the municipality whose ordinance was under attack had been the subject of an official fair share housing study of a group of

counties or municipalities conducted under such auspices as
the DVPRC or the planning boards of a county or group of
counties functioning under Executive Order No. 35 (see
note 42, *supra*). We conceivably might regard a "region"
so constructed, and the dependent fair share allocations
thereby arrived at, as meriting *prima facie* judicial ac-
ceptance. The Kim and Abeles "studies" before us do not
have that authority or stature, and we have accorded them
only such weight as they deserve on their merits, as analyzed
above.[43]

For examples of regions large enough and sufficiently in-
tegrated economically to form legitimately functional hous-
ing market areas, we turn to some of the pioneering fair

---

[43]We do not fully accord such status to the preliminary state-
wide housing allocation plan of the State Division of State and
Regional Planning as it is only tentative and subject to further
public hearings and review. See notes 37 and 42 *supra*.

To date a number of fair share plans have been proposed or im-
plemented by governmental or regional bodies. The plans vary, de-
pending upon the type of body selected to formulate or implement the
plan, the geographical areas encompassed, and the type of housing
being allocated (*e. g.*, subsidized or total low income). See Listokin,
"Fair Share Housing Distribution: Will It Open the Suburbs to
Apartment Development?", 2 *Real Estate L. J.* 739, 743 (1974). The
most noted of those plans which have been actually implemented in-
clude the following: Miami Valley (Dayton, Ohio area) Regional
Planning Commission, *The Miami Valley Region's Housing Plan*
(1973) (updating its 1970 housing allocation plan); Metropolitan
Washington (D. C. area) Council of Governments, *Fair Share Hous-
ing Formula* (1972); San Bernardino County (California) Planning
Department, *Government Subsidized Distribution Model for Valley
Portion of San Bernardino County* (1972); Metropolitan Council of
the Twin Cities Area (Minneapolis-St. Paul); *Housing: Plan,
Policy, Program* (1973); *Delaware Valley Regional Plan*, see *supra*
note 37.

The utility of almost all these plans is that they are intended to
subserve the actual construction or subsidization of low cost housing.
By contrast, a plan for a *Mount Laurel* type litigation, as the pres-
ent, is not capable of direct utilization by the affected municipality
or by the court.

For a list of twenty-five additional plans, see Erber and Prior,
*Housing Allocation Planning: An Annotated Bibliography* (Council
of Planning Librarians Exchange Bibliography #547, 1974).

share allocation plans executed under official or quasi-official auspices. The Miami Valley (Dayton, Ohio) Regional Planning Commission includes five counties and 31 municipalities as far as 60 miles from the center of Dayton. The Metropolitan Washington GOG (see *supra* p. 529) covers 15 counties and local governmental jurisdictions, including the District of Columbia, San Bernardino County, California, although a county, occupies 20,000 square miles. The Metropolitan Council of the Twin Cities (Minneapolis-St. Paul) covers 7 counties, including almost 300 jurisdictions, with a total population of 1.9 million. The DVRPC, as already shown, comprises nine counties in Pennsylvania and New Jersey. The present significance of the cited plans is that their regions are of such size that it is difficult to conceive of a *substantial* demand for housing therein coming from any one locality *outside* the jurisdictional region, even absent exclusionary zoning. The essence of the cited plans is "to provide families in those economic categories [low and moderate] a choice of location." 16 *Trends on Housing,* No. 2 p. 2 (1972).

We thus proceed to formulation of our position as to the concept of region in the context of an *ad hoc* application of *Mount Laurel* principles to a single litigated ordinance, having in mind our determination in II, *supra,* that it would not generally be serviceable to employ a formulaic approach to determination of a particular municipality's fair share. We conclude that, in general, there is no specific geographical area which is necessarily the authoritative region as to any single municipality in litigation. Different experts may quite reasonably differ in their concepts of the pertinent region. See Lindbloom, "Defining 'Fair Share' of 'Regional Need' ", 98 *N. J. L. J.* 633–644 (July 24, 1975). But in evaluating any expert testimony in terms of the *Mount Laurel* rationale, weight should be given to the degree to which the expert gives consideration to the areas from which the lower income population of the municipality would *substantially* be drawn absent exclusionary zoning. (Evidence of the historical sources

of a municipality's population, among other indicia, is relevent thereto.) This is broadly comparable to the concept of the relevant housing market area, to which there has been prior reference herein.

The factors which draw most candidates for residence to a municipality include not only, for employed persons and those seeking employment, reasonable proximity thereto of jobs and availability of transportation to jobs, as mentioned by Judge Furman and stressed by most of the experts,[44] but

---

[44]The criteria relevant for determining "region" have not received the same attention as those used to measure fair share, see note 45 *infra*, because of the fact that most of the fair share plans under discussion have accepted the geographic area within the jurisdiction of the planning agency as the appropriate region. Moreover, urban literature on derivation of regional boundaries often pertains to subject matter other than housing allocation, *e. g.*, water supply, environment, transportation, etc. However, suggestions do emerge from fair share discussions as to the criteria for determining the appropriate region. The most mentioned is that of journey to work. Rose, "Exclusionary Zoning and Managed Growth: Some Unresolved Issues", 6 *Rutgers-Camden L. J.* 689, 717–720 (1975) ; Lustig and Pack, "A Standard for Residential Zoning Based Upon the Location of Jobs", 1974 *AIP Journal* 333 (1974) ; Burchell, Listokin and James, "Exclusionary Zoning: Pitfalls of the Regional Remedy", 7 *Urban Lawyer* 262, 271 (1975). This implicates existing job and transportation patterns. *Burchell, et al., supra.*

The Federal Housing Authority (FHA) has defined a housing market region as the geographic entity within which non-farm dwelling units are in mutual competition, HUD, FHA Economic and Market Analysis Division, *FHA Techniques of Housing Market Analysis* 12, and hence the location of actual and prospective business centers and the availability of transportation facilities are important. *Id.*

Rubinowitz has suggested that the relevant region should be the area in which development and movement are or will be taking place, places where middle income families have already exercised the option to move and which would be desirable to low and moderate income groups if housing were available. "Exclusionary Zoning: A Wrong in Search of a Remedy", 6 *Mich. J. L. Reform* 625, 654–5 (1973).

The Department of Community Affairs in its November 26, 1975 status report (see note 42 *supra*) rejected journey to work as the sole criterion for delineation of regions in northern New Jersey, suggesting demarcation of regions "which are large enough or within

proximity to and convenience of shopping, schools and other amenities. Retired people, who represent a substantial part of the lower to moderate income population, might be attracted from a greater distance than employed people.

Finally, we submit general observations as to the techniques of "fair share" allocation to municipalities within an assumedly valid region. There is much greater diversity among the experts in this regard than in relation to determining pertinent regions. Moreover, as already noted herein, harm to the objective of securing adequate opportunity for lower income housing is less likely from imperfect allocation models than from undue restriction of the pertinent region. The essential thing from that standpoint is that the true regional need be adequately quantified.

The trial court specified that for Madison to meet its fair share of the housing needs of the region its zoning ordinance must approximate "in additional housing unit capacity the same proportion of low-income housing as its present low-income population, about 12%, and the same proportion of moderate-income housing as its moderate-income population, about 19%". The 1973 ordinance was held "palpably short" of these requirements. 128 *N. J. Super.* at 447.

*Mount Laurel* devised no formula for estimating "fair share", but the matter was left for the municipality to apply the expertise of the "municipal planning adviser, the county planning boards and the state planning agency." 67 *N. J.* at 190.

The number and variety of considerations which have been deemed relevant in the formulation of fair share plans is such as to underscore our earlier observation that the entire

which a burden may be shared." Plaintiffs' witness Paul Davidoff suggested three factors for determining the relevant region: (1) the volume of transactions (communications, trade, employment) between component sections of the region; (2) the demand exerted for housing within the region; and (3) the area within which a satisfactory solution of the housing need may be found.

problem involved is essentially and functionally a legislative and administrative, not a judicial one.[45]

---

[45]The most frequently mentioned fair share criteria have been grouped under four headings. We list them for informational purposes without necessarily implying our approval.

"Equal share" criteria have as their objective equal distribution of housing. e. g., by establishing a minimum percentage of low and moderate income housing units to be contained within each community.

"Need" criteria allocate housing to regions where there is the greatest need, but have been criticized as perpetuating slums.

"Distribution" criteria allocate low and moderate income units to areas lacking the same in order to achieve a greater income and racial mix.

"Suitability" criteria select areas containing the most suitable housing sites based on physical and fiscal capacity. Kelly, "Will the Housing Market Evaluation Model Be the Solution to Exclusionary Zoning?", 3 *Real Estate L. J.* 373 (975) ; Brooks, *Lower Income Housing : The Planner's Response, op. cit. supra*, n. 40 ; Listokin, "Fair-Share Housing Distribution : Will It Open the Suburbs to Apartment Development?", 2 *Real Estate L. J.* 739, 746 (1974).

The most important single criterion emerging from fair share literature is the amount of vacant developable land, as "access to land is the basic issue in exclusionary zoning." Rubinowitz, "Exclusionary Zoning : A Wrong in Search of a Remedy", 6 *Mich. J. L. Reform* 625, 661 (1973). Other basic criteria include employment opportunity, fiscal measures (including per capita income, equalized assessed valuation per pupil, degree of underutilization of classrooms) and existing housing or population density. See generally, Brooks, *supra; Listokin, supra;* Kelly, "Will the Housing Market Evaluation Model be the Solution to Exclusionary Zoning?", 3 *Real Estate L. J.* 373 (1975) ; Rubinowitz, *supra;* authorities cited *supra* note 39.

It has been emphasized that many of the potential fair share criteria measure the same factors, Rubinowitz, *supra,* 6 *Mich. J. L. Reform* at 660–661, and the effort should be made to keep the formula factors simple to avoid duplication and the "statistical warfare" which may otherwise result from over-sophisticated formulae. *Cf.* Rose, "The *Mount Laurel* Decision : Is It Based on Wishful Thinking?", 4 *Real Estate L. J.* 61, 67 (1975).

The Delaware Valley Regional Planning Board adopted a formula equally weighing only three criteria : relative wealth (based upon the market value of all taxable real estate in the county compared to the region total) ; equalization criteria (would give each county the same proportion of income groups) ; and projected employment opportunities. See Moskowitz, "Regional Housing Allocation Plans : A Case History of the Delaware Valley Regional Plan", 7 *Urban Lawyer* 292 (1975).

The formula specified by the trial court would not necessarily be properly utilizable in other contexts. Some municipalities might have such very high or very low existing proportions of lower-income families in their population make-up as to render such a formula patently unfair. If the existing municipal proportions correspond at least roughly with the proportions of the appropriate region the formula would appear *prima facie* fair. The evidence herein is that the stated municipal proportions approximate those of the county of Middlesex. We are without data as to the comparative proportions of such a larger area as would include the more urban counties in the northeast New Jersey region.

Harking back to our statement in II as to why we proposed in this opinion to discuss the concepts of fair share and region notwithstanding that we would not, nor would we require the trial court to specify a pertinent region or fix a fair share housing quota for Madison, we summarize the observations in VII and VIII as follows:

1. Based upon our analysis and findings in IV and VI, the 1973 ordinance is clearly deficient in meeting Madison's obligation to share in providing the opportunity for lower cost housing needed in the region, whether or not the specific fair share estimates submitted by defendant are acceptable. Those estimates are, in any event, defective at least in not including prospective need beyond 1975.

2. The objective of a court before which a zoning ordinance is challenged on *Mount Laurel* grounds is to determine whether it realistically permits the opportunity to provide a fair and reasonable share of the region's need for housing for the lower income population.

3. The region referred to in 2 is that general area which constitutes, more or less, the housing market area of which the subject municipality is a part, and from which the prospective population of the municipality would substantially be drawn, in the absence of exclusionary zoning.

4. Fair share allocation studies submitted in evidence may be given such weight as they appear to merit in the

light of statements 2 and 3 above. But the court is not required, in the determination of the matter, itself to adopt fair share housing quotas for the municipality in question or to make findings in reference thereto.

## IX

### Environmental Considerations

As noted above, a considerable amount of vacant acreage in Madison borders certain streams or comprises important aquifer storage and discharge areas. Depositions and counter-depositions were taken by defendant and plaintiffs, respectively, bearing upon the effect of development of varying kinds on such areas as Burnt Fly Bog, the Old Bridge Sands, Raritan Bay beachfront, the salt marshes behind Raritan Bay and the four streams flowing into South River. Defendant offered the depositions at the trial to establish that certain areas zoned R-80, R-40 and RP were so sensitive to flood, water contamination and related problems that they should be kept from development at all or restricted to very low residential density. The trial judge declined to consider this evidence on the ground that considerable other land, free from such ecological considerations, and amenable to higher density development, was available within the township with which it could meet its fair share obligation for its own and the region's housing needs. 128 *N. J. Super.* at 447.

Plaintiffs' experts testified on depositions that the answer to the ecological problems posed was not prohibition or regulation of the density of development *per se* but careful use of the land, with adequate controls in respect of construction, sewerage, water control and treatment, sufficient open space per structure and other services.

Ecological and environmental considerations were also advanced by the municipality in *Mount Laurel* to justify large lot zoning throughout the township. We pointed out there that while such factors and problems were always to be given consideration in zoning (see 3 Williams, *American*

*Land Planning Law* (1975) § 66.12, pp. 30, 34–35), "the danger and impact must be substantial and very real (the construction of every building or the improvement of every plot has some environmental impact) — not simply a make-weight to support exclusionary housing measures or preclude growth * * *". 67 *N. J.* at 187.

■ ■ Notwithstanding the foregoing, we conclude the trial court erred in not receiving in evidence and giving consideration to the environmental depositions mentioned. It is not an answer to say there is ample other land capable of being deployed for lower income housing. The municipality has the option of zoning areas for such housing anywhere within its borders consistent with all relevant considerations as to suitability. There are proponents of scattering lower income housing widely throughout a municipality as well as adherents of segregating such housing in limited areas. Since the municipal fathers should have the widest latitude of judgment in that regard, it is in the interests both of the municipality and the plaintiffs that the parties have the benefit of findings by the court, from the proofs, as to exactly which of the allegedly environmentally sensitive areas, if any, are in fact not susceptible of housing development at all; which, of only low density development; and which are free of any environmental constraints in respect of density or type of housing.

We shall, in the remedial portion of this opinion, be directing amendment of the ordinance to add substantial areas to districts zoned for multi-family housing and for single-family homes on very small lots. It therefore will be necessary for the governing body of defendant to be apprised, from the findings of the court in the respects just noted, what part of the areas claimed by defendant to be environmentally unsuited for such zoning need not be resorted to for that purpose.

The court may, in its discretion, permit the depositions to be amplified at a hearing on remand, but any such hear-

ings and the added findings here directed to be made shall be expedited.

In concluding this point, however, we find no basis in the record for determining that, in any view of the environmental proofs, defendant does not have sufficient vacant developable land free from disabling ecological considerations to enable it to create the zoning opportunity for its fair share of the region's need for least cost housing.[46]

## X

### "Affirmative Action" for Lower Income Housing

Plaintiffs and supporting *amici* press for a judicial mandate that developing municipalities be required affirmatively to act for creation of additional lower income housing in more ways than by eliminating zoning restrictions militating against that objective. Of the devices which have been suggested to this end, tax concessions and mandatory sponsorship of or membership in public housing projects must be summarily rejected. Tax concessions would unquestionably require enabling legislation and perhaps constitutional amendment. While we have described the sponsorship of public housing projects as a moral obligation of the municipality in certain specified circumstances, *Mount Laurel*, 67 *N. J.* at 192, we have no lawful basis for imposing such action as obligatory. It goes without saying, however, that the zoning in every developing municipality must erect no bar or impediment to the creation and administration of public housing projects in appropriate districts. See also *id.* at 211–212 (Pashman, J., concurring).

We have hereinabove indicated that provision by zoning for density bonuses keyed to quantitative or bulk concessions

---

[46]See generally Ackerman, "The *Mount Laurel* Decision: Expanding the Boundaries of Zoning Reform," 1976 *U. of Ill. Law Forum* 1, 43–71 (1976).

by the builder (*e. g.*, added bedrooms) is both valid and mandatory where necessary to achieve sufficient suitable least-cost housing, but that we are not prepared presently to pass upon the validity of zoning for bonuses keyed to rental or sale price concessions.

Various additional suggestions for encouraging the proliferation of lower cost housing on municipal initiative are set forth in the supplemental *amicus* brief of The Public Advocate but are not deemed to require comment here as none warrant mandatory imposition in any revised Madison ordinance. See also *Mount Laurel*, 67 *N. J.* 209–213 (Pashman, J., concurring).

## XI

### *The Validity of the Zoning Statute*

Plaintiffs' original cross-appeal from the trial court's first determination assailed that portion of the court's decision upholding the constitutionality of the zoning enabling act, *N. J. S. A.* 40:55–30 *et seq.*, and their second brief to this court incorporates the supporting arguments. Plaintiffs' novel contention is that the general zoning purposes stated in *N. J. S. A.* 40:55–32, although adequate when enacted in 1928, today fail to provide detailed standards to guide municipalities in their exercise of the zoning power, to wit, they fail to direct that a municipality must be racially and economically "inclusionary" rather than exclusionary.

The stated argument was formulated before we decided *Mount Laurel* and is basically mooted by our holding there, in effect, that the zoning statute is to be construed to conform with state due process and equal protection so as to compel zoning in developing municipalities to affirmatively combat exclusion of the lower income population needing housing.[47]

---

[47] In addition, it should be noted that on January 14, 1976 a new zoning statute, *L.* 1975, *c.* 291, was enacted to supersede the one under consideration, and took effect August 1, 1976. Under this

In any event, we find the contention to lack intrinsic merit. The statute expressly sets out as a standard for the exercise of the zoning power the promotion of health, morals and the general welfare as well as other subordinate criteria. *N. J. S. A.* 40:55–32. As noted, a zoning ordinance contrary to the general welfare is invalid, *Mount Laurel, supra,* 67 *N. J.* at 175, and the term "general welfare" requires the consideration of regional housing needs. *Ibid. Cf. Ward v. Scott,* 11 *N. J.* 117 (1952), where a similar attack was made on *N. J. S. A.* 40:55–39(d), providing for the issuance of use variances, on the grounds that specific standards did not accompany the delegation of power. Finding that this section incorporated the standard of *N. J. S. A.* 40:55–32, and hence was valid, Justice Jacobs noted that although "the Legislature may not vest unbridled or arbitrary power in the administrative agency but must furnish a reasonably adequate standard to guide it * * * [nonetheless] the exigencies of modern government have increasingly dictated the use of general rather than minutely detailed standards in regulatory enactments under the police power." *Id.* at 123–4. Provision for local and regional housing needs, although not expressly enumerated under *N. J. S. A.* 40:55–32, is required in the promotion of the general welfare. *Mount Laurel, supra.*

 It goes without saying that the statutory and constitutional prohibition, by judicial construction, of zoning to exclude, encompasses exclusion by race as well as by economic circumstances.

The statute is valid.

## XII

### *Relief for Corporate Plaintiffs*

The corporate plaintiffs contend that the 1973 ordinance is invalid not only generally, as exclusionary of lower in-

statute, housing needs, regional needs and low cost development are specified as among the concerns of zoning. *L.* 1975, c. 291, § 2(a), (d), (e), (g), (m).

come housing, but specifically as to their own tract of land because of zoning restrictions which are confiscatory. They therefore ask that the court specifically order the township to place their property in an appropriate multi-family or PUD zone to be created — in effect, to grant them a permit to build the kind of moderate-to-middle income housing they have in mind.[48]

Plaintiffs' expert witnesses testified that the restrictions upon their land (originally encompassing about 400 acres, but later reduced by a "Green Acres" taking to about 200 acres in the R-40 zone) were such that even using the clustering device the residences to be produced would have to sell for about $63,000, for which there was no feasible market in the number producible on the property. Plaintiffs' witness Chester conceded that if only 30 or 40 units were involved they might be marketable, but not the hundreds contemplated by plaintiffs' project. We cannot render an assured determination that the zoning is confiscatory against corporate plaintiffs on such proofs. Plaintiffs are not necessarily entitled to zoning feasible for their holdings as an entirety if they are reasonably utilizable as divided in separate ownerships. Nor are they entitled to zoning permitting the most profitable development of the property. *Cobble Close Farm v. Bd. of Adjustment, Middletown Tp.,* 10 *N. J.* 442, 452 (1952). Yet it appears that even if divided into smaller ownerships it would be difficult to market the property for residential uses under the zoning restrictions as they stand, having in mind the historical absence of any large lot development in the area. *Cf. Schere v. Township of Freehold, supra* (119 *N. J. Super.* 433).

A consideration pertinent to the interests of justice in this situation, however, is the fact that corporate

[48]Plaintiffs offered purported proof, and contend that if their land were appropriately zoned they could develop 20% of their proposed housing for families of moderate income.

plaintiffs have borne the stress and expense of this public-interest litgation, albeit for private purposes, for six years and have prevailed in two trials and on this extended appeal, yet stand in danger of having won but a pyrrhic victory. A mere invalidation of the ordinance, if followed only by more zoning for multi-family or lower income housing elsewhere in the township, could well leave corporate plaintiffs unable to execute their project. There is a respectable point of view that in such circumstances a successful litigant like the corporate plaintiffs should be awarded specific relief. Mytelka and Mytelka, "Exclusionary Zoning: A Consideration of Remedies", 7 *Seton Hall L. Rev.* 1, 26–29 (1975); Rubinowitz, "Exclusionary Zoning: A Wrong in Search of a Remedy", 6 *Mich. J. L. Ref.* 625, 668 (1973); Hartman, "Beyond Invalidation — The Judicial Power to Zone", 9 *Urban L. An.* 159, 162–168 (1975); *cf.* Mallach, "Do Lawsuits Build Housing?: The Implications of Exclusionary Zoning Litigation", 6 *Rutgers-Camden L. J.* 653, 675, 677 (1975).

There is also judicial precedent for such action. *In Appeal of Girsh,* 437 *Pa.* 237, 263 *A.* 2d 395 (Sup. Ct. 1970), a builder succeeded in obtaining an adjudication of the invalidity of an ordinance precluding apartment development. The municipality rezoned to create an apartment district but did not include plaintiff's land. The plaintiff then sought to compel issuance of a permit, but the town announced the property would be condemned for a park. When plaintiff sued to enjoin condemnation, the Supreme Court ordered issuance of a permit. Order No. MP–12, 271 (August 29, 1972). Hartman, *op. cit supra,* 9 *Urban L. An.* at 161–162. The same court took similar action in *Township of Williston v. Chesterdale Farms, Inc.,* 462 *Pa.* 445, 341 *A.* 2d 466 (Sup. Ct. 1975). See also *Franklin v. Village of Franklin Park,* 19 *Ill.* 2d 381, 167 *N. E.* 2d 195 (Sup. Ct. 1960).

Such judicial action, moreover, creates an incentive for the institution of socially beneficial but costly litigation such

as this and *Mount Laurel,* and serves the utilitarian purpose of getting on with the provision of needed housing for at least some portion of the moderate income elements of the population. We have hereinabove referred to the indirect housing benefits to low income families from the ample provision of new moderate and middle income housing. Point V.

The foregoing considerations have persuaded us of the appropriateness in this case of directing the issuance to the corporate plaintiffs, subject to the conditions stated *infra,* of a permit for the development on their property of the housing project they proposed to the township prior to or during the pendency of the action, pursuant to plans which, as they originally represented, will guarantee the allocation of at least 20% of the units to low or moderate income families.[49] This direction will be executed under the enforcement and supervision of the trial judge in such manner as to assure compliance with reasonable building code, site-plan, water, sewerage and other requirements and considerations of health and safety. *Cf. Township of Williston v. Chesterdale Farms, Inc., supra* (341 *A.* 2d at 468–469).

An express condition of this holding, moreover, is that the trial court, after consideration of the ecological and environmental proofs referred to in IX, *supra,* determine that the plaintiff's land is environmentally suited to the degree of density and type of development plaintiffs propose. Subject to these conditions it is our purpose to assure the issuance of a building permit to corporate plaintiffs within the very early future.[50]

---

[49]The income standards specified are to accord with data applicable as of the date of the completion of the buildings.

The "Statewide Housing Allocation Plan for New Jersey" study, *op. cit. supra,* n. 35, sets 1970 ranges for low income households as up to $5,568/year and moderate income household as $5,569–$8,567/year. As of 1976 the estimate for low and moderate income households is stated as "up to approximately $13,000". p. 492.

[50]This determination is not to be taken as a precedent for an automatic right to a permit on the part of any builder-plaintiff who

## XIII

### *Remedy and Remand*

We herewith modify the judgment entered in the Law Division to hold, as we did in *Mount Laurel* as to the ordinance there involved, that the 1973 zoning ordinance is invalid, not *in toto,* but only "to the extent and in the particulars set forth in this opinion". *Mount Laurel,* 67 *N. J.* at 191. For the reasons elaborated above the ordinance is presumptively contrary to the general welfare and beyond the scope of the zoning power in the particulars mentioned. *Mount Laurel,* 67 *N. J.* at 185. The municipality has not borne its consequent burden of establishing valid reasons for the deficiencies of the ordinance. *Id.* at 185. It is obvious that a revision of the residential provisions of the ordinance is called for in order to provide the opportunity for that amount of least-cost housing in the township which will comply with the directions contained in this opinion.

In *Mount Laurel* we elected not to impose direct judicial supervision of compliance with the judgment "in view of the advanced view of zoning law as applied to housing laid down by [the] opinion". 67 *N. J.* at 192. The present case is different. The basic law is by now settled. Further, the defendant was correctly advised by the trial court as to its responsibilities in respect of regional housing needs in October 1971, over five years ago. 117 *N. J. Super.* 11. It came forth with an amended ordinance which has been found to fall short of its obligation. Considerations bearing upon the public interest, justice to plaintiffs and efficient judicial administration preclude another generalized remand for another unsupervised effort by the defendant to produce a satisfactory ordinance. The focus of the judicial effort after six years of litigation must now be transferred from theorizing over zon-

is successful in having a zoning ordinance declared unconstitutional. Such relief will ordinarily be rare, and will generally rest in the discretion of the court, to be exercised in the light of all attendant circumstances.

ing to assurance of the zoning opportunity for production of least cost housing. See Mytelka and Mytelka, "Exclusionary Zoning: A Consideration of Remedies", 7 *Seton Hall L. Rev.* 1, 18, 23 (1975).

The trial court on remand shall execute the directions in IX and XII above and render its findings thereon with the reasonable dispatch appropriate to the age of this litigation. It shall become the obligation of the defendant, within 90 days thereafter, unless more time is allowed by the trial court, to submit to the trial court for its approval a revised ordinance.

The revision shall zone, in the manner specified in this opinion, to create the opportunity for a fair and reasonable share of the least cost housing needs of Madison's region, the concept of "region" to be understood as generally set forth in II and VIII hereinabove. While no formulaic determination or numerical specification of such a fair and reasonable share is required, we do not preclude it if the municipal planning advisors deem it useful. The revision shall, as *minima*: (a) allocate substantial areas for single-family dwellings on very small lots; (b) substantially enlarge the areas for dwellings on moderate sized lots; (c) substantially enlarge the AF district or create other enlarged multi-family zones; (d) reduce the RP, R–80 and R–40 zones to the extent necessary to effect the foregoing, subject to the directions in IX, *supra;* (e) modify the restrictions in the AF zones and PUD areas discussed hereinabove which discourage the construction of apartments of more than two bedrooms; (f) modify the PUD regulations to eliminate the undue cost-generating requirements specified above; and (g) generally eliminate and reduce undue cost-generating restrictions in the zones allocated to the achievement of lower income housing in accordance with the principles of least cost zoning set forth in V hereinabove.

The trial court shall have discretion, in the event of undue delay in compliance with this opinion or of a finding by the court that any zoning revision submitted by defendant fails

to comply with this opinion, to appoint an impartial zoning and planning expert or experts. Such expert may be directed to file a report or to testify, as the court may deem appropriate, as to a recommedation for the achievement by defendant of compliance with this opinion or with any further directions by the court pursuant thereto. See *Mount Laurel,* 67 *N. J.* at 216 (Pashman, J., concurring); *Pascack Assoc. v. Mayor, Coun. Tp. of Washington,* 131 *N. J. Super.* 195 (Law Div. 1974); Mytelka and Mytelka, "Exclusionary Zoning: A Consideration of Remedies", 7 *Seton Hall L. J.* 1, 31 (1975); Hartman, "Beyond Invalidation: The Judicial Power to Zone", 9 *Urban L. An.* 159, 171–173 (1975); Rubinowitz, "Exclusionary Zoning: A Wrong in Search of a Remedy", 6 *Mich. J. L. Ref.* 625, 656–657 (1973).

Judgment modified, and affirmed as modified; no costs.

PASHMAN, J., concurring and dissenting.

## OUTLINE OF CONCURRING AND DISSENTING OPINION

| I | Limited Agreement with Majority | 555 |
|---|---|---|
| II | The Need for Affirmative Relief | 556 |
| III | The Nature of Affirmative Judicial Relief | 576 |

| (A) | Remedial Objectives | 577 |
|---|---|---|
| (B) | Procedural Approach | 582 |
| (C) | Calculation of the Municipal "Fair Share" of Regional Housing Needs | 588 |
| (D) | Imposition of Remedial Devices | 595 |

| (1) | Award Specific Relief to Corporate Plaintiffs | 596 |
|---|---|---|
| (2) | Enjoin Interference with Construction of Low and Moderate Income Housing | 601 |
| (3) | Establish "Set-Aside" or "Override" Procedures to Facilitate Construction of Low and Moderate Income Housing | 602 |

(4) Declare that Regional Housing Needs
Constitute a "Special Reason" for
Granting Use Variances 605

(5) Order Specific Changes in the
Zoning Ordinance 609

(6) Enjoin Municipal Approval of Other
Forms of Development 610

(7) Order Municipality to Provide
Density Bonuses and Other Incen-
tives for Building Lower Income
Housing 611

(8) Order Municipality to Impose
Subdivision Conditions and Other
Inclusionary Devices 612

(9) Order the Municipal Government to
Establish a Local Housing Authority 615

IV Conclusion 616

## I

### LIMITED AGREEMENT WITH MAJORITY

I concur in the majority holding that the 1973 Madison Township zoning ordinance is invalid. Contrary to the constitutional precepts of *Southern Burlington Cty. NAACP v. Mt. Laurel Tp.*, 67 *N. J.* 151 (1975), appeal dismissed and *cert.* den. 423 *U. S.* 808, 96 *S. Ct.* 18, 46 *L. Ed.* 2d 28 (1975) (hereinafter *"Mt. Laurel"*), the instant ordinance fails to "make realistically possible the opportunity for an appropriate variety and choice of housing for all categories of people who desire to live there," particularly persons of low and moderate income. In his opinion for the Court, Judge Conford details the ways in which the Madison Township ordinance falls short of its obligation under *Mt. Laurel*. The township has

failed to zone adequate amounts of vacant and developable land for multi-family housing and for homes on very small lots, and has imposed undue cost-generating features which raise the rental or purchase price of new housing units above levels affordable by lower income families. Consequently, the majority concludes that the township has failed to foster or promote the construction of new, least-cost housing. I am in substantial accord with these findings.

I also agree with the majority that "[c]onsiderations bearing upon the public interest, justice to plaintiffs and efficient judicial administration" require immediate, specific relief and judicial supervision of all remedial efforts. Unquestionably, it is time that we begin to steer our energies toward good faith implementation of established principles.

I differ with the majority, however, as to the nature and scope of judicial remedies made available for the trial court during the remedial stages of the litigation. In cases of this nature, I conceive that powerful judicial antidotes may become necessary to eradicate the evils of exclusionary zoning. For this reason, I would proceed less gingerly than the majority; I would go farther and faster in outlining for the trial judge the full arsenal of judicial weaponry available for this purpose. I will first analyze the need for stronger, more effective judicial relief in exclusionary zoning cases and then enumerate the various remedial weapons which are or should be available to the trial judge upon remand.

## II

### THE NEED FOR AFFIRMATIVE RELIEF

The evils which the widespread practice of exclusionary zoning inflicts upon the State are now well-documented and need only be summarized here.

Exclusionary land use devices, such as minimum house size requirements, minimum lot size and frontage requirements, bedroom restrictions, overzoning for nonresidential or low density residential uses, and the outright prohibition of

multifamily housing, mobile homes and other forms of lower cost housing, effectively preclude construction of low and moderate cost housing units and thereby foreclose the opportunity for low and moderate income families to reside within the community. *Mt. Laurel, supra,* 67 *N. J.* at 170–173; *id.* at 197–203; (Pashman, J., concurring). The nefarious effects of this pattern of land use development are obvious.

First, exclusionary zoning contributes to the current housing shortage, not only by legislatively foreclosing opportunities for construction of low and moderate cost housing, but also by preventing construction of "least cost" housing which might create vacancies in units affordable by low income families. As to exclusionary zoning and the housing shortage generally, *see Mallach,* "Do Law Suits Build Housing?: The Implications of Exclusionary Zoning Litigation," 6 *Rutgers-Camden. L. J.* 653, 659 n. 24 (1975); Sagalyn & Sternlieb, *Zoning and Housing Cost: The Impact of Land-Use Controls on Housing Price* (1973); *Dep't of Community Affairs, The Housing Crisis in New Jersey* (1970).

Exclusionary zoning also tends to undermine rather than promote efficient land use development by sometimes subserving parochial interests in derogation of more efficient regional plans for the development and utilization of land. *Mt. Laurel, supra,* 67 *N. J.* at 171. It raises the unfortunate spectre of not only excluding from the community "strangers" whom local residents consider to be "undesirable," but also excluding (or even expelling) former or current residents who can no longer afford the high costs of housing in the community. Such persons might include elderly residents dependent upon fixed incomes, newly married sons and daughters of suburbanite parents, young families with children or persons currently residing in substandard housing. *See, e. g., Pascack Ass'n Ltd. v. Mayor & Council of Washington Tp.,* 131 *N. J. Super.* 195, 201 (Law Div. 1974), certif. granted, 69 *N. J.* 73 (1975).

Another similarly "incongruous result" stems from the fact that exclusionary land use practices often make it impossible for lower paid industrial or municipal employees to reside in the community where they work. *Mt. Laurel, supra,* 67 *N. J.* at 172. *See also* L. Rubinowitz, *Low-Income Housing: Suburban Strategies* 215, 235–236 (1974); Aloi & Goldberg, "Racial and Economic Exclusionary Zoning: The Beginning of the End?", 1971 *Urban L. Ann.* 9, 12–13; Sager, "Tight Little Islands: Exclusionary Zoning, Equal Protection, and the Indigent," 21 *Stan. L. Rev.* 767, 781 (1969).

Exclusionary land use practices also contribute directly to the rapid and relentless deterioration of our cities. In recent decades, industry and a large number of retail businesses have moved out of the city and relocated in suburban shopping centers and industrial parks. Meanwhile, lower income employees have been forced to remain in the cities. This phenomenon in turn causes two developments — an increase in unemployment among low income workers who cannot afford to reach the new sources of suitable employment and a critical erosion of the urban tax base, with its corresponding erosion of the city's ability to provide essential governmental services, such as police, fire protection, education, health and welfare, *Mt. Laurel, supra,* 67 *N. J.* at 173; M. Clawson, *Suburban Land Conversion in the United States: An Economic and Governmental Process* (1971). Thus, in a very direct and real way, exclusionary zoning fuels the financial crisis now facing most of our major cities. It also contributes to the creation of urban slums and the social unrest which they inevitably breed. *See Nat'l Advisory Comm'n on Civil Disorders, Report* (1968).

Finally, exclusionary land use regulation builds a wall around the cities over which only the well-to-do can escape. *Mt. Laurel, supra,* 67 *N. J.* at 171; Mytelka & Mytelka, "Exclusionary Zoning: A Consideration of Remedies," 7 *Seton Hall L. Rev.* 1, 3 (1975). Residential segregation is the inevitable result, violating the sacred ideals of our

pluralist society expressed in our State and Federal Constitutions. Among these are the right to travel, the right to live wherever one chooses and the basic right to equal opportunity to seek the amenities of life. *Mt. Laurel, supra,* 67 *N. J.* at 221 (Pashman, J., concurring); Kleven, *supra,* 21 *U. C. L. A. L. Rev.* at 1507–1508; Sager, *supra,* 21 *Stan. L. Rev.* at 791.

In *Mt. Laurel,* this Court began to deal with the sinister side of municipal land use controls. After discussing in detail the evils, pervasiveness and detrimental impact of exclusionary zoning practices, we concluded that such practices are inconsistent with the general welfare and violate both the zoning enabling act, *N. J. S. A.* 40:55–30 *et seq.*[1] and the State constitutional requirements of substantive due process and equal protection of the laws, *N. J. Const.* (1947), Art. I, ¶ 1. *Mt. Laurel, supra,* 67 *N. J.* at 175, 185; *id.* at 195 (Pashman, J., concurring). As a result, we imposed upon each developing community an obligation "affirmatively to plan and provide, by its land use regulations, the reasonable opportunity for an appropriate variety and choice of housing, including, of course, low and moderate cost housing, to meet the needs, desires and resources of all categories of people who may desire to live within its boundaries." *Mt. Laurel, supra,* 67 *N. J.* at 179. Having found the Mount Laurel Township zoning ordinances violative of this principle, we set aside those portions of the ordinance deemed to be exclusionary and allowed the township 90 days within which to adopt amendments to correct the deficiencies. *Mt. Laurel, supra,* 67 *N. J.* at 191. The majority

---

[1] On August 1, 1976, this statute was superseded by the "Municipal Land Use Law," *L.* 1976, *c.* 291, *N. J. S. A.* 50:55D–1 *et seq.* Nothing there suggests that the principles set forth in *Mt. Laurel* need be reconsidered, especially in light of the constitutional underpinning of that decision. In fact, the new law itself expressly incorporates the principle that municipal zoning regulations must not be blind to the needs and general welfare of neighboring communities, the county and the State as a whole. *See, e. g., L.* 1976, *c.* 291, § 2(d).

declined, however, to directly provide judicial supervision of municipal compliance with the decision, and noted simply that:

It is not appropriate at this time, particularly in view of the advanced view of zoning law as applied to housing laid down by this opinion, to deal with the matter of the further extent of judicial power in the field or to exercise any such power. * * * The municipality should first have full opportunity to itself act without judicial supervision. We trust it will do so in the spirit we have suggested, both by appropriate zoning ordinance amendments and whatever additional action encouraging the fulfillment of its fair share of the regional need for low and moderate income housing may be indicated as necessary and advisable.

[67 *N. J.* at 192]

Expressing concern that reliance upon voluntary municipal action might prove to be ineffective and that the abuses condemned by the Court were already widespread and deeply ingrained in local attitudes, I urged this Court to go "farther and faster" in implementing the principles announced that day. I once again call upon this Court to increase its efforts to combat the ills of exclusionary zoning.

In *Mt. Laurel,* I indicated several reasons justifying direct, immediate and effective judicial involvement. These factors remain equally pertinent today. There can be no doubt that abuse of the municipal zoning power is still widespread and pervasive. Zoning devices which have an exclusionary impact govern the vast majority of suburban New Jersey's vacant and developable land. *Mt. Laurel, supra,* 67 *N. J.* at 181–184; *id.* at 197–203 (Pashman, J., concurring); Sagalyn & Sternlieb, *supra,* at 193–195; Williams & Norman, "Exclusionary Land Use Controls: The Case of North-eastern New Jersey," 22 *Syracuse L. Rev.* 476 (1971); *N. J. Dep't of Community Affairs, Div. of State and Regional Planning, Land Use Regulation: The Residential Land Supply* (1972), Clawson, *supra,* at 261–280. Recent indications show that there has been no substantial change in this unlawful pattern of land use development. Mallach,

*supra*, 6 *Rutgers-Camden L. J.* at 653.[2] Mere invalidation of exclusionary ordinances and even the veiled threat of further judicial action (*see Mt. Laurel, supra,* 67 *N. J.* at 192) apparently have not succeeded in stimulating voluntary compliance with the principles of *Mt. Laurel.*

For one thing, local attitudes continue to militate against efforts to bring municipal land use regulations into conformity with the letter and spirit of *Mt. Laurel.* As we noted in *Mt. Laurel,* exclusionary zoning stems in part from the belief — partially discredited by recent studies[3] — that opening the suburbs to low and moderate income families will increase demands on locally financed government services without producing a corresponding increase in local revenues. It is feared that higher property taxes will be the inevitable result. *See, e. g., N. J. Cty. & Mun. Gov't Study Comm'n, supra* note 3, at xi, 83–88. This concern prompts

---

[2] *See also* Kushner, "Land Use Litigation and Low Income Housing: Mandating Regional Fair Share Plans," 27 *Zoning Digest* No. 282, at 13 (1975) (judicial action thus far has not produced "any observable improvement in either the quantity of low income housing or the quality of its locational configurations"); Delogu, "On the Choice of Remedies," 27 *Zoning Digest* No. 282, at 6 (1975). *The Bergen Record,* April 7, 1976, at C–2, col. 1 ("very little has happened" since *Mt. Laurel*); *The New York Times,* August 1, 1976, § 8, at 1 (N. J. ed.) ("State officials and builders alike agree that the change brought about by Mount Laurel thus far has been negligible."); *The Bergen Record,* Jan. 19, 1976, at 1 ("the message [of *Mt. Laurel*] has been ignored"); *Paterson News,* August 19, 1976, at 8, col. 1 ("But the ruling in the Mount Laurel case has turned out to be a disappointment. The decision's a flop . . . ."); *The Newark Star Ledger,* July 14, 1976, at 36, col. 3 ("The clear mandate in *Mt. Laurel* . . . has actually led to the production of very few, if any, moderate priced housing units"); *Paterson News,* October 17, 1975, at 4, col. 4 ("The five appeals court decisions . . . diminished the impact of the Supreme Court ruling [*Mt. Laurel*] . . ."); Bisgaier, "Some Notes on Implementing Mt. Laurel — An Admittedly Biased View," 99 *N. J. L. J.* 729 (1976).

[3] *See, e. g., N. J. Cty. & Mun. Gov't Study Comm'n, Housing & Suburbs: Fiscal & Social Impact of Multifamily Development* (1974); G. Sternlieb, *Housing Development and Costs* (1973).

local officials to strive for the benefits but avoid the costs of suburban development, by encouraging commercial and industrial uses while barring construction of housing for nonaffluent families. *Ibid.*

Exclusionary zoning is also motivated to a large extent by long-standing social and racial fears and prejudices.[4] Suburbanites generally perceive exclusionary land use regulation as a way of preserving cherished middle class values and the amenities of their insular communities. They fear that low and moderate income people will bring to their communities a corresponding influx of urban ills and social conflict. *Id.* at 86. *See also* Kleven, "Inclusionary Ordinances — Policy and Legal Issues in Requiring Private Developers to Build Low Cost Housing," 21 *U. C. L. A. L. Rev.* 1432, 1464–1465 and n. 107 (1974); Mytelka & Mytelka, *supra*, 7 *Seton Hall L. Rev.* at 14. The public resistance to the spirit of *Mt. Laurel,* which derives from these attitudes, would effectively stymie any action by locally elected officials. Hence, it is parochial interests which continue to dominate land use planning, at the expense of broader statewide and regional needs.

Other factors, which have come to light since *Mt. Laurel,* further illustrate the urgent need both for close judicial supervision and for the formulation of guidelines to direct remedial efforts. Critics of *Mt. Laurel* have urged a narrow reading of its applicability to other communities and the extent and nature of the judical relief which it authorizes, thereby producing uneven and equivocal results in the lower courts. *Compare, e. g., Pascack Ass'n Ltd. v. Mayor & Council of Washington Tp., supra,* 131 *N. J. Super.* 195 and

---

[4]One study, for example, reports that through a local referendum the residents of an "all-white" suburb of Detroit chose to reject all further federal funds for urban renewal, rather than comply with an order to provide housing for minority residents. Note, "A Wrong Without a Remedy: Judicial Approaches to Exclusionary Zoning," 6 *Rutgers-Camden L. J.* 727, 730 n. 12 (1975), citing G. Muller, *Exclusionary Zoning* 32–33 (1972).

*Urban League of Greater New Brunswick v. Mayor & Council of Carteret,* 142 *N. J. Super.* 11 (Ch. Div. 1976) *with Segal Construction Co. v. Wenonah Zoning Bd. of Adjustment,* 134 *N. J. Super.* 421 (App. Div. 1975), and *Nigito v. Borough of Closter,* 142 *N. J. Super.* 1 (App. Div. 1976).. *See also* Rose, "From the Courts: The Trickle Before the Deluge from *Mount Laurel,*" 5 *Real Estates L. J.* 69 (1976); *The Bergen Record,* "Mt. Laurel Zoning Ruling: A Vision Ignored," Jan. 19, 1976, at A-4, col. 5.

The failure to clarify ambiguities and to formulate guidelines for effective judicial review serves to strip the principles laid down in *Mt. Laurel* of all practical effect. Town officials who believe that courts will equivocate in enforcing municipal obligations to meet regional housing needs have no reason to act voluntarily in satisfying the mandate of Mt. Laurel, especially where such action faces strong local opposition. Under these circumstances, judicial timidity merely encourages municipal officials to yield to local prejudices and await the filing of law suits by low income persons and frustrated developers. In order to furnish a real incentive to good faith efforts on the part of municipal government, our legal pronouncements must guarantee prospective litigants effective relief for the vindication and enforcement of their constitutional rights.

Yet, even when law suits are filed, dilatory tactics by the municipality can still frustrate efforts to implement the principles of *Mt. Laurel.* For example, recalcitrant communities can delay legal proceedings by simply rezoning during litigation, or engaging in what one article calls the "zoning amendment shuffle." Mytelka & Mytelka, *supra,* 7 *Seton Hall L. Rev.* at 29–30.

The instant case provides an illustration of the problem. Plaintiffs instituted this action in November 1970. After the trial court invalidated defendant's zoning ordinance, *Oakwood at Madison, Inc. v. Madison Tp.,* 117 *N. J. Super.* 11 (Law Div. 1971), cross-appeals were taken and this Court certified the appeals pending unheard in the Appel-

late Division. 62 *N. J.* 185 (1972). In October 1973, while the matter was awaiting a second hearing before this Court, Madison Township adopted the revised zoning ordinance now under review. As a result, we remanded to obtain rulings on the ordinance as amended. In April 1974, the trial court again invalidated the Madison Township zoning scheme, *Oakwood at Madison, Inc. v. Madison Tp.,* 128 *N. J. Super.* 438 (Law Div. 1974) and, now, more than six years after the action was initially filed, the case is again before this Court.

While I do not question the motivations or impugn the intentions of the municipality in this particular case, it demonstrates that rezoning during the course of litigation can be used as a means of forestalling compliance with judicial decrees. In fact, several jurisdictions have responded to this danger by refusing to consider amendatory afterthoughts where a litigant has received a favorable determination in a suit challenging the exclusionary nature of a zoning ordinance. *First Nat'l Bank v. Village of Skokie,* 35 *Ill. App.* 3d 545, 342 *N. E.* 2d 448, 451 (App. Ct. 1975); *Fiore v. City of Highland Park,* 93 *Ill. App.* 2d 24, 235 *N. E.* 2d 23, 26–28 (App. Ct. 1968), *cert.* den. 393 *U. S.* 1084, 89 *S. Ct.* 867, 21 *L. Ed.* 2d 776 (1969); *First Nat'l Bank v. Village of Skokie,* 85 *Ill. App.* 2d 326, 229 *N. E.* 2d 378, 381–384 (App. Ct. 1967); *Casey v. Warwick Tp. Zoning Hearing Bd.,* 328 *A.* 2d 464, 467–468 (Pa. Sup. Ct. 1974); *Bd. of Supervisors of Willistown Tp. v. Walsh,* 20 *Pa. Cmwlth.* 275, 341 *A.* 2d 572 (Cmwlth. Ct. 1975); *Camp Hill Dev. Co., Inc. v. Zoning Bd. of Adjustment,* 13 *Pa. Cmwllh.* 519, 319 *A.* 2d 197 (Cmwlth Ct. 1974); *Sauer v. Richland Tp.,* 8 *Pa. Cmwlth.* 464, 303 *A.* 2d 269 (Cmwlth. Ct. 1973).

The hesitancy to order direct judicial supervision and assure adequate enforcement of *Mt. Laurel* principles may lead to another, equally distressing result. In the absence of such supervision following a final adjudication of invalidity, imaginative draftspeople will be able to construct

"fresh devices, untrammeled by precedent" to circumvent the holding of the trial court and preserve the exclusionary character of the community. Mytelka & Mytelka, *supra*, 7 *Seton Hall L. Rev.* at 19. Again, the instant case furnishes an illustration of the problem.

In October 1971, the trial court struck down Madison Township's zoning ordinance as impermissibly exclusionary and violative of the general welfare. *Oakwood at Madison, Inc. v. Madison Tp., supra,* 117 *N. J. Super.* at 21. On October 1, 1973, following oral argument in this case but prior to a second hearing before this Court, Madison Township substantially amended its earlier ordinance. The ostensible purpose of this revision was to rectify some of the deficiencies in the original ordinance. Though making the new ordinance more complex and sophisticated, township draftspeople failed to alter its illegal exclusionary character. For instance, the trial judge's first opinion criticized the township for zoning too much of its vacant and developable land for large minimum size lots and not devoting enough acreage to zones permitting construction of multifamily dwellings and lower cost houses on small lots. *Id.* at 19–21. As a result, the township reduced the size of its most restrictive zone, R–80, which requires a minimum lot size of two acres. But at the same time, it increased the size of the R–40 zone which requires minimum lot sizes of one acre. Additionally, it created a new zone, RP, which is developable as an R–80 zone until condemned by the township. These changes effectively offset the salutary effect of reducing the size of the R–80 zone. Furthermore, while the ordinance as amended now devotes a somewhat larger area to higher density districts and multifamily zones, these zones still cover only a small fraction of the township and, in fact, much of the land so zoned is not even vacant or developable. Thus, while the AF or multifamily apartment zone was enlarged by 150 acres and now encompasses 676 acres, at most only 193 of these acres are vacant and de-

velopable.[5] *See generally* Judge Conford's analysis of this aspect of the revised ordinance, *ante* at 505–507.[6]

In order to offset these apparent deficiencies, Madison Township claims to have satisfied its obligation with respect to lower income housing by permitting establishment of PUDs (planned unit developments) and residential clusters pursuant to "The 'Municipal Planned Unit Development Act'," *N. J. S. A.* 40:55–54 *et seq.* (superseded by the "Municipal Land Use Law," *L.* 1975, *c.* 291, §§ 28–46, effective August 1, 1976). While PUDs and residential clusters ordinarily increase the potential for low and moderate cost housing (*Mt. Laurel, supra,* 67 *N. J.* at 166; *see generally* Babcock & Bosselman, *Exclusionary Zoning: Land Use Regulation and Housing in the 1970's* 69–76 (1973)), here the township has foreclosed this possibility by locating two of the three PUD sites in remote areas of the township unserviced by essential utilities. Furthermore, other restrictions on PUD and residential cluster also foreclose low and moderate income housing: (1) maximum PUD density levels are even more restrictive than those contained in the Mount Laurel Township ordinance; and (2) an additional cost-

---

[5]As Judge Conford points out, Judge Furman stated that the true figure was probably closer to 120 acres and plaintiffs argued that it may be as low as 67 acres. *Ante* at 506 and accompanying text.

[6]This case provides other examples of shrewd draftsmanship. For instance, in his first opinion, the trial judge criticized the imposition of minimum floor space requirements in the R–80 and R–40 zones. *Oakwood at Madison, Inc. v. Madison Tp., supra,* 117 *N. J. Super.* at 20–21. Although the amended ordinance eliminated these provisions, it added a new provision which establishes minimum per room floor space limitations applicable to all residential zones.

In his initial opinion, the trial judge also questioned the propriety of the AF zone bedroom restrictions, limiting multifamily developments to 80% one bedroom and 20% two bedroom apartments. Although the revised ordinance no longer contains these restrictions, it now includes a floor area ratio regulation which confines construction to a maximum of 10,000 square feet per acre, and which effectively limits multifamily developments to efficiencies and one bedroom apartments. *Ante* at 505–506.

generating stage has been added to the approval process in addition to other cost-generating requirements, such as the mandatory construction of a school building to accommodate a specified number of students. For these reasons, I agree with the majority's assessment that the township's reliance upon these provisions is misplaced. *Ante* at 506. I also concur in the trial court's conclusion regarding the township effort to redraft its zoning ordinance: "The advances towards moderate-income housing opportunities are token, towards low-income housing opportunities nil." *Oakwood at Madison, Inc. v. Madison Tp., supra,* 128 *N. J. Super.* at 446.

A similar situation was presented in *Pascack Ass'n Ltd. v. Mayor & Council of Washington Tp., supra,* 131 *N. J. Super.* 195. There, the municipal zoning ordinance was struck down, partly because "it failed to make any provision for multi-family or rental-type housing." *Id.* at 197. In response to this holding, the township adopted an amendment to its zoning ordinance creating a multifamily district. *Id.* at 198. Nonetheless, in doing so, the township fell palpably short of complying with the court's mandate with respect to multifamily housing: first, the area actually rezoned for this use was quite limited both in size and in suitability for multifamily housing and, second, the ordinance imposed unreasonably demanding restrictions concerning lot size, unit density, minimum floor areas, and the required number of bedrooms and bathrooms, which together precluded multifamily residential use consistent with the economic needs of local residents. *Id.* at 199–200, 207.

Numerous other techniques and devices exist for circumventing judicial decisions which attempt to eradicate impermissible, exclusionary land use regulations. For example, in three landmark Pennsylvania cases, the plaintiff-developer was successful in having an exclusionary device invalidated but was still unable to build his proposed project. *Appeal of Kit-Mar Builders, Inc.,* 439 *Pa.* 466, 268 *A.* 2d 765 (Sup. Ct. 1970) (two to three acre minimum lot size requirement in-

validated); *Appeal of Girsh,* 437 *Pa.* 237, 263 *A.* 2d 395 (Sup. Ct. 1970) (de facto ban on apartment buildings invalidated); *Nat'l Land & Inv. Co. v. Easttown Tp. Bd. of Adjustment,* 419 *Pa.* 504, 215 *A.* 2d 597 (Sup. Ct. 1965) (four acre minimum lot size requirement struck down). As one commentator explains:

> None of the landmark decisions of the Supreme Court of Pennsylvania . . . resulted in a victory for the builder in the sense that the builder was able, as a result of litigation, to construct the development he proposed to build. Joseph Girsh never built his apartments. After the decision of the Supreme Court, *In re Girsh* . . . the Township classified several properties other than that owned by Girsh for apartment development. The present owners of the Girsh property are still attempting to convince the Township and the courts that apartments should be permitted on the tract involved in the *Girsh* case. In fact, the Girsh property, possibly as a result of the persistence demonstrated by the would-be developers, has now been condemned as a public park . . . .
>
> Kit-Mar Builders . . . are still negotiating for subdivision approval[7]. . . . Finally, even after the Supreme Court invalidated the four-acre zoning involved in *National Land and Investment Co. v. Easttown Township Board of Adjustment* . . . . Easttown Township then threatened to impose three-acre zoning. National Land finally abandoned its effort to build on one-acre lots, and the case was settled at two-acre minimum lots.[8]

Similar tactics were employed by the municipality in *Fiore v. City of Highland Park,* 76 *Ill. App.* 2d 62, 221 *N. E.* 2d

---

[7]Although the developer in *Kit-Mar* finally did obtain a subdivision approval, this did not occur until May 1972, more than two years after the Pennsylvania Supreme Court decided the case. Krasnowiecki, "Zoning Litigation and the New Pennsylvania Procedures," 120 *U. Pa. L. Rev.* 1029, 1082–1083 & n. 204 (1973).

[8]Rubinowitz, *supra,* at 210–211 quoting from Brief for Appellants, at 45–47, *Commonwealth v. County of Bucks,* 22 Bucks Cty. L. Rep. 179 (Ct. C. P. 1972), appeal docketed Commonwealth Ct. Pa. 27 T. D. 1972. *See also* Rubinowitz, "Exclusionary Zoning: A wrong in Search of a Remedy," 6 *Mich. J. L. Reform* 625, 638–639 (1973); Hartman, "Beyond Invalidation: The Judicial Power to Zone," 9 *Urban L. Ann.* 159, 161–162 (1975), Krasnowiecki, *supra* note 7, 120 *U. Pa. L. Rev.* at 1080–1084.

323 (App. Ct. 1966). There the plaintiff-developer sought to build apartments in a single family zone. Prior to a final judgment in the case, the city rezoned the property to office and research use. The trial court held that both this classification and the original single-family use were too restrictive and hence invalid. On appeal, the appellate court affirmed, but set aside the determination with respect to the original classification because the question was then moot. *Fiore v. City of Highland Park, supra,* 221 *N. E.* 2d at 330–331. The city then rezoned back to the single-family classification and the trial court again struck it down. Obviously irritated by the municipality's bad faith, the appellate court affirmed, stating:

In the light of the language, intent and meaning of the opinion and mandate, and the understanding of it, as indicated in the report of the Plan Commission, the act of the City in rezoning plaintiffs' property to the same single-family classification which it had in 1963, indicated a complete disregard for, and constituted an attempt to thwart, the opinion and mandate of this court. We have utmost respect and deep regard for the philosophy embodied in the principle of the separation of the powers of the three branches of our government. However, a City which is an appellant in zoning litigation, cannot parlay the doctrine of separation of powers into an authorization to exercise its delegated legislative powers after the case is decided adversely to it and remanded to the trial court with directions, and thereby frustrate and void the opinion and mandate of the reviewing court to which it submitted its case for decision.

[*Fiore v. City of Highland Park, supra,* 235 *N. E.* 2d at 27–28.]

For other examples of municipal delay and subterfuge, *see, Gautreaux v. Chicago Housing Authority,* 342 *F. Supp.* 827 (N. D. Ill. 1972), aff'd 480 *F.* 2d 210 (7 Cir. 1973), *cert.* den. 414 *U. S.* 1144, 94 *S. Ct.* 895, 896, 39 *L. Ed.* 2d 98 (1974) (inaction by city officials aimed at subverting a court order for the construction and placement of public housing); *Crow v. Brown,* 457 *F.* 2d 788 (5 Cir. 1972), aff'g 332 *F. Supp.* 382 (N. D. Ga. 1971) (refusal by local officials to grant developers building permits for apartments to be occupied by low income black tenants); *Dailey v. City of Lawton,*

425 *F. 2d* 1037 (10 Cir. 1970), aff'g 296 *F. Supp.* 266
(*W. D. Okla.* 1969) (denial of building permits for construction of low-income housing); *Kennedy Park Homes Ass'n
v. Lackawanna,* 318 *F. Supp.* 669 (W. D. N. Y. 1970), aff'd
436 *F. 2d* 108 (2 Cir. 1970), *cert.* den. 401 *U. S.* 1010, 91
*S. Ct.* 1256, 28 *L. Ed. 2d* 546 (1971) (imposition of a moratorium on new subdivisions); *Casey v. Warwick Tp. Zoning
Hearing Bd., supra,* 328 *A. 2d* 467–468 (amending zoning
ordinance during litigation); *G & D Holland Constr. Co. v.
City of Marysville,* 12 *Cal. App. 3d* 989, 91 *Cal. Rptr.* 227
(Ct. App. 1970) (rezoning to frustrate construction of an
apartment building for lower income families).

Thus, in the absence of effective judicial supervision, a recalcitrant community can employ a variety of techniques to
forestall efforts to eliminate exclusionary zoning practices.
See one court's expressed recognition of this problem in *Van
Ness v. Borough of Deal,* 139 *N. J. Super.* 83, 101 (Ch. Div.
1975). *See generally* Babcock & Bosselman, *supra,* at 14–17.
Using these techniques, a "bad-faith municipality can play
games until a developer gives up and goes elsewhere." Mytelka & Mytelka, *supra,* 7 *Seton Hall L. Rev.* at 24. For
this reason, most commentators agree that sole reliance upon
the municipality to correct the exclusionary effect of its zoning scheme is insufficient[9] and that, in the words of one
authority,

> . . . if judicial review of local zoning action is to result in anything
> more than a farce, the courts must be prepared to go beyond mere
> invalidation and grant definite relief.
>
> > [*Casey v. Warwick Tp. Zoning Hearing Bd., supra,*
> > 328 *A. 2d* at 469, quoting Krasnowiecki, *supra* note 7,
> > 120 *U. Pa. L. Rev.* at 1082.]

---

[9] *See, e. g., Hartman, supra* note 8, 9 *Urban L. Ann.* at 161; Mytelka, "The Mount Laurel Case: Where to Now?", 98 *N. J. L. J.*
513 (1975); Rubinowitz, *supra,* at 205; Rubinowitz, *supra* note 8,
6 *Mich. J. L. Reform* at 626; Note, "The Mount Laurel Case: A
Question of Remedies," 37 *U. Pitt. L. Rev.* 442, 453 (1975); Note.
*supra* note 4, 6 *Rutgers-Camden L. J.* at 727, 729, 754.

Obviously, action by other branches of government designed to address the problem of exclusionary zoning is preferable to judicial intervention on a case-by-case basis.[10] I strongly urge and warmly welcome such action. However, in its absence, courts must be prepared to provide effective relief in cases properly before them. Without such relief, the principles of *Mt. Laurel* will be shorn of all value and meaning, and the infringement of constitutional rights will remain unredressed.

> In seeking to vindicate the constitutional rights of low- and moderate-income families, . . . the courts' responsibility is to take *all steps within their power* to provide real remedies for those deprived of constitutional rights.
>
> [Rubinowitz, *supra*, 26, 224; emphasis supplied]

---

[10]As noted in *Mt. Laurel* by both the trial court (119 *N. J. Super.* at 177) and this Court (67 *N. J.* at 189 n. 22; *id.* at 214; (Pashman, J., concurring)), legislative or administrative action is preferable to litigation. First, legislation can have a much broader impact than judicial intervention, which ordinarily is limited to providing relief on a case-by-case basis. Second, legislative bodies are not confined to the issues brought before them, but may undertake a broad multi-faceted approach to the problem. Third, the legislature may draw upon a much broader range of informational sources and expertise. Finally, the Legislature and the agencies to whom it delegates authority are often better equipped to handle politically sensitive issues. Nevertheless where this process fails and where constitutional infirmities and social problems persist, the courts must and will intervene when called upon to do so. *Mt. Laurel, supra*, 67 *N. J.* at 192; *id.* at 215 (concurring opinion). *See also ante* at 535–536. As I noted in *Mt. Laurel*, if judicial intervention does become necessary in cases of this nature, courts are clearly capable of handling the issues presented to them. To assist them in resolving difficult questions, courts may invite the participation of the Department of Community Affairs or other governmental agencies as *amici curiae*, and appoint independent experts or join necessary parties. *Id.* 67 *N. J.* at 216. *See generally* Chayes, "The Role of the Judge in Public Law Litigation," 89 *Harv. L. Rev.* 1281 (1976).

While some efforts have already been taken in this direction, *Mt. Laurel, supra*, 67 *N. J.* at 189 n. 22; *ante* at 535; Mallach, *supra*, 6 *Rutgers-Camden L. J.* at 677–686, few of these measures provide for mandatory municipal participation and it is as yet unclear how effective they will be.

Judicial enforcement of our decision in *Mt. Laurel* would be consistent with the role other courts have taken in similar situations. Recently, in a case which upheld a remedial order compelling the U. S. Department of Housing and Urban Development to implement a comprehensive plan for the construction and deconcentration of public housing facilities in the Chicago metropolitan area, the United States Supreme Court reaffirmed the power of courts to provide such relief in housing discrimination cases:

> . . . Our prior decisions counsel that in the event of a constitutional violation "all reasonable methods be available to formulate an effective remedy," *North Carolina State Board of Education v. Swann*, 402 *U. S.* 43, 46 [91 S. Ct. 1284, 1286, 28 L. Ed. 2d 586, 589], and that every effort should be made by a federal court to employ those methods "to achieve the greatest possible degree of [relief], taking into account the practicalities of the situation." *Davis v. Board of School Comm'rs*, 402 *U. S.* 33, 37 [91 S. Ct. 1289, 1292, 28 L. Ed. 2d 577, 581]. As the Court observed in *Swann v. Charlotte-Mecklenburg Board of Education*: "Once a right and a violation have been shown, the scope of a district court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies." 402 U. S. [1], at 15 [91 S. Ct. 1267 at 1276, 28 L. Ed. 2d 554, at 566].
>
> > [*Hills v. Gautreaux*, 425 *U. S.* 284, 297, 96 *S. Ct.* 1538, 1546, 47 *L. Ed.* 2d 792, 803 (1976) aff'g sub. nom. *Gautreaux v. Chicago Housing Authority*, 503 *F.* 2d 930 (7 Cir. 1974)]

*See also Hawkins v. Town of Shaw*, 437 *F.* 2d 1286 (5 Cir. 1971), aff'd en banc 461 *F.* 2d 1171 (5 Cir. 1972) ; *Kennedy Park Homes Ass'n v. Lackawanna, supra,* 436 *F.* 2d 108; *Norwalk Core v. Norwalk Redevelopment Agency*, 395 *F.* 2d 920 (2 Cir. 1968), *Cf. Griffin v. School Bd. of Prince Edward Cty.,* 377 *U. S.* 218, 233–234, 84 *S. Ct.* 1226, 1234–1235, 12 *L. Ed.* 2d 256, 266–267 (1964) ; *Newman v. Alabama,* 503 *F.* 2d 1320, 1332–1333 (5 Cir. 1974), *cert.* den. 421 *U. S.* 948, 95 *S. Ct.* 1680, 44 *L. Ed.* 2d 102 (1975) ; *Robinson v. Cahill,* 69 *N. J.* 133, 152 (1975) ; *id.,* 70 *N. J.* 155, 174 (Pashman, J., dissenting). When constitutional rights have been violated and the responsible governmental agencies

have failed to correct the violation, courts have *a duty* to provide effective relief by taking whatever reasonable steps are necessary to right the wrong. *Swann v. Charlotte-Mecklenburg Bd. of Educ.,* 402 *U. S.* 1, 15–16, 91 *S. Ct.* 1267, 28 *L. Ed.* 2d 554, 566 (1971); *Green v. Cty. School Bd.,* 391 *U. S.* 430, 437–438 & n. 4, 88 *S. Ct.* 1689, 1694, 20 *L. Ed.* 2d 716, 723 (1968); *Louisiana v. United States,* 380 *U. S.* 145, 154, 85 *S. Ct.* 817, 13 *L. Ed.* 2d 709, 715 (1965); *Robinson v. Cahill, supra,* 69 *N. J.* at 152–153; *id.,* 69 *N. J.* at 156 (Pashman, J., concurring and dissenting); *Jackman v. Bodine,* 43 *N. J.* 453 (1964), supplemented 53 *N. J.* 585 (1969); *Cooper v. Nutley Sun Publishing Co.,* 36 *N. J.* 189, 196–197 (1961); *Asbury Park Press, Inc. v. Woolley,* 33 *N. J.* 1 (1960); *King v. South Jersey Nat'l Bank,* 66 *N. J.* 161, 177 (1974) (dictum).

Yet before suggesting various techniques for providing alternative judicial relief, it is necessary to address the problems raised by Mr. Justice Mountain. I am aware of the difficult task which the Court faces in attempting to fashion adequate relief. These problems are raised in my Brother's concurring and dissenting opinion and have properly engaged the attention of courts almost since the beginnings of our Republic. Though the difficult problems of enforcing the *Mt. Laurel* decision may uniquely be the province of this Court, other tribunals have also been faced with the problem of fashioning adequate relief to protect the enjoyment of various rights. Indeed, the existence of adequate relief to remedy the violation of a known right must not be considered merely ancillary to the merits of the instant case; in fact, it is a central issue in any controversy.

It is precisely because of the difficulty in enforcing our decision in *Mt. Laurel* that I have urged this Court and others to utilize a creative hand in shaping remedies which will adequately address the problems which have engaged our attention. This Court's role must not be limited by the complexities of the problems which it faces; though simplicity is desirable, it must not be purchased at the cost of sacrificing

the place which the Judiciary has attained in remedying the injustices of our society. Accordingly, I enthusiastically endorse Professor Chayes' eloquent expression of these principles:

> In my view, judicial action only achieves such legitimacy by responding to, indeed by stirring, the deep and durable demand for justice in our society. *I confess some difficulty in seeing how this is to be accomplished by erecting the barriers of the traditional conception to turn aside, for example, attacks on exclusionary zoning and police violence, two of the ugliest remaining manifestations of official racism in American life.* In practice, if not in words, the American legal tradition has always acknowledged the importance of substantive results for the legitimacy and accountability of judicial action. Otherwise it could not praise *Marbury v. Madison* as creative judicial statesmanship while condemning *Lochner v. New York* as abuse of power. *Perhaps the most important consequence of the inevitably exposed position of the judiciary in our contemporary regulatory state is that it will force us to confront more explicitly the qualities of wisdom, viability, responsiveness to human needs — the justice — of judicial decisions.*
>
> ["The Role of the Judge in Public Law Litigation," 89 *Harv. L. Rev.* 1281, 1316; footnotes omitted, emphasis added.]

Any tribunal which stops short of redressing a known wrong, particularly one of constitutional dimension, has been misguided as to the value of the right which it seemingly upholds. I do not read Mr. Justice Mountain's opinion as meaning in any way to disparage the important rights which we discussed in *Mt. Laurel.* On the contrary, he clearly states that the "rule of law and statement of principle" announced in *Mt. Laurel* are unexceptionable, yet it is in their implementation that difficulties arise. (at 624, Mountain J., concurring and dissenting). Yet to the extent that my Brother's opinion applauds a person's right to equal protection of the laws and due process, it is equally insensitive to those rights in its failure to provide appropriate remedies to ensure their continued enjoyment.

The problems inherent in the nature of the judicial power were realized and discussed by Chief Justice Marshall, in the landmark case of *Marbury v. Madison,* 1 *Cranch* (5

*U. S.*) 137, 2 *L. Ed.* 60 (1803). There the United States Supreme Court faced for the first time the difficult task of enforcing a decision to hold unconstitutional an Act of Congress, and thereby act as the final arbiter of the law. Chief Justice Marshall did not find the Court's task insurmountable. Instead, he noted the importance of its decision to our constitutional form of government:

[t]he very essence of civil liberty certainly consists in the right of every individual to claim the protection of the laws, whenever he receives an injury.

*Id.* at 163. Yet Chief Justice Marshall's statement would have reflected a wholly inadequate view of the meaning of liberty and of our duty today if he had not added the important qualification that "[o]ne of the first duties of government is to afford that protection." *Id.* To the extent that Mr. Justice Mountain is willing to leave the protection of important constitutional guarantees dependent on legislative action, he incorporates into our State Constitution an uncertainty in enforcement which renders equally uncertain the enjoyment of these rights.

Of course, to the extent that Mr. Justice Mountain urges legislative action to remedy the persistent wrongs of exclusionary zoning, I commend his effort and join in his opinion.[11] This Court has repeatedly cited the need for

---

[11]The concurring and dissenting opinion might be read as logically calling for the Court to declare unconstitutional the zoning enabling statute, thereby requiring the Legislature to fashion a "workable" scheme which the Court could then enforce. The fact that Mr. Justice Mountain has chosen to criticize our enforcement powers under the present statutory scheme, as opposed to our constitutional analysis in *Mt. Laurel*, supports this conclusion and leaves open this possibility. I note that Professor Payne's article, "Delegation Doctrine in the Reform of Local Government Law: The Case of Exclusionary Zoning," 29 *Rutgers L. Rev.* 803 (1976), which is approvingly cited in the concurring and dissenting opinion, calls for such an alternative approach to the problems of exclusionary zoning. Professor Payne suggests an alternative to the

comprehensive planning and a regional approach to zoning which the Legislature may accomplish with the power which it has within its grasp.[12] Though the Judiciary acts independent of the Legislature and is, constitutionally, an independent branch of the government, I am not opposed to a legislative solution which would lessen the burden facing this Court. Nevertheless, I realize that we must not avoid our constitutional duty to remedy the violation which the Court unanimously agrees exists in this case. We cannot remain aloof when fundamental liberties are at stake. Accomplishing effective relief in this case is a job which belongs to this Court alone.

## III

### THE NATURE OF AFFIRMATIVE JUDICIAL RELIEF

In *Mt. Laurel*, I called for the trial court to be "flexible and imaginative" in molding remedies to fit the circumstances of each case. I now go a step further and propose guidelines which I hope will fuel the judicial imagination.

Because all communities have differing characteristics, a remedial order which is suitable for one town may be wholly

Court's current approach which "is not inconsistent with *Mount Laurel*:"

. . . without backtracking from the commitment to break the cycle of neglect of regional housing needs made in Mount Laurel, the Supreme Court should, in a case properly presenting the issue, declare the New Jersey Zoning Enabling Act unconstitutional, on a theory that it improperly delegates to local decision-making matters that are demonstrably regional in concern.

[20 *Rutgers L. Rev.* at 820]

Though I agree that such an approach offers an attractive promise that headway will be made in meeting current zoning problems, I cannot ignore other problems which that approach might bring about. *Cf.*, *Robinson v. Cahill*, 70 *N. J.* 155, 161 (1976)(Mountain J., dissenting).

[12] *See* e. g., *Mt. Laurel*, 67 *N. J.* at 189, n. 22 ("Authorization for regional *zoning* — the implementation of planning —, or at least regulation of land uses having a substantial external impact by some agency beyond the local municipality, would seem to be logical and desirable as the next legislative step.").

inappropriate for another. For this reason, it would be ludicrous for this Court to define a standard remedial order applicable to all municipalities which have failed to use their land use regulations to make possible an appropriate variety and choice of housing. Nevertheless, contrary to the majority, I firmly believe that this Court *can and should* specify the goals which must be furthered by such judicial relief and then outline the procedures and devices which, depending on local circumstances, can be employed to attain those goals.

## A. *Remedial Objectives*

Five basic goals or objectives are readily identifiable. Most important, the trial court must prohibit continued use of the zoning power for illegal, exclusionary purposes. Ordinarily, this may be accomplished by enjoining operation of exclusionary devices and ordering the municipality to amend its zoning ordinance to correct these deficiencies. Thus the court can alter an exclusionary scheme and foreclose prospective denial of plaintiffs' rights. *Mt. Laurel, supra,* 67 *N. J.* at 191. Insofar as the majority opinion sets aside the unlawfully exclusionary provisions of the Madison Township zoning ordinance and orders the township to correct the deficiencies therein, I join in that opinion. *Ante* at 552–553.

Second: Not only must the trial court enjoin all prospective abuse of the zoning power, but through its remedial order it must provide effective relief to remedy past discrimination as well. Thus, in *Mt. Laurel,* we held that where a municipality chooses to exercise its power pursuant to the zoning enabling act, it automatically assumes a presumptive obligation with respect to regional housing needs:

We conclude that every such municipality must, by its land use regulations, presumptively make realistically possible an appropriate variety and choice of housing. More specifically, presumptively it cannot foreclose the opportunity of the classes of people

mentioned for low and moderate income housing and in its regulations *must affirmatively afford that opportunity, at least to the extent of the municipality's fair share of the present and prospective regional need therefor.*

[67 *N. J.* at 174; emphasis supplied.]

When a court has determined that a municipality has failed to meet this obligation, it must order that community to fulfill its duty.[13] This means that the town must make housing opportunities reasonably available to persons who desire to live there, but have been precluded from doing so by the town's land use regulations. Obviously, if the rights afforded by *Mt. Laurel* are to have any real meaning or value, fulfillment of the obligation must be measured in terms of actual production of sufficiently dispersed low and moderate income housing.[14] Judicial relief therefore must

---

[13]This essential objective remains unaffected by proof that the municipality's failure to meet its obligation under *Mt. Laurel* derives from inadvertence rather than from a conscious effort to discriminate against certain classes of people. *See, e. g., Mt. Laurel, supra,* 67 *N. J.* at 174 n. 10; *id.* at 196 n. 2 (Pashman J., concurring).

[14]Naturally a municipality which affirmatively encourages the construction of low and moderate income housing in an already overcrowded, blighted or deteriorated section of the community in order to preserve the exclusionary character of the remainder of the municipality does not satisfy its obligation under *Mt. Laurel.* Therefore, not only must the municipality foster production of low and moderate income housing, but it must also assure that the housing is placed so that it alleviates, rather than aggravates, current concentrations of low and moderate income residents. It is interesting to note that the Housing and Community Development Act of 1974 provides that one of its primary objectives is to reduce the isolation of income groups within communities and geographical areas and [promote] an increase in the diversity and vitality of neighborhoods through the spatial deconcentration of housing opportunities for persons of lower income.

[42 *U. S. C. A.* § 5301(c)(6).]

*See generally,* Rose "Fair Share Housing Allocation Plans: Which Formula Will Pacify the Contentious Suburbs?" 12 *Urban L. Ann.* 3 (1976).

be geared toward achieving that goal. One well-reasoned article states:

Where a municipality has engaged in exclusionary practices, particularly where it has done so in the face of precedents like *Mount Laurel,* the overriding judicial consideration should be to get housing built without delay.[15] [Mytelka & Mytelka, *supra,* 7 *Seton Hall L. Rev.* at 26.]

Third: While principally designed to eliminate exclusionary zoning and encourage construction of low and moderate cost housing, remedial decrees must not be insensitive to other legitimate local concerns. Therefore, judicial decrees must also strive to preserve the amenities which have made the defendant-municipality an attractive place in which to live. This goal reflects the fact that providing an appropriate variety and choice of housing, though fundamental, is not the only objective of land use planning. Other objectives include preservation of the environment, regulation of the pace of community growth and development and protection of the public health, safety and welfare. *N. J. S. A.* 40:55–32, superseded by Municipal Land Use Act, *L.* 1975, *c.* 291, § 2. In *Mt. Laurel,* we stressed the importance of these additional functions of zoning. *Mt. Laurel, supra,* 67 *N. J.* at 190–191; *id.* at 212–213 (Pashman, J., concurring). *Cf. Village of Belle Terre v. Boraas,* 416 *U. S.* 1, 94 *S. Ct.* 1536, 39 *L. Ed.* 2d 797 (1974); *Euclid v. Ambler Realty Co.,* 272 *U. S.* 365, 47 *S. Ct.* 114, 71 *L. Ed.* 303 (1926). A failure to advance this third objective could invariably lead to a condition which has been described as follows:

---

15In a footnote, this article quotes from another source as follows:

In exclusionary zoning cases the measure of whether the remedy is working should be actual production of low-and moderate-income housing.

[Rubinowitz, *supra,* at 211.]

Exclusionary zoning can be successfully attacked in the courts, but the excluded can win too well. If land use regulations are torn down without regard to the efficacy of substitute ordinances, the desirable residential community which originally attracted the plaintiffs can rapidly deteriorate into a place of soaring taxes, disappearing amenities, and inadequate schools, utilities, and public services — in short, a scene of chaotic, ugly growth. [Mytelka & Mytelka, *supra,* 7 *Seton Hall L. Rev.* at 1-2.]

To avoid such a result the trial court must carefully balance the objective of building lower cost residences with the goal of preserving local amenities. As we noted in *Mt. Laurel,* both of these objectives can be achieved through careful planning and local cooperation:

There is no reason why developing municipalities like Mount Laurel, required by this opinion to afford the opportunity for all types of housing to meet the needs of various categories of people, may not become and remain attractive, viable communities providing good living and adequate services for all their residents in the kind of atmosphere which a democracy and free institutions demand. They can have industrial sections, commercial sections and sections for every kind of housing from low cost and multifamily to lots of more than an acre with very expensive homes. Proper planning and governmental cooperation can prevent over-intensive and too sudden development, insure against future suburban sprawl and slums and assure the preservation of open space and local beauty. We do not intend that developing municipalities shall be overwhelmed by voracious land speculators and developers if they use the powers which they have intelligently and in the broad public interest. Under our holdings today, they can be better communities for all than they previously have been.
[67 *N. J.* at 190-191]

*See generally* Sedler, "Conditional, Experimental and Substitutional Relief," 16 *Rutgers L. Rev.* 639 (1962).

Fourth: So far as practical, the relief granted should respect the principle of local prerogative in land use planning. As was recognized in *Mt. Laurel,* zoning is still largely a function of local government.[16] *Mt. Laurel, supra,* 67

---

[16]Though recognizing this fact, we also stressed the critical need to eventually reduce reliance upon local decision-making and to pro-

*N. J.* at 189. Therefore, at least in the first instance, it is the function and responsibility of local government to revise and amend its zoning ordinance and to formulate plans to meet its affirmative obligation under *Mt. Laurel. Id.* at 191. For this reason courts usually require the initial stages of remedial action to be undertaken by the municipality. Of course, respect for local judgment and control of land use decisions does not justify judicial acquiescence to indifference, evasion or subterfuge on the part of the municipality. Therefore, respect for local control should never override the other objectives of remedial action. As I stated in *Mt. Laurel,* "[t]he mere fact that local land use control issues are involved does not preclude the court . . . from exercising full panoply of equitable powers to remedy the situation." 67 *N. J.* at 215 (Pashman, J., concurring).

Fifth: The relief ordered by the trial court must be judicially manageable. This, of course, does not mean that it may not be innovative, flexible, or require long-range or novel forms of judicial involvement. In short, the appropriateness and sufficiency of each remedial device must be measured in terms of its relation to the advancement of these five goals and objectives.[17]

---

vide for a greater degree of intergovernmental cooperation and use of regional and statewide development schemes. *Mt. Laurel, supra,* 67 *N. J.* at 189 n. 22; *id.* at 210 (Pashman, J., concurring). Until such changes are enacted, though, the Judiciary will continue to ensure that localities consider and weigh the impact which their land use regulations have on regional and statewide needs. *Id.* at 177. *But cf. ante* at 571 (Pashman, J., concurring).

[17]It is interesting to note that one writer theorized that a comparable set of objectives underlie the decrees of federal courts in federal voting rights and school desegregation cases:

Several principles of fashioning appropriate relief in the vindication of federal constitutional rights can be distilled from these cases. *First, the remedy must be effective: it must maximize the actual relief sought, such as actual desegregation. Second, the court must be flexible and consider the use of all available techniques. A choice of remedies must take into account the practicalities of relief. Nor can the existence of administrative inconvenience bar the use of a particular form of relief. Third, courts must*

## B. Procedural Approach

In cases challenging the validity of municipal legislation, the traditional equitable remedy has been to enjoin operation and enforcement of the offending provisions. As noted in Part II, *supra,* this remedy is wholly inadequate in the context of exclusionary zoning. It makes no provision for vindicating and redressing past wrongs; skillful draftspeople will be able to circumvent it by devising new exclusionary devices, requiring prolonged litigation to achieve desired results; and, finally, an unqualified injunction against operation of the ordinance may subvert the legitimate, nonexclusionary function of land use planning, to the detriment of the entire community. Therefore, I conceive that the remedial stage of most exclusionary zoning cases will require both affirmative relief and close judicial supervision, almost as a matter of course.

The need for a deliberate approach implementing this relief is apparent. As I noted in *Mt. Laurel,* effective relief can be achieved only if the trial court proceeds steadfastly in following these four steps:

(1) identify[ing] the relevant region;
(2) determin[ing] the present and future housing needs of the region;
(3) allocat[ing] these needs among the various municipalities in the region; and
(4) shap[ing] a suitable remedial order.

[67 *N. J.* at 215–216]

In order to effectuate each of these steps, the procedural guidelines which follow might be utilized by the trial court.

*supervise these cases until such time as full relief has been provided. Supplemental orders, encompassing additional or different approaches from the original order, may be necessary to accomplish this purpose.*

[Rubinowitz, *supra* note 8, 6 *Mich. J. L. Reform* at 637]
See also Mytelka & Mytelka, *supra,* 7 *Seton Hall L. Rev.* at 18–20; Rose, "Exclusionary Zoning and Managed Growth: Some Unresolved Issues," 6 *Rutgers-Camden L. J.* 689 (1975).

Upon entering a judgment against the municipality, the trial court should, at the earliest practical point, join all municipalities located in the region surrounding the defendant community. *Mt. Laurel,* 67 *N. J.* at 216 (Pashman, J., concurring). If necessary, this may be on the court's own motion. *R.* 4:28–1, 4:30. Not only is this necessary in order to equitably allocate housing needs among municipalities in a region, but it is essential if conflicting decisions are to be avoided in cases involving communities in the same region. 67 *N. J.* at 216 (Pashman, J., concurring).

The trial court should then order the affected towns (if it has not already done so) to undertake a study identifying local and regional housing needs. This study would analyze, *inter alia,* the number of substandard and overcrowded units within the town and surrounding region, the number of people employed but unable to reside there, and the number of people likely to migrate there absent exclusionary zoning. The court would then ask the municipality to submit a recommendation as to what number of new low and moderate income residential units (over what period of time) would constitute its fair share of the regional housing need. See Part III (C) *infra.* Upon receipt of this recommendation, the court would fix and specify the municipality's "fair share" of that need.

However, if prior to assessing each municipality's "fair share" the trial court finds that statistical data or independent testimony would be of assistance, the trial court may appoint its own zoning and planning experts to aid in its judgment. *See Matter of Walter Peterson,* 253 *U. S.* 300, 312, 40 *S. Ct.* 543, 64 *L. Ed.* 919, 925 (1920) (finding that a court possesses the inherent power to appoint persons unconnected with the court to aid in the performance of specific duties arising in a case); *Mt. Laurel,* 67 *N. J.* at 216 (Pashman, J., concurring); *Handleman v. Marwen Stores Corp.,* 53 *N. J.* 404 (1969); *Pascack Ass'n v. Washington Tp., supra; Polulich v. J. G. Schmidt Tool Die & Stamping Co.,* 46 *N. J. Super.* 135 (Cty. Ct. 1957); *Scott v. Spanjer*

*Bros., Inc.,* 298 *F.* 2d 928 (2 Cir. 1962). *See generally, Wigmore, Evidence* § 2484 at 270 (3 ed. 1940); Botter, "The Court Appointed Impartial Expert" in M. Kraft, *Using Experts in Civil Cases* (PLI 1977) at 73. Or, the court might appoint an independent expert if it finds that municipal recommendations are inadequate. Such consultants are to be appointed at the expense of the defendant; they should be allowed to consult with defendant, other parties, and the trial court; and ultimately, they should file a report and testify in any proceedings. This would provide the best way of ensuring a dialogue designed to meet *Mt. Laurel* obligations. Additionally, discussions with all parties should have the valuable effect of making certain that the expert's recommendations are sensitive to legitimate local concerns.

After quantifying the municipality's "fair share" of the region's lower income housing needs, the court would order the town to formulate and submit a remedial plan designed to enable, encourage and affirmatively attain satisfaction of its portion of the regional need. The plan should include, among other things, proposed amendments to the municipal zoning ordinance and affirmative programs deemed necessary to satisfy the municipality's obligation under *Mt. Laurel.* Such additional programs might involve establishment of a local housing authority, creation of a mobile home park district, imposition of inclusionary conditions upon subdivision, PUD and cluster zone developments, or provision of density bonuses and other inclusionary devices. *See* Part III (D) *infra.* The plan would then be submitted to the trial court for approval within a specified number of days.

After a hearing at which all parties could comment upon the proposed plan, the trial court would either approve the plan and order immediate implementation or, upon finding it deficient, modify the plan or order the municipality to do so. Such revisions would be submitted to the court for approval at a subsequent hearing. After the remedial plan has been formulated, approved and incorporated by the court into a judicial decree the court would retain jurisdiction in

order to supervise implementation of the plan. During this process, the court could require submission of progress reports from those charged with implementing the plan and could, when necessary, issue supplemental orders enforcing or modifying the remedial decree. If it has not yet done so, independent planning consultants could be appointed to assist with implementation, and additionally, suggestions and participation by all parties to the suit should be encouraged. Finally, if there is evidence of bad faith, inadvertence or neglect on the part of the municipality, the court could assume direct control over certain aspects of the plan and impose stronger remedial measures than those provided for in the initial decree. *See* Part III (D) *infra.*

Ample precedent exists for this approach. It has already been utilized by several of our trial courts in cases challenging the exclusionary character of local zoning ordinances. *Mt. Laurel, supra,* 119 *N. J. Super.* at 178–180; *Pascack Ass'n Ltd. v. Mayor & Council of Washington Tp., supra.* 131 *N. J. Super.* 195; *Urban League of Greater New Brunswick v. Borough of Carteret, supra,* 142 *N. J. Super.* at 35–39. It also mirrors the relief commonly provided by federal courts in school and housing desegregation cases. *See, e. g., Swann v. Charlotte-Mecklenberg Bd. of Educ., supra,* 402 *U. S.* 1, 91 *S. Ct.* 1267, 28 *L. Ed.* 2d 554. (Defendant's failure to meet a school desegregation deadline fixed by the District Court, triggered the appointment of an independent consultant whose recommendations were ultimately incorporated into a desegregation plan adopted by the court); *Southern Alameda Spanish Speaking Organization (SASSO) v. Union City,* 424 *F.* 2d 291 (9 Cir. 1970), on remand, 357 *F. Supp.* 1188, 1199 (N. D. Cal. 1970) (District Court gave the city nine months within which to "take steps necessary and reasonably feasible under the law to accommodate . . . the [housing] needs of [its] low income residents," and also ordered the city to submit periodic reports concerning the steps it had taken to accomplish this objective); *Crow v. Brown, supra,* 332 *F. Supp.* at 395–396 (county officials and

a local housing authority were ordered to appoint a joint committee to prepare a county wide plan for the development and placement of low rent public housing projects and to implement the recommendations of the joint committee after first reporting to the court); *Gautreaux v. Chicago Housing Authority, supra,* 296 *F. Supp.* 907 (N. D. Ill. 1969), supplemented 304 *F. Supp.* 736 (N. D. Ill. 1969) (the District Court ordered the parties to submit plans designed "to prohibit the future use and to remedy the past effects of [the housing authority's] unconstitutional site selection and tenant assignment procedures"; following review of these plans, the Court issued a detailed order providing for the immediate deconcentration of public housing facilities in the Chicago Metropolitan area and further compelling the housing authority to revise its tenant assignment policy, submit such revisions to the Court for approval and undertake certain studies); *Hawkins v. Town of Shaw, supra,* 437 *F.* 2d at 1286 (5 Cir.), aff'd *en banc* 461 *F.* 2d 1171 at 1174 (5 Cir. 1972) (town required to submit a plan for the court's approval detailing proposed cures for the "long history of discrimination which the record reveals."). *Cf. Brown v. Bd. of Educ.,* 349 *U. S.* 294, 299–300, 75 *S. Ct.* 753, 99 *L. Ed.* 1083, 1105–1106 (1955); *Wright v. City of Emporia,* 407 *U. S.* 451, 454–458, 92 *S. Ct.* 2196, 33 *L. Ed.* 2d 51, 57–59 (1972); *Mahaley v. Cuyahago Metropolitan Housing Authority,* 355 *F. Supp.* 1257, 1269 (N. D. Ohio 1973), rev'd on other grounds, 500 *F.* 2d 1087 (6 Cir. 1974), *cert.* den. 419 *U. S.* 1108, 95 *S. Ct.* 781, 42 *L. Ed.* 2d 805 (1975).[18]

---

[18]*See also Cal. Gov't Code* § 65302 (West Supp. 1972), quoted in Kleven, *supra,* 21 *U. C. L. A. L. Rev.* at 1436 n. 7, requiring all municipalities to develop housing plans which make adequate provision for the housing needs of all economic segments of the community and 42 *U. S. C. A.* § 5304(a)(4) requiring all applicants for federal assistance under the Housing and Community Development Act of 1974 to first study and assess the housing needs of lower income persons residing in the community and then formulate and submit an appropriate "housing assistance plan."

This approach is attractive in several respects. First, placing the initial responsibility for formulating a remedial plan into the hands of municipal officials furthers the objective of assuring maximum respect for local prerogatives. *Cf. Reynolds v. Sims,* 377 *U. S.* 533, 586, 84 *S. Ct.* 1362, 1394, 12 *L. Ed.* 2d 506, 541 (1964) ; *Jackman v. Bodine, supra,* 43 *N. J.* at 473–474. Good faith compliance with the letter and spirit of the initial court decree will obviate the need for additional judicial interference and thus guarantee the retention of municipal control and responsibility over zoning matters.

Second, this approach recognizes the need to preserve local amenities. As noted above, if the municipality must accommodate low and moderate income families, it is best that this be done in a planned and orderly fashion. Intelligent use of PUD restrictions, density bonuses, landscape requirements and dispersal of different types of housing throughout the community can achieve compliance with the municipality's obligation under *Mt. Laurel* and still adequately protect the amenities which make the town an attractive place to live. Phased zoning, a technique which permits control over the pace and location of new development affords another means of achieving these ends.[19] Nevertheless, this technique must be used with caution. *See Golden v. Ramapo Planning Bd.,* 30 *N. Y.* 2d 359, 334 *N. Y. S.* 2d 138, 285 *N. E.* 2d 291 (Ct. App. 1972), appeal dismissed 409 *U. S.* 1003, 93 *S. Ct.* 436, 34 *L. Ed.* 2d 294 (1972) ; *Constr. Industry Ass'n of Sonoma Cty. v. Petaluma,* 375 *F. Supp.* 574 (N. D. Cal. 1974), rev'd 522 *F.* 2d 897 (9 Cir. 1975), *cert.* den. 424 *U. S.* 934, 96 *S. Ct.* 1148, 47 *L. Ed.* 2d 342 (1976) ;

---

[19]While this Court has not yet ruled upon the validity of phased zoning, there appears to be no reason why this technique could not be employed so long as it is well planned, the phasing is not too drawn out and there is early provision for lower income housing. *Mt. Laurel, supra,* 67 *N. J.* at 189 n. 20; *id.* at 213 (Pashman, J., concurring) ; *see also* Mytelka & Mytelka, *supra,* 7 *Seton Hall L. Rev.* at 16, 22–23.

Kleven, *supra,* 21 *U. C. L. A. L. Rev.* at 1453 n. 66. All such efforts, if otherwise proper and valid, should be encouraged by the court.

Third and most important, by requiring judicial review and approval of all remedial programs, this approach assures that plaintiffs' rights will be adequately protected and that the municipality's proposed plans will comply with both the trial court order and the dictates of *Mt. Laurel.* Moreover, by retaining jurisdiction to supervise implementation of the remedial order, the trial court will forestall the possibility of dilatory tactics or bad faith compliance on the part of the municipality. *See* Part II *supra.* As one commentator correctly notes:

> The mere adoption of [a remedial] plan is not sufficient to satisfy the court's duty. It must take the necessary steps to see to it that the plan becomes a reality.
> [Rubinowitz, *supra* note 8, 6 *Mich. J. L. Reform* at 669.]

The remedial approach which I have suggested, seeks to do this by permitting courts to retain jurisdiction, require periodic reports, set time limits and, if necessary, issue supplemental orders to address problems which arise during implementation of the order. "In this area, more than in most, continual supervision can be crucial." Mytelka & Mytelka, *supra,* 7 *Seton Hall L. Rev.* at 32. *Cf. Green v. Cty. School Bd., supra,* 391 *U. S.* at 439, 88 *S. Ct.* at 1694, 20 *L. Ed.* 2d at 724; *Louisiana v. United States, supra,* 380 *U. S.* at 156, 85 *S. Ct.* at 823, 13 *L. Ed.* 2d at 716; *Kelley v. Altheimer,* 378 *F.* 2d 483, 489 (8 Cir. 1967); *Kennedy Park Homes Ass'n v. Lackawanna, supra,* 318 *F. Supp.* at 698; *City of Miami Beach v. Weiss,* 217 *So.* 2d 836, 838 (Fla. Sup. Ct. 1969); *Casey v. Warwick Tp. Zoning Hearing Bd., supra,* 328 *A.* 2d at 470.

### C. *Calculation of the Municipal "Fair Share" of Regional Housing Needs.*

As noted, the task of formulating a remedial order ordinarily begins with a quantification of the municipality's

"fair share" of regional housing needs. In *Mt. Laurel,* we observed that the recent proliferation and widespread acceptance of fair share allocation plans has engendered numerous formulae and techniques for making this determination. *Mt. Laurel, supra,* 67 *N. J.* at 189–190; *id.* at 215–216 (Pashman, J., concurring). Obviously, no one approach or formulaic device is judicially mandated and courts should carefully weigh all reasonable proposals submitted to them by expert witnesses and local planning authorities. However, some quantifiable approximation of the municipality's "fair share" is necessary as an aid in formulating remedial plans or evaluating their adequacy. *See id.* at 190. For this reason, I am baffled by the majority's pronouncement that, while Madison Township is obligated to create the opportunity for a fair and reasonable share of the housing needs of its region, "no formulaic determination or numerical specification of such a fair and reasonable share is required." *Ante* at 553. Because this approach gives the trial court no reliable way of measuring local compliance with the Court's remedial order, I fail to see how it will encourage implementation of an effective remedial plan. The need for at least some degree of specificity in this regard was aptly stated in a recent article on the subject of exclusionary zoning:

. . . The absence of explicit tests for determining whether an ordinance is unlawfully exclusionary exacerbates the problem. On remand, the *Madison* court discussed the concept of "fair share" allocation of low and moderate income housing within a given region. This concept requires an evaluation of both the income distribution of the municipality's population and that of the larger metropolitan area of which the township is a part. The precise manipulation of the statistics to be gathered and the formulation of land use provisions, however, was not addressed by the court and thus the township was left with no clear idea of how best to implement the "fair share" concept. *To require a township to revise its ordinance to meet reasonable yet imprecise standards imputes a measure of good faith that may not exist.* It is difficult to believe that a township that systematically has excluded all but the affluent would frame,

much less administer, an ordinance that actively will encourage the entry of others.

[Mallach, *supra*, 6 *Rutgers-Camden L. J.*
at 664; footnotes omitted, emphasis supplied]

While absolute precision or adoption of a foolproof formula is neither necessary nor possible, some reasonable approximation of the municipality's fair share obligation is essential for a proper evaluation of remedial efforts.

Ordinarily a challenge that a local zoning ordinance is exclusionary requires an initial determination of the municipality's "fair share" of regional housing needs during the course of the trial. However, in some cases, such as in the instant case, the exclusionary impact of the challenged ordinance is so patent that there is no need to quantify the municipal obligation under *Mt. Laurel* prior to entering judgment in the case. *Oakwood at Madison v. Madison Tp., supra,* 128 *N. J. Super.* at 447. Thus, where no such determination has been made, the trial court will have to fix and specify the municipal obligation during the remedial stage of the case.

As noted in *Mt. Laurel,* proximate quantification of the municipal obligation generally requires (1) identification of the relevant region; (2) a determination of the present and prospective housing needs of the region and (3) allocation of these needs among the various municipalities in the region. *Mt. Laurel, supra,* 67 *N. J.* at 215 (Pashman, J., concurring).

While the trial court should solicit recommendations from the parties and particularly from the municipality's planning authority, delineation of the appropriate region is ultimately a question for the court. As we recognized in *Mt. Laurel,* the composition of the relevant "region" will necessarily vary from case to case and no "hard and fast rule" can provide the appropriate answer in every instance.[20]

---

[20]For example, in both *Mt. Laurel* and the instant case, the court properly rejected the municipality's suggestion that the appropriate

*Mt. Laurel, supra,* 67 *N. J.* at 189. Among the geographic units which experts have suggested are: the county, a multicounty unit, the Standard Metropolitan Statistical Area utilized by the Federal Office of Management and Budget in calculating the United States Census, an "urbanized" or nonrural subregion of the relevant Standard Metropolitan Statistical Area (such as that utilized in *Gautreaux v. Chicago Housing Authority, supra,* 304 *F. Supp.* at 737–738); an area coextensive with the jurisdiction of a regional planning authority, if one exists; the area within which most residents of the community journey to work; and the "housing market" area employed by the U. S. Department of Housing and Urban Development and discussed by the U. S. Supreme Court in *Hills v. Gautreaux, supra,* 425 *U. S.* at 298–301, 96 *S. Ct.* at 1546–47, 47 *L. Ed.* 2d at 804–05.

In determining which of these alternate definitions of a region is appropriate in a particular case, the court should consider and weigh the following factors: (1) where low and moderate cost housing is currently being sought, (2) where development is likely to take place in the foreseeable future, (3) where the municipality's current and prospective residents work or are likely to work, (4) whether there exists a regional planning agency, (5) whether the location

---

"region" was the county within which the community lies. *Mt. Laurel, supra,* 67 *N. J.* at 189–190; *Oakwood at Madison v. Madison Tp., supra,* 128 *N. J. Super.* at 441; *ante* at 537–544. Central to this determination in *Mt. Laurel* was the proximity of Mount Laurel Township to high concentrations of lower income families in adjacent Camden County. In the instant matter, the fact that 50% of the current residents of Madison Township are employed outside the county and that the township has close ties to the more densely populated areas of the New York metropolitan region, weighed heavily in undermining defendant's contention that Middlesex County was the appropriate region. On the other hand, it is conceivable that in cases where the county contains a highly urbanized core and most of the residents of the municipality are employed within the county, the appropriate region could be coextensive with the county. *See, e .g., Middle Union Associates v. Holmdel Tp.,* Dkt. No. L–1149–72 P. W. (Law Div. 1975) (unreported), discussed in a recent article by Professor Rose, *supra,* 5 *Real Estate L. J.* at 73.

of transportation facilities and prospective employment makes commutation likely, and (6) whether the suggested "region" is sufficiently large and diverse to permit a feasible solution to the housing problem. *See generally ante* at 540; *Mt. Laurel, supra,* 67 *N. J.* at 215 n. 16 (Pashman, J., concurring) ; Rubinowitz, *supra* note 8, 6 *Mich. L. J. Reform* at 652–655; Rubinowitz, *supra* at 219–220; Rose, *supra* note 17, 6 *Rutgers-Camden L. J.* at 717–720; Davidoff & Davidoff, "Opening the Suburbs: Toward Inclusionary Land Use Controls," 22 *Syracuse L. Rev.* 509 (1971) ; *Bisgaier, supra* note 2, 99 *N. J. L. J.* at 738, Cols. 2–3; Lindbloom, "Defining 'Fair Share' of 'Regional Need': A Planner's Application of Mount Laurel," 98 *N. J. L. J.* 633 (1975).

I would order the trial court to actually identify the region which includes the defendant municipality. The majority, on the other hand, concludes that, generally, no specific geographical area will be necessarily the authoritative region, and that in this case the trial court should look to the housing market area of which Madison Township is a part and from which the future population of the township would be drawn in the absence of exclusionary zoning. *See ante* at 537, 538, 543–544. Unless the trial court determines the appropriate region with some degree of specificity, it will be unable to arrive at any meaningful estimate of the region's housing needs or the defendant's "fair share." Although the majority's formulation of the approximate region in this case is relevant to the factors which I have listed, it fails to provide a definitive standard necessary to identify the appropriate region.

Once the relevant region has been identified, the court must then determine the housing need for that region. Again, this information should be solicited from the local planning board, its consultants, the other parties in the case and, if necessary, impartial experts appointed by the court. In the present context, the regional housing need may be defined as "the number of new housing units that would be necessary to provide each low and moderate income

family in the region with a decent, standard housing unit within the financial means of the family." Rubinowitz, *supra* note 8, 6 *Mich. J. L. Reform* at 656. *See also M. Brooks, Lower Income Housing; The Planner's Response* 14 (Am. Soc'y of Planning Officials 1972); Bisgaier, *supra* note 2, 99 *N. J. L. J.* at 738.

Finally, the trial court must fix and specify the number of low and moderate cost dwelling units which shall constitute the municipality's fair share of the regional housing need. As noted above, this approximation need not be mathematically precise nor rely exclusively upon any one particular formula or technique. However, it must be specific enough to provide a workable benchmark to guide the formulation and measurement of remedial efforts.

Ample discussion of the pertinent factors exists both in the literature[21] and in currently operative fair share al-

---

[21] *See, e.g.,* Brooks, *supra, Lower Income Housing: The Planner's Response;* Rubinowitz, *supra* note 8, 6 *Mich. J. L. Reform* at 658–661; Rubinowitz, *supra,* at 65–84, 219–220; *Lindbloom, supra,* 98 *N. J. L. J.* 633; Kelly, "Will the Housing Market Evaluation Model Be the Solution to Exclusionary Zoning?" 3 *Real Estate L. J.* 373 (1975); Rose, *supra* note 17, 6 *Rutgers-Camden L. J.* at 709–717; Rose, *supra,* 5 *Real Estate L. J.* 69; Rose, *supra* note 14, 12 *Urban L. Ann.* 3 (1976); N. Williams, *American Land Planning Law* § 66.13(o) (1975 Supp.); Bisgaier, *supra* note 2, 99 *N. J. L. J.* at 738, Cols. 3–5.

Some experts suggest that allocation of the region's housing obligation should be based on an equal share of new dwelling units per town, or on a proportionate share of units equal to the ratio of the town's low and moderate income population to that of the region at large. Though attractively easy to apply, where there has already been a substantial degree of exclusion, application of these formulae will fail to satisfy the goal of curing past discrimination, and hence is wholly inappropriate.

In response to this shortcoming, some commentators have suggested that the court allocate low and moderate income units in inverse proportion to the amount of such units currently located in the municipality. While this criterion serves to further the goal of deconcentration of housing opportunities — and therefore should be given serious consideration — exclusive emphasis on this factor could subvert the goal of preserving local amenities by ignoring the amount

location programs.[22] These factors include, but are not necessarily limited to: the percentage of the region's vacant, developable land lying within the municipality; whether this land is suitable for low cost housing in terms of its proximity to utilities, transportation facilities and other services; whether it is accessible to available or prospective

of vacant land in the municipality which is fiscally and environmentally suitable for low and moderate cost housing.

Some commentators, such as Professor Rose, advocate a "take care of their own" approach which would allocate new housing units to those subregions where there is the greatest need for such housing. Rose, *supra*, 5 *Real Estate L. J.* at 78; Rose, *supra* note 14, 12 *Urban L. Ann.* 3 (1976). While this approach is politically attractive, sole reliance upon it will fall short of the municipality's obligation under *Mt. Laurel* since it probably would allocate the largest number of units to the most highly urbanized areas and would therefore perpetuate the high concentration of low and moderate income families in those areas.

One study suggests that all of these criteria can be catalogued into the following three categories: the municipal need to satisfy its own demand for low and moderate cost housing, based upon the number of substandard and overcrowded units within the community; the regional need to disperse a certain percentage of its urban population among outlying suburban areas; and the local need to consider the community's ability to absorb additional units of low and moderate cost housing. Under this approach, allocation of the regional housing need could then be based upon a combination of the first two factors, subject of course to the last set of criteria. Brooks, *supra; Lower Income Housing: The Planner's Response* at 20–21, 37–38. *See also* Rubinowitz, *supra note* 8, 6 *Mich. J. L. Reform* at 661.

[22]*See, e.g., Miami Valley (Dayton, Ohio) Regional Planning Comm'n, a Housing Plan for the Miami Valley Region* (July 1970); *Metropolitan Washington (D. C.) Council of Gov'ts, Fair Share Housing Formula* (Jan. 1972); *Metropolitan Council of the Twin Cities Area* (Minneapolis-St. Paul, Minn.), *Housing: Plan, Policy Program* (1973); *San Bernardino Cty. Planning Dep't Gov't Subsidized Housing Distribution Model for Valley Portion of San Bernardino Cty., Calif.* (Jan. 1972); *Sacramento, Calif., Regional Area Planning Comm'n, An Approach to the Distribution of Low and Moderate-Income Housing, A Technical Report* (Aug. 1972); and Erber & Prior, *Housing Allocation Planning: An Annotated Bibliography* (Council of Planning Librarians Exchange Bibliography #547, 1974).

employment opportunities; the town's population density relative to that in the region at large; whether or not the town's proportion of lower income families exceeds that in the region as a whole and the extent to which the municipality has heretofore violated the precepts of *Mt. Laurel* by excluding low and moderate income persons. Naturally, the relevance and weight accorded each of these factors will vary from case to case. For example, in a small region where jobs are still relatively concentrated, location of employment opportunities may not be as critical as in a large region with substantial suburbanization of employment. *See Rubinowitz, supra* note 8, 6 *Mich. J. L. Reform* at 666 n. 133. Similarly, in cases where exclusionary zoning has already become well entrenched, an allocation plan which overemphasizes satisfaction of local housing needs or immediate availability of job opportunities will reward those towns which have been most exclusionary and hence would subvert the fundamental objective of redressing past indiscretions. *See* note 21 *supra*. In the final analysis, it will be the task of the trial court to decide which of the above factors should be weighed most heavily in evaluating the figures submitted by the municipality and the other parties in the case, and in finally fixing a "fair share" figure.

## D. *Imposition of Remedial Devices*

Obviously, if the municipality fails to submit an adequate remedial plan in a timely manner, or if having done so it fails to faithfully execute that plan, a court will be required to issue stronger remedial measures, either upon application by one of the parties or upon its own motion. In addressing the problem of municipal neglect or recalcitrance, a court may utilize the services and assistance of an independent planning consultant. *See Mt. Laurel, supra,* 67 *N. J.* at 217 (Pashman, J., concurring); *Pascack Ass'n Ltd. v. Mayor & Council of Washington Tp., supra,* 131 *N. J. Super.* at 201. *Cf. Swann v. Charlotte-Mecklenburg*

*Bd. of Educ., supra,* 402 *U. S.* at 8, 91 *S. Ct.* at 1272, 28 *L. Ed. 2d* at 562; *Hartman, supra* note 8, 9 *Urban L. Ann.* at 173; Moskowitz, "How to Use Experts Effectively in Land Regulation Proceedings," 3 *Real Estate L. J.* 359 (1975). In addition, a court should continue to solicit suggestions and comments from the parties in the case. Ultimately, though, it is the responsibility of the court to adopt measures which (so far as reasonably practical) will provide effective relief for plaintiffs and satisfy the objectives listed in Part III (A) *supra.* Following is a list of affirmative remedies which can be imposed, either by the defendant voluntarily or, if the town defaults in its responsibility, by the court. The list is not intended to be exhaustive. Nor should every measure be adopted in every case. Rather, the list is simply suggestive of what devices might be available to the municipality and to the court in framing a remedial order.

## (1) Award Specific Relief to Corporate Plaintiffs

Frequently, challenges to a municipal zoning ordinance, such as in the instant case, are initiated (either singly or in cooperation with low and moderate income plaintiffs) by a corporate land developer which seeks to build a residential development contrary to the local ordinance. Often, as here, the corporate plaintiff will contend that the municipal zoning scheme is unreasonable, arbitrary and confiscatory with respect to its property.[23] I agree with the

---

[23]This issue can arise in a variety of procedural contexts. Often it will be raised on appeal from an administrative denial of plaintiff's application for a desired use, pursuant to the special exception or variance procedures of *N. J. S. A.* 40:55–39(b), (d), which have been superseded by the Municipal Land Use Law, *L.* 1975, c. 291, § 57, *N. J. S. A.* 40:55D–70. See *Mt. Laurel, supra,* 67 *N. J.* at 181 n. 12. Sometimes, the developer will attempt to circumvent the administrative process by attacking the exclusionary provision directly. On other occasions, the developer will raise the issue in a suit to compel intransigent local officials to issue the requisite building, sewer, health, water or subdivision permits for its project. In each case, though, the ultimate relief sought by the corporate plaintiff is the same — permission to build the kind of residential development desired.

majority that in the instant case Oakwood at Madison, Inc. and Beren Corporation have not sustained this contention, and relief should not be granted on that basis. In particular, these plaintiffs have failed to demonstrate that they will be denied a reasonable return on their property if it is put to its assigned use. It is well established that landowners are not entitled to the most profitable utilization of their land. *Bow & Arrow Manor v. West Orange*, 63 *N. J.* 335, 350 (1973); *Cobble Close Farm v. Middletown Tp. Bd. of Adjustment*, 10 *N. J.* 442, 452 (1952).

Nevertheless, specific relief may be available to corporate litigants on another ground. While it is not the function of courts to rewrite zoning ordinances, issue building permits or otherwise interfere with municipal control over zoning matters (*Bow & Arrow Manor v. West Orange, supra,* 63 *N. J.* at 343), where there has been an adjudication of municipal abuse of the zoning power, the court may (and, in some cases, must) intervene to the extent necessary to provide effective relief. In the present context, granting the specific relief sought by the corporate plaintiff (*see* note 23 *supra*) will serve several important functions.

First, as previously noted, even after an exclusionary zoning provision has been invalidated, a shrewd, intransigent community may rezone plaintiff's property in such a manner as to frustrate the proposed use. Towns may also require lengthy approval procedures or withhold from the corporate plaintiff permits necessary to proceed with a project. As one court has noted, such actions "effectively grant the municipality a power to prevent any challenger from obtaining meaningful relief after a successful attack on a zoning ordinance." *Casey v. Warwick Tp. Zoning Hearing Bd., supra,* 328 *A.* 2d at 468. By affording the corporate plaintiff specific relief, a remedial order will effectively prevent this form of harassment and will obviate the need for further litigation with respect to the property involved. *See Sinclair Pipe Line Co. v. Village of Richton Park, infra,* 19 *Ill.* 2d 370, 167 *N. E.* 2d 406 at 411. Moreover, it will furnish an important in-

centive for developers to bring suits in the public interest. As our own Court has recognized, "unless the immediate litigant can hope to gain, there [will] be no incentive to challenge existing practices or prior holdings which, in the public interest, ought to be reviewed." *Goldberg v. Traver,* 52 *N. J.* 344, 347 (1968).

Second, this remedial device directly advances the fundamental objective of promoting actual construction of low and moderate income housing. By allowing the corporate landowner to proceed with his project without further delay it offers one of the fastest and surest ways of accomplishing this objective. Mytelka & Mytelka, *supra,* 7 *Seton Hall L. Rev.* at 26.

Finally, issuance of a variance or building permit under these circumstances also serves to protect the interests of the municipality because it assures that the corporate plaintiff will undertake the proposed use and no other. As one court notes:

. . . [A] decree [invalidating a zoning provision] which was induced by evidence which depicted a proposed use in a highly favorable light would not restrict the property owner to that use, and he might thereafter use the property for an entirely different purpose.

In our opinion, it is appropriate for the court to avoid these difficulties by framing its decree with reference to the record before it . . . [T]he relief awarded may guarantee that the owner will be allowed to proceed with that use without further litigation and that he will not proceed with a different use.

[*Sinclair Pipe Line Co. v. Village of Richton Park, infra,* 167 *N. E.* 2d at 411.]

In light of these considerations, numerous courts have awarded specific relief to successful corporate litigants in cases of this nature. *Crow v. Brown, supra,* 332 *F. Supp.* at 395; *Dailey v. City of Lawton, supra,* 296 *F. Supp.* at 269; *Casey v. Warwick Tp. Zoning Hearing Bd., supra,* 328 *A.* 2d at 469; *Appeal of Girsh, supra,* 263 *A.* 2d 395; *Tp. of Williston v. Chesterdale Farms, Inc.,* 7 *Pa. Cmwlth.* 453, 300 *A.* 2d 107, 121–122 (Comwlth. Ct. 1973); *Camp Hill Dev. Co., Inc. v. Zoning Bd. of Adjustment, supra,* 319 *A.* 2d at

201; *Fiore v. City of Highland Park, supra,* 221 *N. E.* 2d at 330: *Franklin v. Village of Franklin Park,* 19 *Ill.* 2d 381, 167 *N. E.* 2d 195 (Sup. Ct. 1960); *Kavanewsky v. Zoning Bd. of Appeals,* 160 *Conn.* 397, 279 *A.* 2d 567, 571 (Sup. Ct. 1971); *Pascack Ass'n, Ltd. v. Mayor & Council of Washington Tp., supra,* 131 *N. J. Super.* at 207–208; *Brunetti v. Mayor & Council of Madison Tp.,* 130 *N. J. Super.* 164, 169 (Law Div. 1974). *Cf. Sinclair Pipe Line Co. v. Village of Richton Park,* 19 *Ill.* 2d 370, 167 *N. E.* 2d 406, 411 (Sup. Ct. 1960); *First Nat'l Bank v. Village of Skokie, supra,* 342 *N. E.* 2d at 451; *Duggan v. County of Cook,* 17 *Ill. App.* 3d 253, 307 *N. E.* 2d 782 (App. Ct. 1974), modified on other grounds, 60 *Ill.* 2d 107, 324 *N. E.* 2d 406 (Sup. Ct. 1975).[24]

Naturally, if successful corporate litigants were to receive a building permit or other specific judicial relief *as a matter*

---

[24]Admittedly, some jurisdictions have rejected these precedents and continue to adhere to the traditional rule that, even upon a finding of invalidity, courts may not compel municipal authorities to zone in a particular fashion. *See, e. g., Bd. of Supervisors of Fairfax Cty. v. Allman,* 215 *Va.* 434, 211 *S. E.* 2d 48, 55 (Sup. Ct. 1975), *cert.* den. 423 *U. S.* 940, 96 *S. Ct.* 300, 46 *L. Ed.* 2d 272 (1976); *City of Richmond v. Randall,* 215 *Va.* 506, 211 *S. E.* 2d 56, 61 n. 3 (Sup. Ct. 1975); *City of Miami Beach v. Weiss, supra,* 217 *So.* 2d at 837. However, even these courts, though ostensibly adhering to the traditional rule, have begun to afford indirect relief to corporate plaintiffs. In *Bd. of Supervisors of Fairfax Cty. v. Allman,* for example, the Supreme Court of Virginia ordered the couty board of supervisors to "reconsider its action refusing to rezone" defendant's property, and further stated that failure to do so would lead to subsequent judicial intervention. *Id.* 211 *S. E.* 2d at 55–56. Similarly, in *City of Miami Beach v. Weiss,* the court essentially held that after invalidating a zoning classification lower courts could enjoin enforcement of any classification more restrictive than that requested by the plaintiff. In any event, because of the realities of the planning process and the effective way in which this remedial device deals with these realities, I find the precedents *in support* of this technique to be compelling. *See generally,* Mytelka & Mytelka, *supra,* 7 *Seton Hall L. Rev.* at 26–29; *Hartman, supra* note 8, 9 *Urban L. Ann.* at 162–166; *Krasnowiecki, supra* note 7, 120 *U. Pa. L. Rev.* at 1059–1065, 1070–1083.

*of right,* the community would be wholly unprotected against "what in essence would be the unregulated development by the plaintiffs of their property." *Pascack Ass'n, Ltd. v. Mayor & Council of Washington Tp., supra,* 131 *N. J. Super.* at 207. Therefore, most courts have required that the corporate plaintiff satisfy all other municipal requirements and regulations (such as utility, building and health codes, environmental reviews and subdivision controls) before a building permit will issue.[25] *See, e. g., Casey v. Warwick Tp. Zoning Hearing Bd., supra,* 328 *A.* 2d 469; *Dailey v. City of Lawton, supra,* 296 *F. Supp.* at 269; *Camp Hill Dev. Co., Inc. v. Zoning Bd. of Adjustment, supra,* 319 *A.* 2d at 201; *Schere v. Freehold Tp.,* 119 *N. J. Super.* 433, 437 (App. Div. 1972), certif. den. 62 *N. J.* 69 (1972), *cert.* den. 410 *U. S.* 931, 93 *S. Ct.* 1374, 35 *L. Ed.* 2d 593 (1973). However, it should be emphasized that municipalities may not use these additional requirements and procedures to frustrate development or impede remedial efforts. Where this occurs, the trial court should intervene and either appoint an independent planning expert to review the developer's plans or issue an order requiring the municipality to show why the plan should not be approved. In the event of clearly arbitrary and bad faith tactics on the part of the town, the court could simply order the municipality to issue the necessary permits. *See, e. g., Crow v. Brown, supra,* 332 *F. Supp.* at 395; Mytelka & Mytelka, *supra,* 7 *Seton Hall L.* Rev. at 31; Rubinowitz, *supra* note 8, 6 *Mich. J. L. Reform* at 643–647. Under these

---

[25]In this regard, I agree with the majority that specific relief should not be "automatic," but rather should rest in the discretion of the court. *Ante* at 551. Obviously, prior to granting such relief, the court would have to determine whether the proposed use is suitable to the area, consistent with other aspects of the remedial order and generally in furtherance of remedial objectives. I cannot agree with the majority, however, that "such relief will ordinarily be rare." On the contrary, due to the salutary features of this form of relief, I envision that it ordinarily will be granted so long as the proposed use is found to be "suitable."

circumstances, requiring the developer to comply with State building and safety standards (*see, e. g.,* State Uniform Construction Code Act, *L.* 1975, *c.* 217, *N. J. S. A.* 52:27D–119 *et seq.*) might be sufficient to protect valid local interests.

### (2) Enjoin Interference with Construction of Low and Moderate Income Housing

Frequently, a corporate litigant which wishes to construct a residential development will initiate a suit challenging a municipal zoning ordinance even before it has designed the project or acquired the land. Under such a case, a trial court would be unable to grant a successful litigant the type of specific relief which I have described.

Therefore, even after an exclusionary ordinance has been set aside, an unyielding municipality may be able to frustrate the developer's plans and impede construction of housing for low and moderate income people. The multiplicity of local controls (*e. g.,* subdivision, building and health codes) and the presence of numerous reviewing agencies (*e. g.,* planning and zoning boards, site plan and environmental review commissions and building, health, water and sewer authorities) increase the potential for administrative delay. Unwarranted delays, in turn, can cause problems for the developers by increasing their costs to the point that their projects become financially unfeasible.

To avoid these problems in cases where specific relief is not yet practical, courts could enjoin unwarranted municipal interference with efforts by the corporate plaintiff to construct needed housing. For instance, in *Crow v. Brown, supra,* a federal housing discrimination case, the U. S. District Court included in its remedial decree an order enjoining all county officials "from interfering in any way with the construction and completion" of several apartment buildings earmarked for low and moderate income residents. *Id.* 332 *F. Supp.* at 395. Where necessary or appropriate, a court

may go further and issue an order enjoining government officials from failing to take certain affirmative actions. An excellent example of this remedial device appears in *Kennedy Park Homes Ass'n v. Lackawanna, supra,* another housing discrimination case. There, the court ordered, *inter alia*:

2. That . . . defendants shall immediately take whatever action is necessary to provide adequate sewage service to the K.P.H.A. [the corporate litigant] subdivision.

\* \* \* \* \* \* \*

4. That defendants be enjoined from using any of the City's municipal powers regarding land use to prevent or interfere with the construction of Kennedy Park Subdivision.

5. That defendants affirmatively take whatever steps are necessary to allow the Kennedy Park Subdivision to begin construction.

[318 *F. Supp.* at 697.]

### (3) Establish "Set-Aside" or "Override" Procedures to Facilitate Construction of Low and Moderate Income Housing

Establishment of a so-called "set-aside" or "override" procedure provides another means of preventing unnecessary administrative delays and stimulating construction of low and moderately priced housing. This technique may be utilized whether or not developers of low and moderate cost housing are actually involved as litigants in the suit.

This procedure is embodied in the Massachusetts Zoning Appeal Law, *L.* 1969, *c.* 774, *Mass. Gen. Laws,* ch. 40B §§ 20–23.[26] This act allows certain developers of low and moderate income housing to bypass local land use regulations which prohibit such housing or make it economically in-

---

[26]*See Mahoney v. Bd. of Appeals of Winchester,* 366 *Mass.* 228, 316 *N. E.* 2d 606, 608–609 (Sup. Jud. Ct. 1974), appeal dismissed 420 *U. S.* 903, 95 *S. Ct.* 822, 42 *L. Ed.* 2d 834 (1975) ; *Bd. of Appeals of Hanover v. Housing Appeals Comm.,* 363 *Mass.* 339, 294 *N. E.* 2d 393 (Sup. Jud. Ct. 1973) upholding the constitutionality of the law. *See also* Note, *supra* note 4, 6 *Rutgers-Camden L. J.* at 743–746; Rubinowitz, *supra* note 8, 6 *Mich. J. L. Reform* at 644–645.

feasible. Under the law, any public agency, nonprofit corporation or limited dividend organization[27] that proposes to build low or moderate income subsidized housing may submit to the local zoning board of appeals "a single application to build such housing in lieu of separate applications as to the [other] applicable local boards." *Mass. Gen. Laws,* ch. 40B, § 21. The board of appeals then notifies all other local boards and agencies and schedules a hearing on the application. If the application is approved, the developer receives a *comprehensive permit* in lieu of all other required permits or approvals. *Ibid.* This procedure prevents unnecessary delays and bad faith, dilatory tactics.

If, however, the local board of appeals denies an application for a comprehensive permit, the developer may appeal to the state Housing Appeals Committee, a division of the Massachusetts Department of Community Affairs. *Id.* at § 22. For purposes of such appeals, the statute establishes a quota of low and moderate income housing as the legislative determination of what is "consistent with local needs." *Id.* at § 20. Where the Housing Appeals Committee concludes that a local decision denying a developer's application is unreasonable or is inconsistent with "local needs" (as defined by the act), the state agency is empowered to vacate the decision of the local board and direct the board to issue a comprehensive permit to the applicant. *Id.* at § 23. In this way, the statute provides for state review of local zoning decisions and permits the state to override decisions which are myopic, unreasonable or in conflict with broader state and regional goals. For an analogous statutory procedure, see *ALI Model Land Dev. Code* §§ 7–501 to 7–503 (Proposed Official Draft, 1975).

---

[27]A "limited dividend" organization is not a public agency but is eligible for federal or state housing subsidies. While the Massachusetts law is limited in its application to subsidized housing, there is no reason why its principles may not be applied by a trial court to all forms of low and moderate income housing.

While the Massachusetts law is a product of legislative initiative, its principles are equally available to trial courts for the framing of judicial relief. As noted above, remedial decrees ordinarily fix and specify the defendant-municipality's "fair share" of the regional housing need. This designation is, in many respects, comparable to the "quotas" established by the Massachusetts legislation. *Mass. Gen. Laws,* Ch. 40B, § 20. Under this approach, the trial court could provide that, until such time as the required number of low and moderate income housing units have been constructed, a developer whose proposed project is consistent with the court-ordered allocation plan could apply to the court, or its designee, for an order setting aside all local regulations which unreasonably interfere with its project. This procedure would be available to all developers of low and moderately priced housing regardless whether they were litigants in the law suit which produced the remedial plan.

One variation of this approach would allow the developer to apply to the trial court for a "set-aside" or "override" order only after it had made a good faith effort to comply with local regulations and obtain all necessary approvals. Thus, before granting this relief, the trial court would have to determine whether the applicant had made the necessary "good faith effort," whether the developer's project would in fact have furthered the objectives of the remedial plan and whether the municipality had unreasonably withheld approval of the project.

A second, more potent variation of this approach would permit the developer to apply directly to a single, designated municipal board or, if the board proved to be uncooperative, to a court appointed panel of planning experts for a "comprehensive permit" similar to the one available under the Massachusetts law. A denied application could be reviewed by the trial court which originally imposed the procedural remedy. *See generally* Rubinowitz, *supra,* at 221–222; Rubinowitz, *supra* note 8, 6 *Mich. J. L. Reform* at 662–665; Note, *supra* note 4, 6 *Rutgers-Camden L. J.* at 741–744;

Mallach, *supra,* 6 *Rutgers-Camden L. J.* at 670; Mytelka & Mytelka, *supra,* 7 *Seton Hall L. Rev.* at 7–12.

Imposition of either of these devices as part of a remedial order will facilitate construction of low and moderate cost housing. Moreover, through its abbreviation of the approval process, this approach will provide an incentive to developers to undertake projects geared toward meeting the housing needs of lower income families.

### (4) Declare that Regional Housing Needs Constitute a "Special Reason" for Granting Use Variances

A related, but procedurally different technique for fostering development of low and moderately priced housing would be to have the trial court utilize a developer's application for a use variance as part of its remedial plan.

*N. J. S. A.* 40:55–39(d), superseded by the Municipal Land Use Law, *L.* 1975, *c.* 291, § 57[28] requires the issuance of a use variance where the applicant can show that "special reasons" exist for granting the variance, and that it "can be granted without substantial detriment to public good and will not substantially impair the intent and purpose of the zone plan and zoning ordinance." *Kohl v. Mayor and Council of Fair Lawn,* 50 *N. J.* 268, 276 (1967); *Kunzler v. Hoffman,* 48 *N. J.* 277, 284 (1966); *Wickatunk Village, Inc. v. Tp. of Marlboro,* 118 *N. J. Super.* 445 (Ch. Div. 1972). *See generally* 2 *Anderson, American Law of Zoning* ch. 14 (1968). Although it is not clear whether regional housing needs of lower income people currently are regarded as a "special reason" for granting a use variance, *compare, e. g., Brunetti v. Mayor & Council of Madison Tp., supra,* 130 *N. J. Super.* 164 *with Nigito v. Borough of Closter,*

---

[28]It has been suggested that similar results may be attained by declaring low and moderate income housing to be a "special exception" use under *N. J. S. A.* 40:55–39(b). Mytelka & Mytelka, *supra,* 7 *Seton Hall L. Rev.* at 11.

*supra,* 142 *N. J. Super.* 1, this issue is currently pending before this Court.

However, even if this Court should find that filling regional housing needs is not a "special reason" within the meaning of the statute generally, such a holding would not prevent a trial court from utilizing this procedure as part of its remedial order in a given case by finding that regional housing needs constitute a "special reason" for granting a developer's application for a use variance. Such an order could be vacated as soon as the critical need for such housing subsides and the town shows that it has satisfied its obligation under *Mt. Laurel.* Essentially, this approach identifies low and moderate income . housing as a "preferred" or "favored" use within the region in which the defendant-municipality lies.

Substantial precedent exists for this approach. In *De-Simone v. Greater Englewood Housing Corp. No.* 1, 56 *N. J.* 428 (1970), taxpayer-residents of the City of Englewood challenged the validity of a special use variance which allowed a nonprofit housing agency to construct a semipublic multifamily residential project. In particular, plaintiffs argued that the grounds offered to justify the variance did not qualify as "special reasons" under existing legislation. Justice Hall, speaking for the Court, unequivocally upheld the variance in language which is appropriate in the present context:

> We specifically hold, as a matter of law in the light of public policy and the law of the land, that public or, as here, semi-public housing accommodations to provide safe, sanitary and decent housing, to relieve and replace substandard living conditions or to furnish housing for minority or underprivileged segments of the population outside of ghetto areas is a special reason adequate to meet that requirement of *N. J. S. A.* 40:55-39(d) and to ground a use variance.
> [56 *N. J.* at 442.]

*Accord, Brunetti v. Mayor & Council of Madison Tp., supra,* 130 *N. J. Super.* at 167–168 (need for moderate-income, multifamily housing held to be a "special reason" in sup-

port of a variance) ; *Pascack Ass'n v. Mayor & Council of Washington Tp., supra,* 131 *N. J. Super.* at 197 (same). *Cf. Kunzler v. Hoffman,* 48 *N. J.* 277 (1966) (private hospital for the emotionally disturbed) ; *Wickatunk Village, Inc. v. Marlboro Tp.,* 118 *N. J. Super.* 445 (Ch. Div. 1972) (sewage treatment plant for mobile home park). *Contra Nigito v. Borough of Closter, supra,* 142 *N. J. Super.* 1 (moderate income garden apartments) ; *Jenpet Realty Co., Inc. v. Ardlin, Inc.,* 112 *N. J. Super.* 79, 84–85 (App. Div. 1970) (small-garden type apartment complex).[29] *See also* the unreported cases reviewed by Professor Rose in his article, "The Trickle Before the Deluge from Mount Laurel," *supra,* 5 *Real Estate L. J.* 69, and the *Newark Star-Ledger,* July 14, 1976, at 36, cols. 1–3, which notes that developers are increasingly relying on the use variance "in their long-running battles to build low and moderate-income housing in the State's suburban communities."

A similar approach was employed in *Bristow v. Woodhaven,* 35 *Mich. App.* 205, 192 *N. W.* 2d 322 (Ct. App. 1971). There the court held that the municipality's total ban on trailer parks was invalid with respect to plaintiff's property. Affirming the trial court, it held

Certain uses of land have come to be recognized as bearing a real, substantial, and beneficial relationship to the public health, safety, and welfare so as to be afforded a *preferred* or *favored* status. To restrict such uses appears to conflict with the concept of presumed validity of an ordinance prohibiting such an otherwise legitimate use . . . Therefore, in such limited situations, the proponent of a

---

[29] Litigants who oppose this approach have argued that if the need for moderate income, multifamily housing is held to be a "special reason" justifying issuance of a use variance, then the entire zoning scheme of the municipality will break down. Nonetheless, as the court pointed out in *Brunetti v. Mayor & Council of Madison Tp.,* this is not necessarily true since applications for a variance will still be subject to the negative criteria that the proposed use must be without substantial detriment to the public good and must not substantially impair the intent and purpose of the zoning ordinance. *Id.,* 130 *N. J. Super.* at 168.

preferred or protected but prohibited use may establish a *prima facie* case thereby casting upon the municipality the burden of going forward to justify its prohibition of a use heretofore recognized as beneficial to the public welfare.

[192 *N. W.* 2d at 324, 325; emphasis supplied.]

While in *Kropf v. Sterling Heights,* 391 *Mich.* 139, 215 *N. W.* 2d 179 (1974), the Michigan Supreme Court rejected the statement in *Bristow* that certain uses should be preferred or favored, it stated:

On its face, an ordinance which *totally* excludes from a municipality a use recognized by the Constitution or other laws of this State as legitimate also carries with it a strong taint of unlawful discrimination and a denial of equal protection of the law as to the excluded use.

[215 *N. W.* 2d at 185]

Accordingly, it accepted a lower court's statement that a "*total* prohibition by a local zoning ordinance of a 'constitutionally' — recognized use will amount to establishment of a *prima facie* case placing a heavy burden on the municipality to justify the local legislation." [215 *N. W.* 2d at 185].

Another analogy for this remedy may be drawn from the American Law Institute's proposed Model Land Development Code. While the Model Code continues to respect local prerogatives in most land use matters, it does provide for state supervision in certain areas substantially implicating the state or regional welfare. One such area concerns land use developments which are likely "to present issues of state or regional significance" and so-called "developments of regional benefit" which include, *inter alia,* uses sponsored by governmental agencies and "housing for persons of low and moderate income." *ALI Model Land Dev. Code* § 7–301 (Proposed Official Draft, 1975). Where applications for such developments are filed with a local land development agency, the Model Code states that the local agency "shall not restrict its consideration to benefit and

detriment within the jurisdiction, but shall consider all relevant and material evidence offered to show the impact of the development on surrounding areas." *Id.* at § 7–402. It also allows an unsuccessful applicant to appeal to the State Land Adjudicatory Board which is empowered to override local decisions in appropriate cases. *Id.* at §§ 7–501 to 7–504. Mirroring the concepts of "special reason" and "preferred use" discussed above, the drafters of the Model Code justify the special treatment afforded these uses by noting that they "typically provide benefits to an area beyond the boundaries of a single local government." *Id.* at § 7–301, Comment. *See generally* Note, *supra* note 4, 6 *Rutgers-Camden L. J.* at 746–754.

(5) Order Specific Changes in the Zoning Ordinance

Following the invalidation of a zoning regulation, a trial court ordinarily allows a municipality to correct deficiencies by amending its zoning ordinance within a specified period of time. In this way, the court permits the town to retain control over this stage of the rezoning process. However, where the revised ordinance continues an exclusionary character or otherwise fails to comport with the principles of *Mt. Laurel,* the trial court should begin to specify ways in which the ordinance must be modified.

In the instant case, the majority has directed the trial court to undertake this task by ordering the town to adopt a revised ordinance which shall as *minima:*

(a) allocate substantial areas for single-family dwellings on very small lots; (b) substantially enlarge the areas for dwellings on moderate sized lots; (c) substantially enlarge the AF district or create other enlarged multi-family zones; (d) reduce the RP, R–80 and R–40 zones to the extent necessary to effect the foregoing . . .; (e) modify the restrictions in the AF zones and PUD areas . . . which discourage the construction of apartments of more than two bedrooms; (f) modify the PUD regulations to eliminate the undue cost-generating requirements specified above; and (g) generally eliminate and reduce undue cost-generating restrictions in zones allocated to the achievement of lower income housing . . . [*Ante* at 553]

I am in substantial accord with these detailed instructions and believe them to be fully justified under the facts of this case. I would only add that the Court might also have directed the municipality to "overzone" for low and moderate cost housing [*see ante* at 518–520] and to either create a mobile home park zone or allow mobile homes as a permissible use in other residential districts.

In this regard, I note, at the risk of stating the obvious, that mobile homes provide one of the most feasible and most readily available means of furnishing housing which is affordable to the elderly, to low and moderate income families and to young couples with one or two children. This additional source of housing is particularly important when, as now, economic conditions largely preclude construction of other forms of low cost housing. *See generally* D. Mandelker & R. Montgomery, *Housing in America*: *Problems and Perspectives* 223, 438 (1973); Rubinowitz, *supra* note 8, 6 *Mich. J. L. Reform* at 627 n. 3 & 630 n. 14; *Bristow v. City of Woodhaven, supra,* 192 *N. W.* 2d at 327–328; *Sheperd's, Mobile Homes and Mobile Home Parks* 3–8 & *passim* (1975).

(6) Enjoin Municipal Approval of Other Forms of Development

This remedial device — the imposition of a moratorium on building and other development within the municipality until such time as the municipality has taken steps to provide for its fair share of the regional housing need — is one of the most extreme and possibly most effective remedies available. While it should be used sparingly, this remedy might provide an ideal form of judicial relief in certain cases. Modified versions of this device have already been suggested by commentators and employed by some courts. In *Kennedy Park Homes Ass'n v. Lackawanna, supra,* for example, the U. S. District Court included in its decree an order

That defendants be enjoined from issuing building permits for any construction in the second and third wards which will contribute additional sanitary sewage to the municipal system until Kennedy Park Subdivision (a low and moderate income housing project) has been granted permission to tap into the sewer system by the appropriate authority.

[318 *F. Supp.* at 698.]

*See* Rubinowitz, *supra* note 8, 6 *Mich. J. L. Reform* at 661; Rubinowitz, *supra* at 211–212.

Another example of this technique appears in the American Law Institute's proposed Model Land Development Code. Section 7–305 of that code expressly provides that no local land use agency shall approve any proposed development which will create more than 100 new jobs,

unless the agency also finds that
(1) adequate and reasonably accessible housing for prospective employees is available within or without the jurisdiction of the local government . . . .

If appropriate under the circumstances, these or like provisions could be incorporated by the trial court into its final decree.

(7) Order Municipality to Provide Density Bonuses and Other Incentives for Building Lower Income Housing

As noted in *Mt. Laurel* and again by the majority today, it is unlikely that substantial amounts of low and moderate income housing will be built, absent some form of governmental contribution, concession or incentive, because of the high cost of construction and current economic conditions. *Mt. Laurel, supra,* 67 *N. J.* at 170 n. 8 and 188 n. 21; *id.* at 207–208 (Pashman, J., concurring); *ante* at 510–512. *See also Kleven, supra,* 21 *U. C. L. A. L. Rev.* at 1452– 1453; *Mallach, supra,* 6 *Rutgers-Camden L. J.* at 660–663, 686–687. Because the object of this litigation is not only to prevent continued infringement of plaintiffs' rights but

also to redress past wrongs, the municipality must employ whatever tactics are necessary (and reasonably attainable) to achieve these ends. If it appears that some form of governmental "contribution, concession or incentive" is required to stimulate production of low and moderate income housing, these avenues must be explored.

One such incentive is the "density bonus." *See, e. g., N. J. S. A.* 40:55-57(b)(2) and (3). Under one variation, the developer is permitted to build a specified number of conventional units above the maximum density otherwise allowed in the zone, in return for including a certain number of low or moderately priced units in its housing project, or the developer might be allowed to build an additional single bedroom or efficiency apartment, above the maximum allowable density, in return for the construction of a specified number of multibedroom units. The former device serves to promote the production of low and moderate income housing, while the latter directly addresses the critical housing needs of lower income families. In general, the purpose of a density bonus is to "encourage the construction of moderately priced housing by providing for optional increases in density in order to reduce land costs for such . . . housing." *Montgomery County, Md., Code ch.* 25A-1 (1973) quoted in Kleven, *supra,* 21 *U. C. L. A.* at 1444 n. 35. There has already been some indication that these devices can successfully stimulate production of needed housing, despite the presence of adverse economic conditions. *Id.* at 1476-1490. Therefore, where such conditions prevail, these and other comparable incentives should be incorporated into the trial court's remedial order.

(8) Order Municipality to Impose Subdivision Conditions and Other Inclusionary Devices

Another method of fostering production of low and moderately priced housing is to condition approval of large residential developments and subdivisions on agreements that

a certain percentage of units affordable by lower income people will be provided. Such schemes have already been implemented in several parts of the country. In Montgomery County, Maryland, for example, developments with 50 or more residential units are required to include moderately priced dwelling units comprising at least 15% of the total number of units in the project. Similarly, an inclusionary ordinance enacted by the Los Angeles City Council in 1974 now requires developers of multifamily apartments, condominiums or cooperatives with five or more units to include at least 6% low income and a total of 15% low and moderate income units in each project. For a detailed account of these and other inclusionary zoning schemes, *see* Kleven, *supra*, 21 *U. C. L. A. L. Rev.* at 1438–1448 & *passim. See also Rubinowitz, supra* at 53–63, 222; Rose, "From the Legislatures: The Mandatory Percentage of Moderately Priced Dwelling Ordinance (MPMPD) Is the Latest Technique of Inclusionary Zoning," 3 *Real Estate L. J.* 167 (1974).

The terms and conditions of these programs vary considerably. Some rely exclusively on subsidized housing for satisfaction of their mandatory percentage requirements. Where this is the case, the requirement should be set aside if the developer can prove that a good faith effort has failed to uncover necessary government subsidies. Even where the scheme requires provision of privately financed units (with price ceilings in lieu of subsidized dwellings), it often provides for a waiver of this requirement where it would work a hardship upon the developer or deprive him of a fair and reasonable return on his investment.

In order to facilitate production of mandatory low priced dwellings by reducing the cost of these units, many inclusionary schemes also provide for density bonuses and conditional waivers of other cost-generating land use regulations. In addition, inclusionary zoning schemes are generally enforced by simply withholding approval or enjoining construction of a development until compliance with the mandatory percentage provision has been assured. Finally,

many such programs also contain provisions which guarantee that moderately priced units will, in fact, be purchased or rented by low and moderate income families. *See, e. g.,* Kleven, *supra,* 21 *U. C. L. A. L. Rev.* at 1445 n. 40 and 1448 n. 51.

The salutary remedial effects of these devices are obvious. Not only do they promote construction of moderately priced housing, but they directly address the problem of avoiding creation of suburban slums through deconcentration of low and moderate income housing. *Id.* at 1448–1460. In addition, they foster higher quality construction and better maintenance of low income units, because

[t]he incentive for good workmanship and maintenance should be greater . . . if the subsidized units are tied to a developer's conventional sales and rental units, whose marketability would be adversely affected by poor construction or maintenance of the subsidized units. *Id.* at 1461–1462.

For these reasons, inclusionary provisions represent an important and useful addition to the arsenal of judicial remedies.[30]

---

[30]It might be noted, though, that because this remedy entails a considerable degree of interference with both private and public developers, it would best be implemented through legislative initiative and should be imposed by a court only as a last resort. Nevertheless, where the scheme is carefully drafted and clearly warranted by the circumstances, I see no objection to it in principle.

In this regard, I do not have the same reservations the majority has concerning the validity of this remedial device. The majority cites *Bd. of Supervisors v. DeGroff Enterprises, Inc.,* 214 *Va.* 235, 198 *S. E.* 2d 600 (Sup. Ct. 1973). In that case, the Supreme Court of Virginia invalidated a Fairfax County Virginia inclusionary zoning ordinance on the grounds that it exceeded the authority granted by the enabling act and that it constituted an unconstitutional taking without just compensation. *Id.* 198 *S. E.* 2d at 602. With respect to the first ground, I find that the court's construction of the zoning power to be excessively narrow. Moreover, the court failed to distinguish between the exclusionary and inclusionary impact of zoning provisions. As to the second ground cited above, careful draftsmanship should be able to avoid any constitutional objections by assuring

### (9) Order the Municipal Government to Establish a Local Housing Authority

In *Mt. Laurel,* I stressed that municipalities have a clear obligation to encourage and solicit federal and state housing assistance and, in some instances, may even have a duty to provide low income housing itself through local public and semipublic programs. *Id.,* 67 *N. J.* at 211 (Pashman, J., concurring). Establishment of a local housing authority will undoubtedly help the municipality to undertake these tasks. *Community Development and Housing Act of 1974,* 42 *U. S. C. A.* §§ 1401 *et seq.; Local Housing Authority Law, N. J. S. A.* 55:14A–1 *et seq.* Therefore, in the event that preliminary remedial programs prove to be unsuccessful in meeting the municipality's fair share of regional housing needs, the trial court should consider ordering the defendant to establish a local housing authority.

Initially, this body would be charged with actively seeking federal and state assistance. Affirmative solicitation is quite important in the context of low income housing because under most housing subsidy programs the initiative rests with local authorities and private sponsors. The U. S. Department of Housing and Urban Development, which administers most federal programs, must often rely on the submission of applications to it before it may authorize funding for local projects. Inaction or lack of cooperation by local officials will effectively defeat such programs. *See generally Kleven, supra,* 21 *U. C. L. A. L. Rev.* at 1433 n. 1 & 1437 n. 10; Rubinowitz, *supra* note 8, 6 *Mich. J. L. Reform* at 627–630; Note, *supra* note 4, 6 *Rutgers-Camden L. J.* at 733 nn. 42–44; *Hills v. Gautreaux, supra,* 425 *U. S.* at 303, 96 *S. Ct.* at 1549, 47 *L. Ed.* 2d at 806–807 & n. 19.

---

that developers are guaranteed a fair and reasonable return on their investment. *See generally* Kleven, *supra,* 21 *U. C. L. A. L. Rev.* at 1490–1528; Note, "Required Low-Income Housing in Residential Developments: Constitutional Challenges to a Community Imposed Quota," 16 *Ariz. L. Rev.* 439 (1974).

Where even these efforts prove inadequate, and the circumstances so justify, the court should then order the municipal housing authority to undertake the construction of local, low income housing projects. *See, e. g., N. J. S. A.* 55 :14A-7(b). Several federal courts have already resorted to this remedy. *Garrett v. City of Hamtramck,* 335 *F. Supp.* 16 (E. D. Mich. 1971), supplemented 357 *F. Supp.* 925, 927-928 (E. D. Mich. 1973), rev'd on other grounds 503 *F.* 2d 1236 (6 Cir. 1974), on remand 394 *F. Supp.* 1151 (E. D. Mich. 1975) (court ordered the construction of at least 430 units of low and moderate income housing to accommodate black residents whom the city failed to relocate after they were displaced through highway programs and urban renewal). *Cf. Gautreaux v. Chicago Housing Authority, supra,* 342 *F. Supp.* at 830-831; *Southern Alameda Spanish Speaking Organization (SASSO) v. Union City, supra,* 357 *F. Supp.* at 1199; *Crow v. Brown, supra,* 332 *F. Supp.* at 395-396. As one commentary stated:

'Courts do not build housing,' but if other remedies do not succeed, courts could order governmental agencies to do so.
[Mytelka & Mytelka, *supra,* 7 *Seton Hall L. Rev.* at 31-32; citations omitted.]

## IV

### CONCLUSION

Returning to the instant case, it should be recalled that six years have elapsed since this litigation began. Even though the principles set forth in *Mt. Laurel,* defining the municipality's obligation to provide regional housing needs, are now well settled, Madison Township's ordinance has been shown to fall far short of meeting its obligation. Low and moderate income groups continue to be excluded from the township, and plaintiffs' constitutional rights remain unredressed and unvindicated.

Therefore, I would remand the case to the trial court for formulation and expeditious imposition of a comprehensive

remedial order. On remand, the court first should fix and specify Madison Township's "fair share" of the region's lower income housing needs. This requirement might be framed in terms of either an absolute quota or one to be met over a specified number of years. While the court need not support its conclusion by relying upon any one particular formula, it must base its decision on a careful weighing of the factors set forth in this opinion.

Upon notification of its "fair share" requirement, the municipality shall have 90 days within which to submit to the trial court a proposed remedial plan which includes both suggested amendments to its zoning ordinance and affirmative programs designed to achieve (so far as is possible) timely satisfaction of its fair share obligation. Guidelines concerning proposed amendments to the local ordinance are set forth above and need not be repeated here.

A hearing shall be held on the proposed plan thus submitted. If adopted by the court (either in its original form or with modifications), the plan shall be incorporated into a final decree and immediate implementation shall be ordered. The court shall retain jurisdiction for purposes of supervising implementation of this plan.

If, however, the plan is found to be inadequate, the court shall, in consultation with the parties, formulate and enter its own remedial plan. The court may appoint independent zoning and planning experts to assist in this process. *Supra,* at 583. In addition to the amendments to the local zoning ordinance noted above, such a plan might properly include establishment of a local housing authority, creation of a set-aside or override procedure for proposed low and moderate income housing developments, provision of density bonuses, imposition of subdivision quotas or any other device deemed appropriate under the circumstances.

The immediate and specific measures which I have outlined are needed if we are ever to thwart the class segregation which we have too long neglected. Mere good faith reliance that municipalities will rezone to meet their obligations

has not worked in the past. Madison Township, as well as other suburban communities, have already clearly demonstrated their reluctance to provide housing which is critically needed. Now, less than two years after our decision in *Mt. Laurel,* communities have indicated their hostility to any formal plan designed to meet their affirmative obligation. In the absence of action by either members of municipal governing bodies or lower courts, this Court must assume the task of devising measures which will ensure an end to exclusionary zoning.[31]

Yet, the Court's own hesitation in ordering effective remedies for exclusionary zoning suggests a lack of commitment to the intent and spirit of the principles which we unanimously announced in *Mt. Laurel.* Although the members of this Court have all indicated their staunch support of our decision in that case, adherence to these principles lies in the implementation of a remedial plan which will correct the deficiencies of exclusionary zoning. This result cannot be accomplished in this case without ordering the trial court to:

(1) identify the relevant region;

(2) determine the present and future housing needs of the region;

---

[31]The Court's duty to remedy exclusionary zoning is not in any way changed by the United States Supreme Court's recent decision in *Arlington Heights v. Metropolitan Housing Development Corp.,* —— *U. S.* ——, 97 S. Ct. 555, 50 L. Ed. 2d 450 (1977). The opinion makes clear that the Court's decision there is not concerned with the constitutionality of exclusionary zone plans generally but is limited to consideration of governmental action which has a racially disproportionate impact. *See ante* at 562. *See generally Washington v. Davis,* 426 *U. S.* 229, 96 *S. Ct.* 2040, 48 *L. Ed.* 2d 597 (1976) ; Brest, "The Supreme Court, 1975 Term, Forward: In Defense of the Antidiscrimination Principle," 90 *Harv. L. Rev.* 1 (1976). By contrast, the analysis in *Mt. Laurel* is not limited to equal protection principles but also concerns the requirement that municipal zoning regulations conform to the general welfare. 67 *N. J.* at 174–179. More important, it is not limited to the principles embodied in the Federal Constitution but is predicated on more expansive state constitutional grounds. 67 *N. J.* at 174–175.

(3) allocate these needs among the various municipalities in the region;

(4) shape a suitable remedial order.

Because the Court has satisfied itself with declaring exclusionary zoning unconstitutional and relying upon generalized notions of "fair share" and regional considerations, I am fearful that it has stopped short of taking steps which are needed to implement today's decision requiring Madison Township to meet regional housing needs. Unlike decisions declaring specific exclusionary devices unconstitutional, enforcement of an affirmative obligation to provide multi-family housing requires an ongoing process of judicial vigilance coupled with strong corrective measures.

Only by taking upon ourselves the task of fashioning affirmative judicial relief will we make exclusionary suburbs responsive to the needs of our democratic society. Only through such direct and forceful action will the evils of a segregated society and economic bigotry be thwarted and the barriers of exclusionary zoning permanently breached.

SCHREIBER, J. (concurring in part and dissenting in part). We are now called upon to fashion a remedy for and implement our decision in *So. Burl. Cty. N.A.A.C.P. v. Tp. of Mt. Laurel,* 67 *N. J.* 151 (1975), hereinafter referred to as *Mt. Laurel.* At the outset it would be well to identify and define the wrong condemned in *Mt. Laurel.*

*Mt. Laurel* invalidated the Township's zoning ordinance which effectively excluded low and moderate income housing. The Township frankly conceded that adoption of the exclusionary provisions of the ordinance was motivated by the desire to protect the fiscal interests of its residents, for inhabitation by substantial numbers of low and moderate income families would probably increase the local tax rate which would then be thrust upon all the municipality's residents. The underlying cause of this state of affairs is New Jersey's tax structure, essentially local in nature, which generates most of its revenues from real estate assessments.

In *Mt. Laurel* Justice Hall graphically described the financial pattern behind exclusionary zoning:

> There cannot be the slightest doubt that the reason for this course of conduct has been to keep down local taxes on *property* . . . and that the policy was carried out without regard for non-fiscal considerations with respect to *people*, either within or without its boundaries. . . .
>
> This policy of land use regulation for a fiscal end derives from New Jersey's tax structure, which has imposed on local real estate most of the cost of municipal and county government and of the primary and secondary education of the municipality's children. The latter expense is much the largest, so, basically, the fewer the school children, the lower the tax rate. Sizeable industrial and commercial ratables are eagerly sought and homes and the lots on which they are situate are required to be large enough, through minimum lot sizes and minimum floor areas, to have substantial value in order to produce greater tax revenues to meet school costs. Large families who cannot afford to buy large houses and must live in cheaper rental accommodations are definitely not wanted, so we find drastic bedroom restrictions for, or complete prohibition of, multi-family or other feasible housing for those of lesser income.
>
> This pattern of land use regulation has been adopted for the same purpose in developing municipality after developing municipality. Almost every one acts solely in its own selfish and parochial interest and in effect builds a wall around itself to keep out those people or entities not adding favorably to the tax base, despite the location of the municipality or the demand for varied kinds of housing. There has been no effective intermunicipal or area planning or land use regulation. [*Id.* at 170–171].

The *ratio decidendi* of *Mt. Laurel* is that a municipality's zoning ordinance which effectively excludes low and moderate income families from living within its borders and which has been enacted to escape the adverse financial impact on the community is contrary to the general welfare and consequently invalid. Art. I, par. 1 of New Jersey Constitution.[1] No one can reasonably quarrel with that proposition.

---

[1]If adoption of the zoning ordinance had not been motivated by fiscal reasons, but for proper purposes, it could be contended that the validity of the ordinance should be upheld. *Compare Arlington Heights v. Metropolitan Housing Development Corp.*, —— U. S. ——, 97 S. Ct. 555, 50 L. Ed. 2d 450 (1977), where the Supreme Court

Obviously, an effective remedy to alleviate the evil which *Mt. Laurel* has exposed is one which strikes at its root causes, such as revitalization of the cities with new commercial and industrial enterprises which would add substantial ratables to the local tax base, or reformation of New Jersey's tax structure, or both, so that, as Justice Hall wrote, municipalities would "zone primarily for the living welfare of people and not for the benefit of the local tax rate." *Id.* at 188 (footnote omitted). Most would readily concede that the legislature and not the courts is the proper body to exercise such relief. The Public School Education Act of 1975, *N. J. S. A.* 18A:7A–1 *et seq.*, as funded, *N. J. S. A.* 54A:1–1 *et seq.*, will have some effect on the local tax rate, but most public educational costs, expenses for police and fire departments, municipal aid to the poor, and expenditures for other local related services are still borne by local taxes with urban areas having disproportionately greater costs in these respects. *See Robinson v. Cahill*, 67 *N. J.* 333, 369–370 (1975) (Pashman, J., concurring in part and dissenting), *cert.* denied, 423 *U. S.* 913, 96 *S. Ct.* 217, 46 *L. Ed.* 2d 141 (1975). No party in these proceedings has advocated that the judicial remedy be directed toward elimination of the causes. Instead efforts, following the lead of *Mt. Laurel,* have been directed toward the amelioration or elimination of the result, namely modification of the exclusionary provisions of the zoning ordinance.

The judicial remedial guideline suggested in *Mt. Laurel* was that a municipality must bear its "fair share" of low and moderate income housing in the "region". Problems inherent in the "fair share" of the "region" formula have been expressed by the majority as well as Justice Mountain and need not be repeated. Clearly the legislature or an administrative agency with the necessary expertise would un-

held that failure to establish a racially discriminatory motive in refusing to rezone for low and moderate income tenants did not invalidate a zoning ordinance under the Fourteenth Amendment.

questionably be in a far superior position than the courts to receive all relevant information and data and reach legitimate results using the concepts of "fair share" and "region".[2] Furthermore, the Court should not be and is not limited to solutions within that framework. The opportunity to construct low or moderate income housing predicated upon projected population growth (municipal county, regional or area), geological, geographical, environmental, ecological conditions or on other rational bases may satisfy the *Mt. Laurel* mandate.[3]

There is broad language in *Mt. Laurel* to the effect that a "developing" municipality must provide by its land use regulations the reasonable opportunity for an appropriate variety and choice of housing for *all* categories of people who may desire to live within its boundaries. 67 *N. J.* at 179. I do not accept that generalization. The general welfare calls for adequate housing of all types, but not necessarily within any particular municipality. *Fanale v. Hasbrouck Heights,* 26 *N. J.* 320 (1958). Environmental, ecological, geological, geographical, demographic, regional or other factors may justify exclusion of certain types of housing, be it two-acre or multifamily. *See N. J. S. A.* 40:55D-2 c, i, j, k. It should be noted that the general welfare includes "public health, safety, morals and welfare by means of adequate light and air, the avoidance of overcrowding of land and

---

[2]*See Division of State and Regional Planning, A Statewide Housing Allocation Plan for New Jersey* (preliminary draft, 1976), which commented that court decisions have attempted to deal with "fair shares" and related issues, but not on a uniform basis. *Id.* at 2. The study allocated low and moderate income housing needs among the municipalities, using factors such as municipal fiscal capability, employment growth, vacant developable land and personal income. *Id.* at 13-15.

[3]Judge Conford in the majority opinion and Justice Pashman in his concurring and dissenting opinion recognize the need for flexibility in determining "region" and "fair share", but even then, the "fair share" — "region" principle may unduly circumscribe a municipality in its efforts to satisfy the constitutional requirement that a zoning ordinance be consonant with the general welfare.

buildings and the undue concentration of population; these among other considerations related to the essential common good, the basic principle of civilized society." *San-Lan Builders, Inc. v. Baxendale,* 28 *N. J.* 148, 157 (1958). *See also Village of Belle Terre v. Boraas,* 416 *U. S.* 1, 94 *S. Ct.* 1536, 39 *L. Ed.* 2d 797 (1974).

Madison Township's zoning ordinance, as amended, is facially exclusionary to the extent delineated in the majority opinion. It was the Township's burden to justify the exclusionary provisions of its amended ordinance on a reasonable basis such as projected population growth, regional requirements, geological, geographical, environmental or ecological considerations. This it has not done. Accordingly, I would remand to permit the municipality to present evidence to justify the extent to which its ordinance now permits construction of low and moderate income housing to meet the criteria set forth herein or to revise its ordinance in accordance with the minimum requirements projected in Part XIII of the majority opinion. I also agree with Part XII with respect to relief for the corporate plaintiffs at this time under the unusual circumstances of this case. Lastly, I agree with the majority that the trial court erred in not receiving in evidence the environmental depositions. On the remand these should be admitted and additional relevant evidence in connection with that subject matter, if offered by any of the parties, should be considered.

I concur in the remand consistent with the provisions stated herein.

MOUNTAIN, J., concurring and dissenting. As lawyers, judges, scholars and concerned citizens have quickly come to realize, the decision of the Court in *Mount Laurel*[1] has raised problems that defy easy answer. Some of these problems are

---

[1] The correct name of the case is *Southern Burlington County N.A.A.C.P. v. Twp. of Mount Laurel,* 67 *N. J.* 151 (1975), *cert.* denied 423 *U. S.* 808, 96 *S. Ct.* 18, 46 *L. Ed.* 2d 28 (1975). It is here and elsewhere commonly referred to simply as *Mount Laurel.*

identified and commented upon below. It is the thesis of this opinion that the solutions of these problems, individually and in the aggregate, will be far more speedily and effectively devised by the Legislature than by the courts.

*Mount Laurel* announced a limitation on the zoning power. Henceforth, in a "developing municipality,"[2] that power must not be so exercised as to exclude from the community any who may wish to reside there; land use regulation must not be so structured that thereby entrance into the community will be beyond the economic reach of any persons, notably those in the low-and moderate-income groups. As a rule of law and statement of principle this seems unexceptionable.[3] It is in its implementation that difficulties are immediately encountered.

The opinion in *Mount Laurel* laid upon each developing municipality in the State an obligation to exercise its zoning power in such a way as to provide for its "fair share" of the housing needs of the lower-and moderate-income persons resident within the "region" within which the municipality was found to lie. It now seems to me, as it has come to seem to many others, that neither "fair share" nor "region" can be determined with even approximate accuracy in any given case and that neither concept provides a really workable tool to aid in the resolution of this difficult problem. For instance, the majority adopts the trial court's definition of "region" as being "the area from which, in view of available employment and transportation, the population of the township would be drawn, absent invalidly exclusionary zoning" p. 537. As soon as one seeks to apply this definition it is seen that it rests upon circular reason-

---

[2]"Developing municipality" is a phrase that has now taken on a special, if not entirely precise, meaning. See *Rose and Levin, What Is a "Developing Municipality" Within the Meaning of the Mount Laurel Decision?*, 4 *Real Estate Law Jour.* 359 (1976).

[3]The rule has an idealistic, even Utopian quality. For this I would make no apology.

ing. A predicate of exclusionary zoning is a finding that a municipality is contributing less than its fair share of particular housing needs of its region. So before we can know whether zoning is exclusionary we must first find the region to whose housing needs it is allegedly making an inadequate contribution. But by the foregoing definition a determination of region implicates a prior finding of exclusionary zoning. Where is one to begin?[4]

Actually, in light of the rule announced by the majority, it seems no longer necessary to define either "region" or "fair share." The opinion states very clearly that a reviewing tribunal henceforth need not specify a particular region nor fix a fair share quota. (Pp. 498–499, 524, 543). It would seem implicit that a municipality also need not do so. In place of the fair share-regional approach, the majority now postulates a rule directing attention to the *substance* of zoning ordinances and to the *bona fide* efforts of those responsible for the administration of plans of land use regulation. (Pp. 499, 500, n. 5). This is undoubtedly a very great improvement; and yet it carries its own particular weaknesses. Implicit in this rule is the likelihood of *ad hoc* determinations rather than uniform application of a well understood governing principle. Furthermore, and perhaps somewhat naively, it places what I fear is undue reliance upon good faith effort, despite the fact that, for understandable if not laudable reasons, any such effort has thus far been conspicuous by its almost total absence. Nevertheless, there is probably nothing better to offer as a judicially devised alternative.

Quite apart from the uncertain efficacy of this newly formulated rule, there are a number of reasons why courts should abstain from seeking ultimate solutions in this area, but should rather urge a legislative, or legislative-adminis-

---

[4]This is not to say that "fair share" and "region" might not prove useful and entirely workable concepts as part of a well-considered program of legislatively-developed regional zoning.

trative approach. In the first place courts are not equipped for the task. If a court goes beyond a declaration of validity or invalidity with respect to the land use legislation of a particular municipal body, it invites the fairly certain prospect of being required itself to undertake the task of rezoning. Of course it has neither the time, the competence nor the resources to enter upon such an undertaking. It must therefore appoint planning experts to do the work for it. Such a course was followed in *Pascack Association Ltd. v. Mayor and Council of Washington Twp.*, 131 *N. J. Super.* 195 (Law Div. 1974), certif. granted 69 *N. J.* 73 (1975). A principal weakness inherent in this approach is that no authoritative guidelines exist at the present time to aid the trial judge and the planning experts he has appointed, and to which the law would require that they adhere. Therefore a land use plan so devised will reflect rather the informed judgment of the chosen expert than a judicial application of settled principle to particular facts. Full realization of this is likely further to diminish the probability of community acceptance.

Many of the difficulties a court faces in embarking upon such a venture have been discussed in an extremely instructive law review note:

If courts are required to make such determinations, they will be guided only by generalities found in appellate court decisions and by the ad hoc determinations of court-appointed experts, * * * There are no clear standards for determining what tracts should be zoned for housing needs, but the court must certainly consider a number of factors. These include existing drainage capacity and the cost of any required new sewerage systems, present traffic patterns and the capacity of existing roads to satisfy the needs of relatively high-density developments, ecological or landscape considerations, future demands for public services, and the location and capacity of existing schools, fire departments, and other municipal services. The most difficult task for a court is to capitalize on investments previously made by the community. Although not essential for a decision as to the location of new housing, this task must be accomplished with some success if a court is not to undermine the sound financial structure of the municipality.

The court that rezones a municipality to accommodate low-and moderate-income housing must also consider whether it will retain jurisdiction to hear pleas for variances from the scheme it has mandated. A developer might, for instance, wish to build a pharmacy in an area that the court has designated for high-density, multi-unit dwellings. If a court itself decides upon the request, there will be little left of the principle that courts should not function as super-zoning bodies. Moreover, the court will be burdened with administrative duties until the land that it has rezoned is totally developed. * * *

The desirability of a judicial remedy cannot be assessed without considering, for example, the potential for undesirable permanent alteration of the municipality that is inherent in any decision to rezone. A court that concludes it has unwisely ordered busing to desegregate a school system can easily correct its error by withdrawing or altering its order. If a court finds that a court-ordered reapportionment scheme was ill-advised, it can modify the districts or allow the legislature to modify them. In both of these areas, unwise decrees of the judiciary pertaining to complex or potentially inflammatory situations can usually be altered with a minimum of permanent harm. When a court rezones, however, buildings may be erected and development plans previously under consideration may be abandoned. Thus, unlike courts that reapportion to secure an effective political process or employ busing as a temporary measure to desegregate schools until society develops integrated and equal school facilities, the court that rezones makes a decision for the community that may not be subject to effective revision. [*Note, The Inadequacy of Judicial Remedies in Cases of Exclusionary Zoning*, 74 *Mich. L. Rev.* 760, 774–77, 1976]

On the other hand a legislatively created body, whether of an administrative nature or otherwise, would have the equipment and resources to study the problem in depth, take objective account of competing interests, avail itself of expert advice and hopefully achieve results not only in the public interest but also acceptable to the public — results reached by applying legislatively determined standards to particular factual contexts.

A second, and at least equally important reason why courts should not rezone, lies in the fact that in so doing they must inevitably make policy decisions that have traditionally been the prerogative of a democratically selected branch of government. Judicial rezoning, like all other zoning, implicates a choice among competing, often mutually

exclusive uses. While a court may rightfully challenge a municipality's parochialism, it may at the same time find that its own activism constitutes an intrusion upon a legitimate political debate as to how the limited supply of land in a developing municipality is to be regulated. *Id.* at 779. Many others have expressed a like concern. Professor John M. Payne, for instance, has recently drawn attention to the undesirability of seeking ultimate answers to problems of exclusionary zoning through the application of judicially fashioned remedies. *Payne, Delegation Doctrine in the Reform of Local Government Law: The Case of Exclusionary Zoning,* 29 *Rutgers L. Rev.* 803 (1976). Speaking directly to the current tendency of New Jersey courts to seek final remedies where zoning imbalance is perceived, he says,

> This expansive judicial role raises grave constitutional problems going to the inherent limitations on the ability of a court to encroach upon legislative and executive prerogatives, since the structural issues being addressed by the current litigation can seldom be remedied without either legislative and executive cooperation or judicial action that is essentially legislative in scope. Assuming (all other things being reasonably equal) that the law reform decisions under discussion here ought to be framed in terms that are as minimally intrusive of the ordinary democratic process as possible, it appears that the trend of recent decisions seriously and unnecessarily violates that norm of non-intrusiveness. [*Id.* at 804–05]

He further points out that such action on the part of the courts may not only exceed the boundaries of judicial skill but also those of "political tolerance." *Id.* at 805. Such activity "cuts too closely to the political core of our society." *Id.* at 817.

No one questions that zoning is a legislative function. When the judiciary — for whatever reason — undertakes to move in this field, it immediately places in issue its power of legitimacy. I suggest that such intrusion may be especially resented, and hence more likely to be denied acceptance, where the subject matter is as controversial and potentially inflammatory as are many questions of zoning.

How much better were the Legislature to take steps that would obviate this problem altogether!

A chief obstacle to achieving a rational, useful and adequate answer to our problem inheres in the fact that the zoning power today rests — potentially at least — with 567 different entities. Any municipality in the State is at liberty to adopt a zoning ordinance or plan of land use regulation, and presumably most have done so. Of these municipalities a goodly number must surely qualify — albeit reluctantly — as "developing." Their land use plans are therefore required to meet the test of *Mt. Laurel*. But it must be obvious that the housing needs with which we are concerned can be better met in some municipalities within the region than in others. From a purely rational point of view, it makes little sense to apportion the regional obligation, willy-nilly, among some number of diverse political entities, set off from one another by boundary lines placed where they are by historical accident. As Professor Payne observes,

[I]t becomes necessary to ask whether the central premise of *Mount Laurel*, that each community has a proportional responsibility for each component of the region's socio-economic makeup, makes sense. Would a competent planner, as a matter of total professional discretion, ever recommend that each community in a region, no matter how large or small, no matter how blessed with or without certain natural features, no matter what its past and its present makeup, should be an exact (or even approximate) microcosm of the whole. Even in a world of perfect social motivation, and of perfectly equitable distribution of public resources, it seems self-evident that rational planning would require corridors of growth, concentration of housing of various sorts in appropriate locales, preservation of natural amenities on the basis of absolute merit rather than proportional share and so forth. [*Payne, supra,* at 812–13]

Any comprehensive review of our zoning problems should take account of a state-wide or regional allocation of zoning power as a possibly preferable alternative to present arrangements. The strength of the home rule tradition in New Jersey as well as other rather securely built-in forces

will almost certainly provoke immediate opposition to any such proposal. And yet it should be carefully considered, despite the almost certain necessity of constitutional revision that would be entailed.

In *Mount Laurel* we said, "Courts do not build housing nor do municipalities." 67 *N. J.* at 192. Today the majority repeats, "Municipalities do not themselves have the duty to build or subsidize housing." p. 499. This I take to be settled doctrine, which should not, I submit, be altered in any way except by legislation. This comment is provoked by the plethora of suggestions that have arisen on all sides demanding various kinds of immediate and far-reaching affirmative action — kinds of action that if undertaken would require the exercise of some unspecified municipal power, but certainly not the zoning power.

There is no real likelihood that any of the problems to which I have adverted will yield to unaided judicial ingenuity. There is, on the other hand, very legitimate hope that our zoning difficulties and land use problems — centered as they are today around the injustice of exclusionary zoning, but by no means limited to that — can be ameliorated and eventually solved by careful and imaginative legislative action. The Legislature can recruit the expertise, hear all sides of each strand of the tangled web, view the State regionally or as a whole, experiment if need be, and develop a land use program responsive to the needs of all its citizens. I am satisfied this is a feat of which the courts are incapable.

In the meantime this case must be decided. Courts cannot pass. I agree that the case should be remanded to the trial court, but I disagree strongly with the proposed terms of remand. They seem to me unfair to the municipality. The majority has today announced a new rule henceforth to govern the determination as to whether or not a municipality is guilty of exclusionary zoning. The defendant has had no opportunity to address the issue as so propounded. It should have that opportunity, which should include the right to present not only argument but further testimony as well.

Without going into detail, I wish simply to register my disagreement with everything appearing in Point XIII of the majority opinion.

I concur, accordingly, in the conclusion of the majority that the cause be remanded, but only upon the terms hereinabove set forth.

CLIFFORD, J. (concurring). Sometimes judges decide cases with their fingers crossed. I confess that my vote with the majority opinion is cast with a discomforting feeling that this *judicial* effort to meet the imperative of *Mount Laurel*[1], from which I would not retreat, is neither entirely satisfactory nor wholly successful. Were it not for this lingering sense of unease, I would not presume to burden the discussion further, which I do somewhat reluctantly in view of the barrels of ink already lavished upon this case.

I

Some of the shortcomings of the Court's response to the problems presented are laid bare in Justice Mountain's concurring and dissenting opinion. While I am inclined to agree with much of his gentle probing of the vulnerable areas, I tend to look upon whatever infirmity may inhere in our position not as the result of flawed analysis but rather as an unfortunate but inescapable by-product of the *judicial* function being called upon to solve the extraordinarily complex problems underlying this litigation — problems whose solution, it may be plausibly argued, should be undertaken elsewhere. This concept is touched upon in a trenchant editorial entitled "Help for a Stepchild" appearing in the New Jersey Law Journal on December 23, 1976 (98 *N. J. L. J.* 1132):

---

[1] *So. Burl. Cty. N.A.A.C.P. v. Twp. of Mt. Laurel*, 67 *N. J.* 151, app. dism. and *cert.* den., 423 *U. S.* 808, 96 *S. Ct.* 18, 46 *L. Ed.* 2d 28 (1975).

> We should inquire whether we are asking too much of our courts today. Are there not controversies now being laid at the doorstep of our courts which, in reality, ought to be resolved by other governmental branches? We cannot blame judicial activism for an attempt to eliminate deficiencies in justice. Do controversies enter the judicial system because of a default, or inability to cope, on the part of the other branches? Recently, courts have been called upon to render assistance in areas formerly considered inappropriate, because they are "political" in nature. Courts have now tackled and dealt with major New Jersey problems of housing, zoning, education and taxation. * * * [T]he Legislature and the Executive * * * branches of government have, consciously or otherwise, left it to the judiciary to discharge burdens more properly within their provinces.

This same thought is recognized in the majority opinion, *ante* at 534.

> We take this occasion to make explicit what we adumbrated in *Mount Laurel* and have intimated above — that the governmental-sociological-economic enterprise of seeing to the provision and allocation throughout appropriate regions of adequate and suitable housing for all categories of the population is much more appropriately a legislative and administrative function rather than a judicial function to be exercised in the disposition of isolated cases.

Indeed, every opinion in this case makes that point, not at all in any spirit of twitting the legislature but of something between entreaty and persuasion. It is with this latter impulse that I yield to *cacoëthes scribendi* and add these brief comments.

Recognizing the difference between what should come to the courts and what should be dealt with by other institutions is a difficult enough exercise in the abstract; but striking that balance in practice and then maintaining it seems as much to elude our powers of management as those of our co-ordinate branches of government. The spectrum of views expressed by my colleagues demonstrates that disagreement on this fundamental problem underlies at least part of today's division of the Court, as it has others in the past. Doubtless I have, from time to time, contributed my share to what may strike some as this unseemly disarray. There is some solace to be found, however, in the recollection that

the subject is so vexatious as to have confounded judges more experienced and more learned than I.

Let me narrow the focus. What I seek to emphasize is this: society has yet to achieve agreement on the basic question of what it is our courts are expected to do; as a result of this uncertainty we may be accepting litigational burdens which, according to one commentator, are beyond the institutional capacity of the tribunals and the "cranial capacity" of the judges. This, from former Judge Simon H. Rifkind, who points out in his penetrating article, "Are We Asking Too Much of Our Courts?," 15 *Judges' J.* 43 (1976) (Address of Judge Rifkind at the April, 1976 "National Conference on the Causes of Popular Dissatisfaction with the Administration of Justice") (hereinafter "Rifkind"), that the judiciary has increasingly been solicited to become the problem-solver of our society, sort of its all-around handyman.

The American public today perceives courts as jacks-of-all-trades, available to furnish the answer to whatever may trouble us: Shall we build nuclear power plants, and if so, where? Shall the Concorde fly to our shores? How do we tailor dismissal and lay-off programs during the depression, without undoing all of the progress achieved during prosperity by anti-discrimination statutes? All these are now the continuous grist of the judicial mills.

Thus, it is not surprising to learn that a lawsuit was recently filed in the Southern District of New York seeking to prevent the United States Postal Service from issuing a commemorative stamp honoring Alexander Graham Bell — on the grounds that someone else invented the telephone.

[Rifkind, *supra*, at 44.]

The thrust of the Rifkind essay is that courts, being institutions of last resort, should be required to do nothing which other, less irreplaceable institutions can do as well, and should be preserved for doing that which cannot be done elsewhere.

Other institutions, in the other branches of government and outside of the government, must be evaluated to determine whether they can assume greater responsibility. The role of the courts should be

restricted to doing that which commands their special expertise, and to seeing that the other institutions do the jobs that they are supposed to do. There will continue to be dissatisfaction with the administration of justice as long as we promote the notion that the courts are the only place in which justice is administered.

[*Id.* at 50.]

In developing his theme Judge Rifkind dwells on the distinction between the traditional judicial function of "dispute-resolving," with its well-placed reliance on the adversary process, and "problem-solving," for which the adversary system is conspicuously ill-adapted. He cautions that

[p]roblem-solving is \* \* \* a chancy business requiring, in a democracy, not only wisdom and inventiveness but a keen perception of the political implications. Moreover, it imposes a duty upon the problem-solver to hear all those who have a significant interest in the problem. Very frequently the problem-solver tends to become a champion of a cause and not a neutral decider. His reward comes from popular acclaim, not from law review commendation. Despite this chasm which divides the problem-solver from the dispute resolver, there is a growing tendency to confuse the two.

On the campuses, voices are heard which look benignly upon those areas of our jurisprudence wherein courts have become problem-solvers. It is projected as the wave of the future. Indeed, new words have been coined to describe the new judicial role. Courts have become mini-legislatures. Judges now preside at proceedings in which there is no clear alignment of parties but at which all who have so-called significant interest may have their say, and indeed they should since the decree will directly affect them by judgment and not by precedent. Judges, being human, are not averse to their enlarged role and expanded responsibility. It is exhilarating to administer relief to a universe of victims, and if some are unknown and unknowable, then to distribute largesse to the deserving by application of the *cy-pres* doctrine in the fashion of Haroun Al-Rashid.[2]

---

[2]I take this last to represent a somewhat more generous characterization of a particular type of judge than the one furnished by Mr. Justice Rehnquist, who undoubtedly would find room for this hypothetical judicial confrere of Haroun Al-Rashid in a class of jurists consisting of

\* \* \* people attracted by the opportunity to throw their weight around, to tell other people what to do, to get their names in newspapers. The opportunity to write innovative opinions on constitutional questions which would be published in the West Reporter

\* \* \* \* \* \* \* \*

It is one thing for judges to decide bi-party controversies and, in so doing, pronounce principles which may have an effect on the solution of the underlying problem, sometimes favorable and sometimes unfavorable. It is another for the courts to be burdened with the responsibility for the solution of the problems.
[*Id.* at 46–47.]

As Justice Mountain has observed, the gravitation into the judicial machinery of causes better and more effectively dealt with elsewhere surely jeopardizes the judiciary's "power of legitimacy." See Mountain, J., concurring and dissenting, *ante* at 628; *cf. Robinson v. Cahill*, 70 *N. J.* 155, 163–64 (dissenting opinion of Mountain, J.). The concern he expresses is shared by many others. It has reached sufficient magnitude to prompt a recent feature or "cover" article in a national news magazine, which refers to the mounting influence of law and lawyers on American life as

\* \* \* one of the great unnoticed revolutions in U. S. history; the ever-increasing willingness, even eagerness, on the part of elected officials and private citizens to let the courts settle matters that were once settled by legislatures, executives, parents, teachers — or chance.
[*Newsweek*, Jan. 10, 1977, at 42.]

Dean Roger Cramton of Cornell Law School is quoted in the same article as posing the "critical question" of how, in a republic, "government by nonelected officials can be squared with representative democracy." *Id.* at 42–43. In the long run this phenomenon may very well bring on results which instead of being simply unfortunate or ugly become nothing short of calamitous, in the sense of dam-

---

system would make the other disadvantages of a judge's life pale into insignificance. In case you haven't recognized it, this type of person has an element of the zealot in him, and is far from an ideal judge.
[Rehnquist, "The Cult of the Robe," 15 *Judges' J.* 74, 77 (Address of Justice Rehnquist at the Judicial Administration Division's 1976 Annual Dinner in Honor of the Judiciary).]

aging not the courts alone but the whole fabric of the American system of government. We would do well to heed Judge Arlin M. Adams' sober warning:

> Democracy — and the judicial system in our democracy — will not, in my view, succumb to assassination. But it may succumb to an erosion of confidence from the disruptive and unwise arrogation of legislative power by institutions not suited to its exercise.
>
> [Adams, "Judicial restraint,
> the best medicine," 60
> *Judicature* 179, 182 (1976).]

## II

There is an additional point perhaps worth making here, and that is that in many instances the law is becoming "excessively complex, excessively sophisticated, unduly mysterious." Rifkind, *supra* at 50. The author refers specifically to the field of taxes, sensibly acknowledging that "[a]fter 50 years of practice, I would no more have the audacity to formulate my own tax return than I would engage in open heart surgery." *Id.*

It may be that the same excessive complexities and compounded anfractuosities are finding their way into our zoning-planning law. And elsewhere. I have no ready answer as to how that dilemma may be avoided as long, again, as the courts are looked to for ultimate solution of the kinds of problems presented by this case. An attempted solution too often seems to defy its articulation in a judicial opinion unfettered by distracting obfuscation. Reality thus becomes camouflaged.

While I do not for a moment labor under any misapprehension that the general public seeks out our pronouncements to savor the delights of fine English prose, the fact remains that our opinions in this field have to be read — and understood — by the bench and bar, particularly by lower court judges who must decide the next case; by attorneys representing municipal bodies, builders, developers, and public interest groups; by legal scholars and professionals in

the field; and probably by some conscientious non-lawyer members of governing bodies, planning boards, and boards of adjustment. Those readers are not likely to contemplate our current outpourings with complete serenity, much less great rejoicing.[3] Unless our determinations are susceptible of concise expression and clear interpretation, they can hardly act as a guide or aid in the predictive art. When it fails in that regard, the law has lost one of its indispensable characteristics. As Edwin Newman puts it, "We are all safer when language is specific. It improves our chances of knowing what is going on." E. Newman, *A Civil Tongue* 69 (1976).

## III

In referring earlier to the majority opinion I termed it an "effort." *Ante* at 631. My purpose has been to develop (albeit by leaning more heavily on excerpts from the works of others than on any original thinking) the proposition that it is the nature of the judicial enterprise which precludes any opinion in this case from being more than that — an effort — in the sense of furnishing a lasting solution. In no sense do I intend either by that label or by any of the ruminations offered herein to demean Judge Conford's remarkable accomplishment on behalf of the Court, gratuitously to sermonize my colleagues on this bench or elsewhere

---

[3]Perhaps we would fare better were those who must study our opinions endowed with a quality recently attributed to the English, which my own heritage may permit me to repeat. Harold Lever, Chancellor of the Duchy of Lancaster, is reported in the New York Times as having offered this appraisal:

When a policy is immediately disagreeable, the English believe it must produce ultimate and enduring benefit. If it is couched in language they cannot understand, they believe it to be the product of much learning. A conjunction of the unpleasant and the incomprehensible is therefore irresistable to Englishmen.

[N. Y. Times, Dec. 24, 1976,
at A2, col. 1 (late Jersey ed.).]

in the court system, or to recommend wholesale abdication of our proper responsibilities. Rather, I have used the occasion to draw attention to what must be considered a major, growing problem touching the foundation of our society.

> So long as modern life grows ever more complex, demands on the law will increase. That much is inevitable. And if Americans want to prevent their system of government from being changed in a fundamental manner, they will have to find ways in which to prevent every buck from being passed to a judge and every problem from being turned over to a lawyer. The U. S. has created the most sophisticated — and the fairest — legal process in the world. But the burdens are becoming intolerable.
>
> [*Newsweek, supra* at 47.]

Because the majority opinion seems to me to represent the best judicial accommodation of the present controversy to *Mount Laurel's* essential principles, I vote with it.

*For affirmance and remandment as modified*—Chief Justice HUGHES, Justices SULLIVAN and CLIFFORD and Judge CONFORD—4.

*Concurring in part and dissenting in part*—Justices MOUNTAIN, PASHMAN and SCHREIBER—3.